# 19-16618

# United States Court of Appeals
## FOR THE NINTH CIRCUIT

LYNN MOORE, SHANQUE KING, and JEFFREY AKWEI,

*Plaintiffs-Appellants*,

v.

TRADER JOE'S COMPANY,

*Defendant-Appellee*,

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

**BRIEF OF APPELLANTS LYNN MOORE, SHANQUE KING, AND JEFFREY AKWEI**

C.K. Lee, Esq.
**LEE LITIGATION GROUP, PLLC**
148 West 24th Street, Eighth Floor
New York, NY 10011
Tel.: 212-465-1188
Fax: 212-465-1181
Email: cklee@leelitigation.com

David Alan Makman, Esq.
**LAW OFFICES OF DAVID A. MAKMAN**
483 Seaport Court, Suite 103
Redwood City, CA 94063
Tel: 650-242-1560
Fax: 650-242-1547
Email: david@makmanlaw.com

**Counsel for Plaintiffs-Appellants**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ………………………………………………..ii

JURISDICTIONAL STATEMENT…………………………………………1

STATEMENT OF ISSUES PRESENTED FOR REVIEW……………………1

STATEMENT OF THE CASE ………………………………………………..2

  I.   Factual and Procedural Background …………………………………2

  II.  The District Court Decision ……………………………………………7

SUMMARY OF ARGUMENT …………………………………………10

ARGUMENT ……………………………………………………………11

  I.   The District Court Erred in Ruling that Trader Joe's Labels Are Not
Misleading ……………………………………………………………..11

      A.   Standard of Review……………………………………………11

      B.   Trader Joe's Argument…………………………………………11

      C.   Plaintiffs' Rebuttal …………………………………………..13

      D.   The District Court's Error …………………………………...19

  II.  The District Court Erred in Ruling that Plaintiffs' Claims
Are Preempted ………………………………………………………25

      A.   Standard of Review……………………………………………25

      B.   Plaintiffs' 100% Claims Are Not Preempted ………………………25

      C.   Plaintiffs' Ingredient Statement Claims Are Not Preempted………..27

CONCLUSION ……………………………………………………………34

# TABLE OF AUTHORITIES

## Cases

*Altria Grp., Inc. v. Good*,
  555 U.S. 70 (2008) ............................................................................... 36

*Beaver v. Tarsadia Hotels*,
  816 F.3d 1170 (9th Cir. 2016) .............................................................. 36

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ....................................................................... 22, 23

*Bimont v. Unilever U.S., Inc.*,
  No. 14-CV-7749 (JPO), 2015 U.S. Dist. LEXIS 119908 (S.D.N.Y. Sep. 9, 2015)
  ............................................................................................................. 29

*Cal. Ins. Guarantee Association v. Azar*,
  Nos. 17-56526, 17-56528, 2019 U.S. App. LEXIS 30339 (9th Cir. May 16,
  2019) ................................................................................................... 36

*Hawkins v. Kroger Co.*,
  906 F.3d 763 (9th Cir. 2018) ......................................................... 28, 32

*Hill v. Roll Int'l Corp.*,
  128 Cal. Rptr. 3d 109 (Cal. Ct. App. 2011) .......................................... 18

*In re 100% Grated Parmesan Cheese Mktg. & Sales Practices Litig.*,
  275 F. Supp. 3d 910 (N.D. Ill. 2017) .................................................... 18

*Linear Technology Corp. v. Applied Materials, Inc*.,
  152 Cal.App.4th 115 (2007) .................................................................. 27

*McKell v. Washington Mutual, Inc.*,
  142 Cal.App.4th 1457 (2006) ............................................................... 27

*Sciortino v. PepsiCo, Inc.*,
  108 F. Supp. 3d 780 (N.D. Cal. 2015) .................................................. 35

*Starr v. Baca*,
  652 F.3d 1202 (9th Cir. 2011) ....................................................... 12, 27

*Tran v. Sioux Honey Ass'n, Coop.*,
  17-cv-110, 2018 U.S. Dist. LEXIS 146380 (C.D. Cal. Aug. 20, 2018) ........ 25, 29

*Werbel v. Pepsico, Inc.*,
  No. C 09-04456 SBA, 2010 U.S. Dist. LEXIS 76289 (N.D. Cal. July 1, 2010)..26

*Williams v. Gerber Prods. Co.*,
  523 F.3d 934 (9th Cir. 2008) ................................................................27

**Statutes**

21 U.S.C. § 342(b) ............................................................ 4, 7, 11, 28

28 U.S.C. § 1291 ...................................................................................1

28 U.S.C. § 1332(d) .............................................................................1

Cal. Bus. & Prof Code § 17200 .........................................................3

Cal. Bus. & Prof. Code § 17500 ........................................................3

Cal. Civ. Code § 1750 .........................................................................3

California Health & Safety Code § 110585 .......................................4

N.C. Gen. Stat. § 14-117 .....................................................................3

N.C. Gen. Stat. § 75-1.1 ......................................................................3

N.Y. Gen. Bus. Law § 349 ...................................................................3

N.Y. Gen. Bus. Law § 350 ...................................................................3

**Other Authorities**

*Proper Labeling of Honey and Honey Products: Guidance for Industry* (Feb. 2018)
  .................................................................................................4, 30

**Rules**

Fed. R. Civ. P. 12(b)(6)......................................................................12

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction pursuant to 28 U.S.C. § 1332(d) because two of the named Plaintiffs are citizens of New York and North Carolina, while Defendant is a California corporation with its principal place of business in Monrovia, California. ER217. The requisite amount in controversy exists because Plaintiffs alleged a class of over 100 members, and the claims of class members exceed $5,000,000 in the aggregate. ER215.

This Court has jurisdiction pursuant to 28 U.S.C. § 1291 because the District Court entered an Order granting Defendant's motion to dismiss on all of Plaintiffs' claims on June 24, 2019, ER142, and a Final Judgment consistent with that Order, also on June 24, 2019. ER27. Plaintiffs timely filed their notice of appeal on August 16, 2019, ER1, after the District Court granted their motion for an extension of time to file it on August 13, 2019. ER14.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1. Whether the District Court erred in holding that the "100% New Zealand Manuka Honey" statement on Defendant's label is not misleading as a matter of law;

2. Whether the District Court erred in holding the Defendant's practice of listing "Manuka Honey" as the sole ingredient in the Product's ingredients statement is not misleading as a matter of law;

1

3. Whether the District Court erred in holding that Plaintiffs' claims as to (1) and (2) are preempted by federal law.

## STATEMENT OF THE CASE

This appeal arises out of the June 24, 2019 Order and Judgment of the United District Court for the Northern District of California granting Defendant Trader Joe's Company's motion to dismiss Plaintiffs First Amended Class Action Complaint, without leave to amend.

### I. Factual and Procedural Background

On July 20, 2018, Plaintiffs Lynn Moore, Shanque King, and Jeffrey Akwei (collectively, "Plaintiffs") filed a Class Action Complaint ("Complaint") in the United States District Court for the Northern District of California alleging that Defendant Trader Joe's Company ("Trader Joe's" or "Defendant") engaged in deceptive practices in the marketing and sale of its Trader Joe's Manuka Honey (the "Product"). ER264. Some of the front labels state that the Product is "100% New Zealand Manuka Honey" while others state only "New Zealand Manuka Honey." ER267. Regardless of whether the "100%" representation is present, the ingredients statement on every Product unit lists "Manuka Honey" as the sole ingredient. ER268. Plaintiffs alleged that reasonable consumers viewing the 100% representation and/or the ingredients statement would be led to conclude that the Product consists entirely of manuka honey without admixture of any other kinds of honeys.

2

However, Plaintiffs' testing revealed that the Product is only about 60% manuka honey, with the remainder consisting of various other honey ingredients. ER274-275. So, no matter what part of the label consumers encounter, they will have been deceived. Manuka honey is not the only ingredient in the Product. The Product is not 100% manuka honey. Given the rarity and expense of manuka honey, as well as the medicinal/health benefits for which it is sought, misrepresenting the Product's purity has a material bearing on its value for reasonable consumers. Plaintiffs alleged that they purchased the Product in reliance on the label misrepresentations and were financially injured after being were deprived of the benefit of their bargains, with the value of the Products as delivered being significantly lower than its value as warranted (the "Mislabeling Allegations").

Plaintiffs brought claims under California's Consumer Legal Remedies Act, Cal. Civ. Code § 1750, et seq.; California's Unfair Competition Law, Cal. Bus. & Prof Code § 17200, et seq.; California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, et seq.; New York's Deceptive Acts and Practices Act, N.Y. Gen. Bus. Law § 349, et seq.; New York's False Advertising, N.Y. Gen. Bus. Law § 350, et seq.; North Carolina's Unfair and Deceptive Practices Act, N.C. Gen. Stat. § 75-1.1, et seq; North Carolina's Fraudulent and Deceptive Advertising Law, N.C. Gen. Stat. § 14-117, et seq.; Common Law Fraud; and Breach of Express Warranties.

On December 21, 2018, Plaintiffs filed their First Amended Class Action Complaint ("Amended Complaint"), which supplemented the Mislabeling Allegations in the original Complaint with the additional allegation that the Product had been adulterated in violation of 21 U.S.C. § 342(b) and California's Sherman Food, Drug, and Cosmetic Law, California Health & Safety Code § 110585 (the "Adulteration Allegations"). ER213. Both of these laws provide that a food is adulterated:

> (a) If any valuable constituent has been in whole or in part omitted or abstracted therefrom.
> (b) If any substance has been substituted wholly or in part therefor.
> (c) If damage or inferiority has been concealed in any manner.
> (d) If any substance has been added thereto or mixed or packed therewith so as to increase its bulk or weight or reduce its quality or strength or make it appear better or of greater value than it is.

*Id.*

Accordingly, the Amended Complaint argued:

> Defendant's production process constitutes adulteration because it amalgamates honey from many different hives and only afterwards measures the manuka honey content of the mixture. Defendant thereby deliberately adulterates high-manuka honey by diluting it with less valuable low-manuka honey to enable it to market the admixture as "manuka honey." This is adulteration because cheaper honey "has been substituted for some of the honey so as to increase its bulk or weight."

ER224 (quoting FDA, *Proper Labeling of Honey and Honey Products: Guidance for Industry* (Feb. 2018) ("FDA Honey Guidance") (ER324)

The Amended Complaint alleged that the Product had been misbranded as "manuka honey" when it was in fact a blended honey that should have been labeled as such:

> Under both Federal law and the consumer protection laws of the states, Defendant's honey is mislabeled and falsely advertised. The common or usual name of the product sold by Defendant is "Manuka-based honey blend," and its statement of identity must correspond to that description, so the Product is misnamed, misrepresented, and falsely advertised when advertised as "Manuka Honey." Defendant advertises pure Manuka honey, but does not deliver it, instead delivering an inferior Manuka-based blend. The sale of the mislabeled products was unfair and unlawful. Put another way, Defendant sells adulterated manuka honey. This would be actionable even if consumers were not actually deceived.

ER213-214.

As to the Adulteration Allegations, Defendant argued in its motion to dismiss that Plaintiffs' testing, according to which the Product contains approximately 40% non-manuka pollen, did not support a finding of adulteration:

> [T]he presence of other pollens does not support a reasonable inference that the pollens were introduced by mixing less costly honeys with manuka honey.

ER158.

> These allegations carry the opposite inference than Plaintiffs wish to draw: It is much more likely the Product contains pollen from sources other than the manuka flower not because it is the product of mixing two varieties of honey but because the bees that produced it collected nectar from other flowers, in addition to manuka.

ER159.

Citing the FDA Honey Guidance, Defendant argued that it was legally permitted to label the Product "Manuka Honey" even if it contained significant non-manuka honey so long as manuka honey is the Product's "chief floral source," which Defendant contended was confirmed by Plaintiffs' own testing, according to which the Product consists of approximately 60% manuka honey. ER169.

As to the Mislabeling Allegations, Defendant argued that its ingredient statement was lawful because "[n]o reasonable consumer would expect a product labeled 'manuka honey'—or 'clover honey" or "orange blossom honey'—to contain pollen from exclusively the manuka flower, clover, or orange blossom." ER86. Responding to Plaintiffs' allegation that "100% New Zealand Manuka Honey" is misleading given that only 60% of the honey is actually manuka, Defendant argued that reasonable consumers could deduce that the Product was not 100% manuka honey from (1) their general knowledge of bee foraging behavior, which cannot be restricted to a single plant type, (2) the Product's $13.99 price tag, *see* ER164, and (3) the "10+" on the front label. *See* ER162-163. These arguments and Plaintiffs' rejection of them are detailed below.

Defendant also argued that "Plaintiffs' ingredient-statement claims about the listing of 'manuka honey' as the sole ingredient are expressly preempted because the Products comply with federal ingredient list requirements by listing the single ingredient by its common or usual name." ER166-167.

## II.    The District Court Decision

The District Court's Order concluded that the Adulteration Allegations had

not been sufficiently pled:

> As currently alleged, Plaintiffs do not clearly state that the honey mixed
> with the high value manuka honey cannot be independently labeled
> manuka honey prior to the amalgamation. Instead, as pled, it appears
> that both honeys can be legally identified as manuka honey, which
> means that the chief floral ingredient prior to mixing is manuka.

ER32.

Recounting the discussion at the motion hearing, the Order observed:

> In sum, Plaintiffs clarified that their adulteration theory is premised on
> the bees visiting different floral sources and returning to the hive
> resulting in a lower manuka pollen count, rather than the manufacturer
> purposefully mixing manuka honey with non-manuka honey. To
> constitute adulteration under 21 U.S.C. § 342(b), the manufacturer or
> bottler would have to purposefully mix manuka honey with non-
> manuka honey. As there is no dispute that all of the honey involved is
> technically manuka honey, albeit with varying pollen counts, there
> cannot be adulteration in violation of the FDCA.

ER33.

As to their Mislabeling Claims, Plaintiffs argued at the hearing that these

existed separate and apart from their Adulteration Claims.  Irrespective of whether

the Product had been adulterated, "100% New Zealand Manuka Honey" and listing

manuka honey as the sole ingredient remain misleading to a reasonable consumer:

> Now, they've advertised and represented to consumers that all they're
> selling in the bottle is a hundred-percent manuka honey, irregardless of
> how they actually harvest the honey from the bees. It's not up to the
> consumers to decide, Oh, it says a hundred percent but maybe it's

actually not a hundred percent because it's only the chief floral contributor to the product. The consumer just assumes what the manufacturer is saying is going to be correct and that it's a hundred-percent honey.

The defendant's argument is that oh, like -- when they say no -- nobody can assume that they can control the bees and the bees only go to the manuka flowers and not to the clovers, that's not the – that's not the consumer's problem. The consumer just relies on the label.

So our argument is that the label is not accurate. Whether you call it adulteration or fraud or something else, what it is basically is a misrepresentation.

ER40.

As noted above, Trader Joe's had argued that it was entitled to label the Product "Manuka Honey" notwithstanding the significant presence of other honey types because manuka honey is the Product's "chief floral source." However, Plaintiffs argued at the hearing that, even if "Manuka Honey" was permissible as per FDA regulations, it did not follow that "100% Manuka Honey" was lawful and non-misleading

Again, that's – that's kind of like saying their bottle is a hundred-percent manuka honey because they call it "Manuka Honey." We know the floral sources vary. The floral sources vary.

ER63.

They're obligated to say it's not a hundred-percent manuka or at least -- or not to say anything. They don't have to say anything. All they had to do was say "Manuka Honey," and that's it. Okay?

ER66.

Trader Joe's argued that it was not required to list every kind of pollen in the ingredients statement, given that the FDA does not even require an ingredient statement of any kind for honey products. Plaintiffs did not take issue with this but argued that the possibility of dispensing with an ingredients statement altogether did not give Trader Joe's license to misleadingly list "Manuka Honey" as the sole ingredient, when it could have simply listed the non-misleading "Honey":

> And on the ingredients, they -- all they had to do was say either "honey" or if they say "manuka honey," then they need to say what the other floral sources are, but they're trying to be more specific and give more information that falsely gives people a sense that the product is more pure.

ER66.

However, the District Court held that the Mislabeling Allegations should be dismissed on the basis of Plaintiffs' failure to adequately plead their Adulteration Allegations:

> Since Plaintiffs cannot allege adulteration, honey is a single ingredient food, and the chief floral source is undisputedly manuka, the product labeling is accurate. Given the accuracy of the label, a reasonable consumer could not find it misleading, because it is not.

ER34.

> Defendant argues that Plaintiffs have not sufficiently pled that Trader Joe's engaged in fraud by way of adulteration. (Def.'s Mot. at 15.) The Court agrees. The fraud cause of action is predicated on a valid adulteration theory—one in which humans (not bees) purposefully mix non-manuka honey with manuka honey.

ER35.

This [breach of warranty] claim must be dismissed for the same reasons as the fraud and other consumer causes of action—for failure to properly plead adulteration.

ER35.

The District Court additionally ruled that Plaintiffs' "state law causes of action are preempted by federal law" because "Plaintiffs are not alleging adulteration in violation of federal law." ER34.

## SUMMARY OF ARGUMENT

The District Court erred that Plaintiffs failed to adequately plead their Mislabeling Allegations because it erred in holding that "the fraud cause of action is predicated on a valid adulteration theory." The question of whether either (1) "100% New Zealand Manuka Honey" or (2) listing manuka honey as the only ingredient is deceptive exists separate and apart from questions about whether the honey harvesting process that produced the Product constitutes adulteration under 21 U.S.C. § 342(b).

That Trader Joe's may have been entitled to label the Product "Manuka Honey" does not somehow make "100% Manuka Honey" non-deceptive as a matter of law. Plaintiffs alleged that only about 60% of the Product consisted of actual manuka honey and that the "100%" representation and ingredient statement would mislead reasonable consumers to believe otherwise. The District Court erred in concluding that these matters were disposed of by Plaintiffs' failure to plead

adulteration. How the honey in the Product was harvested and produced is one question. What the Product consists of and whether this is accurately reflected in the labeling is another entirely. The District Court additionally erred in holding that Plaintiffs' claims were preempted, likewise by virtue of their failure to plead adulteration. Trader Joe's "100%" representation and ingredient statement are not expressly or impliedly authorized by federal law. Accordingly, Plaintiffs' claims are not preempted.

## **ARGUMENT**

### **I.  The District Court Erred in Ruling that Trader Joe's Labels Are Not Misleading**

#### **A.  Standard of Review**

A district court's dismissal of a claim under Fed. R. Civ. P. 12(b)(6) of the Federal Rules of Civil Procedure is subject to de novo review. *Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011).

#### **B.  Trader Joe's Argument**

Defendant argued in its motion that Plaintiffs' claims fail because no reasonable consumer could believe that the Product consists exclusively of manuka honey, contending that "[r]easonable consumers of honey products do not expect that when they buy clover honey, orange blossom honey, or manuka honey, they are paying for honey that is produced exclusively from the nectar of clovers, orange blossoms, or manuka flowers." ER162. Yet it remains the case that manuka honey

is the only ingredient listed and that many of the Product labels state "100% New Zealand Manuka Honey." Nevertheless, Trader Joe's insisted that while its Product "is 100% manuka honey, … this does not imply… it contains exclusively manuka pollen." ER88. "The Product is 100% manuka honey even if its pollen count is not 100%," Defendant insisted. ER87.

Trader Joe's advanced a series of implausible arguments for its counterintuitive contention that reasonable consumers would not construe "100%" as referring to the percentage of manuka as opposed to other kinds of honey, including (1) the nature of bee foraging behavior, (2) the "10+" printed on the label, and (3) the Product's price tag of $13.99. As detailed below, all three lines of argument are unpersuasive, presupposing as they do specialized industry-knowledge that cannot fairly be imputed to the reasonable consumer.

According to Trader Joe's "[o]ne need not be a beekeeper to understand that it is impossible to keep bees from foraging on numerous types of flowers." ER89. So, "[a] reasonable consumer would not expect the Product to contain only honey from the nectar of manuka flowers." ER161.  Trader Joe's also argued that since "[r]easonable consumers of specialty products are familiar with common traits of those products,… a reasonable consumer of manuka honey would understand the Product's purity based on its grading under UMF standards." ER163.  Thus, consumers would also understand that the Product's "purity rating—a 10+ grading

under Unique Manuka Factor ("UMF") standards" is "much lower than that of other manuka honeys," and from this infer that the Product "has less manuka content than products with higher ratings, like 15+ or 22+." ER161. Lastly, Trader Joe's argued that the Product's relatively inexpensive price tag apprises reasonable consumers that 100% manuka does not mean 100% manuka pollen: "A reasonable consumer of manuka honey would not expect that a product priced at $13.99 would contain almost 100% manuka pollen because such a product would be many times more expensive." ER164.

### C. Plaintiffs' Rebuttal

Plaintiffs explained both in their brief and at the motion hearing why Trader Joe's attempts to minimize the significance of its "100%" representation are unconvincing. Defendant argued that Plaintiffs' claims are undermined by their supposed concession that "[r]easonable consumers know that the concentration of manuka as opposed to other honey pollens can vary significantly from brand to brand depending on what measures have been taken to maximize manuka purity." ER89 (Quoting ER219). But while reasonable consumers of manuka honey may know that different brands are characterized by varying degrees of purity, they are not beekeepers with first-hand knowledge of the challenges involved in directing bees' pollinating behaviors in New Zealand. Even if they know that bees cannot simply be ordered to restrict their foraging behaviors to certain plants, they do not know that

these behaviors cannot be controlled through various artifices, and they certainly cannot be expected to know the make-up of the plant life in the particular region of New Zealand where the honey for the Product is sourced—as they do not even know where this region is. They also do not know that the beehives have not been situated in areas populated exclusively by manuka plants. Lacking all such knowledge, they naturally rely on the representations of the manufacturer, which tell them that the Products are 100% manuka honey.

The notion that the "10+" printed on the Product label will apprise reasonable consumers of this fact is just as fanciful. Reasonable consumers of manuka honey may know that manuka purity varies from brand to brand. But this general understanding does not entail familiarity with the UMF grading system invoked by Trader Joe's. Trader Joe's did not actually obtain UMF certification for the Product, as it acknowledged at the motion hearing when it conceded that "the jars that were purchased by the plaintiffs did not have the UMF registration on it or the UMF registration number on it." ER67. Had it been otherwise, Trader Joe's might have argued that reasonable consumers can go to the UMF website and look up the meaning of "10+." But a bare "10+" is in fact all they see, with no elucidation of either its meaning or where to discover it. As Plaintiffs observed at the hearing: "So the 10 plus means nothing because it only means something if it's UMF certified. They're just randomly putting numbers on there and having people think that's the

14

high pollen count when it's not. It's not certified. It's deceptive." ER70. Reasonable consumers will either ascribe no significance to "10+" or conclude that it denotes a high manuka content, given the cultural practice of grading things on a one-to-ten scale. Certainly, the "10+" would not allow them to deduce that "100%" manuka could not possibly denote the amount of manuka pollen and nectar actually present in the Product.

The District Court granted Trader Joe's request for judicial notice of web content from the manuka manufacturer, *Bees and Trees*, see ER30, which Trader Joe's attached as Exhibit 2 to Declaration of Collins Kilgore. ER182. *Bees and Trees* observed:

> There are only two way proper and legal ways to label Manuka Honey:
>
> 1. Manuka Honey should be labeled with the actual MG[1] test results (in mg/kg), or
> 2. Manuka Honey should be labeled with a rating on the UMF (Unique Manuka Factor) scale.
>
> We label our honey with the actual MG results, and choose not to participate in the UMF organization, which is mostly marketing hype, and is heavily influenced by one of the large Manuka honey packers. If you see anything else on a label of honey purporting to be Manuka Honey, it's likely illegitimate.

ER185-186

---

[1] MG stands for Methylglyoxal, the chemical responsible for manuka honey's antibacterial properties.

Thus, even the authority endorsed by Trader Joe's attests that the latter's mysterious "10+" representation as meaningless. Further, Defendant is really comparing apples to oranges in invoking the UMF grading system, since UMF measures bioactivity associated with manuka honey, not manuka honey purity. Different batches of manuka honey have different levels of bioactivity independent of their purity. *Bees and Trees* notes that manuka honey's bioactivity increases with age. ER185. So, depending on how long the honey has aged, a low-purity batch could still have a high UMF rating, and vice versa. Since the correlation between purity and UMF (or any other manuka grading system) is imperfect at best, the one cannot be deduced from the other.

Defendant also argued that the Product's supposedly modest price tag alerts consumers that its 100% representation could not refer to the percentage of the Product physically consisting of manuka honey. But reasonable consumers are not knowledgeable industry-insiders with the wherewithal to deduce a honey's actual manuka content from its price, especially when Trader Joe's store-brand manuka honey does not sit alongside other brands with which it could be compared. As Plaintiffs underscored in their brief, it is common knowledge that Trader Joe's enjoys unique business operational efficiencies that lower costs by cutting out middlemen. Consumers routinely patronize Trader Joe's in the expectation of discovering high-quality products at discounted prices. ER111. Thus, what Trader

Joe's argues is the Product's competitive price would not suffice to offset the misapprehension generated by Defendant's explicit representations that the Product is "100% New Zealand Manuka Honey" or that manuka honey is its sole ingredient.

Trader Joe's brief cited *In re 100% Grated Parmesan Cheese Mktg. & Sales Practices Litig*., 275 F. Supp. 3d 910, 926 (N.D. Ill. 2017), where the court held that "100% Grated Parmesan Cheese" could mean either (1) that the product was entirely cheese or (2) merely that all of the cheese therein had been grated, and that reasonable consumers could resolve the ambiguity by looking to the ingredients statement, which clarified that cheese was not the product's sole ingredient. ER162-163. The obvious difference with the instant action is that nothing on the Product label disabuses consumers of the impression that the Product is 100% manuka honey. The ingredient statement lists only manuka honey, thus reinforcing the deception created by the front label.

Defendant's argument boiled down to the proposition that the deceptiveness its express misrepresentations regarding the Product's manuka content, issued on both the front label and/or the ingredients list, should somehow be offset by mere inferences made on the basis of a meaningless "10+" designation and consumers' presumed knowledge of beekeeping practices and manuka economics. Defendant insisted that "[t]he 'reasonable consumer' is not the 'least sophisticated' or 'unwary' consumer." ER160 (quoting *Hill v. Roll Int'l Corp*., 128 Cal. Rptr. 3d 109, 115–16

(Cal. Ct. App. 2011)). But as *Hill* also observed, nor is the reasonable consumer presumed to be "exceptionally acute and sophisticated." *Id.* Whatever their presumed level of sophistication, reasonable consumers are entitled to take a manufacturer's express representations at face value on the assumption that laws against consumer fraud are being heeded. They are not required to embark on the series of elaborate inferential leaps that Trader Joe's would demand of them.

Trader Joe's maintained that "[l]abeling the Product as 'manuka honey,' either on the ingredient statement or the front-facing label, does not represent that it contains exclusively manuka pollen, but rather—in line with FDA guidance—that manuka is its chief floral source." ER87. However, the issue is not whether reasonable consumers would expect a product labeled "Manuka Honey" to consist entirely of Manuka honey but whether they would be led to this conclusion upon viewing "100% New Zealand Manuka Honey." Even assuming *arguendo* that reasonable consumer would think it unlikely for "Manuka Honey" to consist in pure manuka honey <u>as a general matter</u>, they would be persuaded that this is in fact so in the <u>specific context</u> of Defendant's explicit 100% and ingredient statement representations. Defendant purposefully misrepresents the content of the Products and then places the burden on consumers to see past its deceptions by engaging in a series of attenuated deductions. Defendant proffers that reasonable consumers know better than to believe its outright lies and be given to understand that manuka is

18

simply the honey's chief floral source. But reasonable consumers have no acquaintance with the FDA Honey Guidance from which this concept derives. Absent such familiarity, the counterintuitive thought that "100%," or listing manuka as the sole ingredient, means nothing more than "chief floral source" would not cross their minds (this might be irrelevant if Defendant's labeling practices were expressly authorized by the FDA Guidance, but as detailed in Section II.B, they are not).

### D.    The District Court's Error

The District Court erroneously concluded that "[t]he fraud cause of action is predicated on a valid adulteration theory." ER35. But whether Trader Joe's manuka harvesting process constitutes unlawful adulteration has no logical bearing on the arguments just canvassed, which the District Court erroneously failed to address on the mistaken premise that they were disposed of by the failure to plead adulteration. Plaintiffs argued that representing the Product as "100% New Zealand Manuka Honey" with manuka honey as the sole ingredient is deceptive when only about 60% of the pollen is manuka. That this 60% may be the outcome of a lawful harvesting process rather than adulteration in no way undermines the deception claim.

The District Court acknowledged Plaintiffs' arguments at a few points during the motion hearing:

> Is there something misleading, though, about having "One-Hundred-Percent Manuka Honey" on there as opposed to just "Manuka Honey"?

ER49.

> Let me just make sure I understand. So based on the FDA regulations, you agree that since it's over 50 percent manuka honey, it's okay to call it "Manuka Honey," but the thing you have an issue with is the labeling that it's one-hundred-percent manuka honey and then the ingredients don't list anything other than manuka honey?

ER43.

Yet the Order did not actually weigh in on these issues and instead rested exclusively on Plaintiffs' failure to plead adulteration, which as explained above does not dispose of the underlying question concerning what "100% Manuka Honey" or listing manuka honey as the sole ingredient conveys to a reasonable consumer.

Having elided these matters, the District Court issued pronouncements that are clearly erroneous on their face, such as: "Defendant's product is accurately labeled 100% manuka honey, which is consistent with Plaintiffs' own testing of the two product samples." ER34. This is plainly false, as the testing revealed the Product to be approximately 60% manuka honey. And the District Court erred when it concluded that 100% and 60% mean the same thing in the eyes of reasonable consumers.

Logically, "100%" could be truthful only if it means that the Product contains enough manuka for the latter to qualify as its "chief floral ingredient" under FDA regulations. But reasonable consumers unfamiliar with the FDA Honey Guidance are infinitely more likely to interpret the claim as referring to the Product's manuka

pollen content—the fraction of the Product that *physically*, *not legally*, consists of manuka. As the Amended Complaint documented, other manuka honey distributors will sometimes reference the percent manuka pollen on their products' front labels to gain marketing advantage, ER223, confirming that reasonable consumers will interpret Defendant's 100% representations in just this way.

Plaintiffs need only "nudge" their allegations "across the line from conceivable to plausible," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 548 (2007), and assert factual allegations sufficient "to raise a right to relief above the speculative level." *Id*. at 555 (2007). The fact that manuka honey producers routinely tout purity levels to market their products alone suffices for this. Indeed, the District Court itself acknowledged the marketing appeal of manuka percentage representations at the hearing:

> Right. But the guidelines allow it to be called "Manuka Honey" if it's over 50 percent. So you can charge more money if it comes out to be 90 percent or a hundred percent, you know, so it's more valuable because then you have a higher level of purity, but it's still manuka honey. So it's not false to say that it's "One-Hundred-Percent Manuka Honey" if it's -- if it's still classified as "Manuka Honey," even though there are different pollen sources within it.

ER63-64.

The District Court was in contradiction with itself here. On the one hand, 100% just means the same thing as "over 50%." On the other, 100% (or 90%) makes the Product appear more valuable than it would otherwise be. Reasonable consumers do

not hold such contradictory views and will interpret "100% Manuka Honey" as conveying something over and above "Manuka Honey" on the assumption that "100%" is not just idle surplusage and is rather intended to communicate something about the comparative purity of the Product. Hence the District Court's concession that "you can charge more money if it comes out to be 90 percent or a hundred percent, you know, so it's more valuable because then you have a higher level of purity." ER63-64. Reasonable consumers will also entertain such thoughts upon being exposed to the Product labeling. That the Product was not adulterated does not forestall the ensuing misapprehension that the Product is purer and hence more valuable than it actually is.

In a case that strongly echoes the instant action, defendant honey manufacturer Sioux Honey argued in the same vein as Trader Joe's that reasonable consumers would know better than to take its "Pure" or "100% Pure" label claims literally, given certain known features of bee behavior:

> Nonetheless, Sioux Honey contends that Tran's claims fall into the category of such rare cases and may be dismissed as a matter of law. Sioux Honey claims that no reasonable consumer would interpret "Pure" or "100% Pure" to mean that a food product is entirely free from any trace amount of pesticide or herbicide. (Mem. at 11.) It claims that reasonable consumers are aware of how honey is produced, and they understand that trace amounts of pesticides will make their way into the honey from the bees' interaction with the modern world. (*Id.* at 15-16.) According to Sioux Honey, "100% Pure" means that "no artificial or synthetic ingredients have been mixed with the food product after harvest," and "Pure" means "no additives or additional ingredients were

added that adulterate the single food product." (*Id.* at 16.) Essentially, Sioux Honey contends that because any glyphosate in the honey is the result of the natural process of bees interacting with agriculture containing glyphosate and not due to Sioux Honey's production process, the products are in fact "Pure" or "100% Pure" and labeling them as such is not deceptive to reasonable consumers.

*Tran v. Sioux Honey Ass'n, Coop.*, 17-cv-110, 2018 U.S. Dist. LEXIS 146380, at *12-13 (C.D. Cal. Aug. 20, 2018)

The *Tran* court rejected these arguments, however, finding it "not so clear that reasonable consumers would understand '100% Pure' and 'Pure' as Sioux Honey contends they would." *Id.* at. *13. Trader Joe's and the District Court concur that the Product could not have been mislabeled so long as it was bees rather than human design that was responsible for the non-manuka content. But like Plaintiffs, the *Tran* court correctly discerned that adulteration and misrepresented purity were entirely separate issues. Based on reasonable consumers' understanding of "100% Pure" and "Pure," it "would not appear to matter whether an artificial or synthetic ingredient, such as glyphosate, was mixed into honey 'after harvest' or whether honey bees unwittingly introduced the ingredient into the honey as they were making it." *Id.* at *14.

The District Court held that, so long as Trader Joe's is authorized to label the Product "Manuka Honey," it is also authorized to label it "100% Manuka Honey." Against this, Plaintiffs have argued that these do not mean the same thing in the eyes of reasonable consumers. And in the same vein, the *Tran* court rejected defendant's

argument that "as a matter of law that any product that meets specified organic standards can be advertised as '100% Natural' or, in this case, '100% Pure' without misleading consumers," because "[w]hether the standards for 'organic' and 'pure' are necessarily aligned in the minds of reasonable consumers is an issue of fact." *Id.* at 17. It is also an issue of fact whether reasonable consumers view "100% Manuka Honey" and "Manuka Honey" as meaning one and the same thing because their interpretive lens is "aligned" with the FDA Honey Guidance—with which they are of course unacquainted. The Product is "100% Manuka Honey" only in the attenuated legalistic sense that the FDA Honey Guidance may authorize Trader Joe's to market each and every tablespoon of honey in the Product as "Manuka Honey" notwithstanding that 40% of the honey is non-manuka. But it is exceedingly doubtful that this is what reasonable consumers—who are not "exceptionally acute and sophisticated"—are thinking upon being exposed to "100% New Zealand Manuka Honey." At a minimum, the question should not have been decided on a motion to dismiss.

*Trans* was consistent with the longstanding principle guiding courts in the consumer fraud context, which is to look upon motions to dismiss with disfavor and grant them seldomly. The District Court erred when it departed from this principle on the basis of dubious assumptions that it did not even straightforwardly articulate. *See Werbel v. Pepsico, Inc.*, No. C 09-04456 SBA, 2010 U.S. Dist. LEXIS 76289,

at *8 (N.D. Cal. July 1, 2010) ("The question of whether a business practice is deceptive generally presents a question of fact not suited for resolution on a motion to dismiss."); *Williams v. Gerber Prods. Co.*, 523 F.3d 934, 939 (9th Cir. 2008) ("The facts of this case, on the other hand, do not amount to the rare situation in which granting a motion to dismiss is appropriate."); *Linear Technology Corp. v. Applied Materials, Inc.*, 152 Cal.App.4th 115, 134-35 (2007) ("Whether a practice is deceptive, fraudulent, or unfair is generally a question of fact which requires 'consideration and weighing of evidence from both sides' and which usually cannot be made on demurrer.") (quoting *McKell v. Washington Mutual, Inc.*, 142 Cal.App.4th 1457, 1472 (2006)).

## II. The District Court Erred in Ruling that Plaintiffs' Claims Are Preempted

### A. Standard of Review

A district court's dismissal of a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure is subject to de novo review. *Starr*, 652 F.3d at 1205.

### B. Plaintiffs' 100% Claims Are Not Preempted

The question of whether a reasonable consumer would be deceived by Trader Joe's labeling would of course be immaterial if Plaintiffs' claims were preempted by federal law. And the District Court held that indeed they are. But as with the reasonable consumer question addressed above, this ruling was defended solely on the basis of Plaintiffs' failure to plead adulteration: "Plaintiffs are not alleging

25

adulteration in violation of federal law… As a result, the state law causes of action are preempted by federal law and must be dismissed." ER34. The District Court thereby repeated the error of confounding two logically unrelated questions. The issue of adulteration does not speak to that of preemption any more than it speaks to the mislabeling. Whether Trader Joe's committed any or none of the five violations listed under 21 U.S.C. § 342(b) has nothing to do with whether its label and ingredient statement were authorized or required under federal law. 21 U.S.C. § 342(b) includes no provisions regarding how to label honey.

The District Court held that "compliance with the Honey Guidance constitutes compliance with the Federal Food, Drug, and Cosmetic Act." ER31. Yet the FDA Honey Guidance is silent as to Trader Joe's "100%" labeling.  As Plaintiffs have repeatedly stressed, the issue is not the "Manuka Honey" representation but the latter as qualified by "100%." It is true that "if FDA regulations expressly permit [a] claim . . . on the face of a product's packaging, any state law claim to the contrary would be preempted." *Hawkins v. Kroger Co.*, 906 F.3d 763, 770 (9th Cir. 2018). *See* ER115.  But there is no federal law or regulation describing the conditions under which a honey may be characterized as "100%." The FDA Honey Guidance may preempt the claim that "Manuka Honey" is deceptive if we assume that manuka is indeed the Product's chief floral source, but it is silent as to the 100% representation, or any percentage representations for that matter. Accordingly, Plaintiffs' claim that

this is deceptive is not preempted. Federal law does not regulate purity representations on honey products. *See Bimont v. Unilever U.S., Inc.*, 14-cv-7749, 2015 U.S. Dist. LEXIS 119908, at *6 (S.D.N.Y. Sep. 9, 2015) ("preemption does not preclude a state-law claim if the state requirement is outside the scope of the relevant federal requirements.").

The defendant in *Tran*, discussed above, likewise argued that claims alleging that its "Pure" and "100% Pure" were deceptive were preempted. Yet that court rejected this contention for the same reason Plaintiffs urge it be rejected here: "Sioux Honey fails to identify any FDA regulation that requires it to label its honey as 'Pure' or '100% Pure.' Should Tran ultimately prevail in her suit, requiring Sioux Honey to remove the words 'Pure' or '100% Pure' from its Sue Bee Products would not conflict with any FDA regulation." *Tran*, 2018 U.S. Dist. LEXIS 146380, at *7-8.

## C. Plaintiffs' Ingredient Statement Claims Are Not Preempted

As to Plaintiffs' claim that listing manuka as the sole ingredient in the ingredients statement is deceptive, Defendant argued that "Plaintiffs' ingredient-statement claims about the listing of 'manuka honey' as the sole ingredient are expressly preempted because the Products comply with federal ingredient list requirements by listing the single ingredient by its common or usual name." ER166-167. Relying on the FDA Honey Guidance, Defendant stressed that a honey product

27

may be named according to its "chief floral source" even when the honey therein does not come exclusively from this source. *See* ER168-169

Yet this argument misleads as to the total context of the FDA's language, which undercuts the argument entirely. The FDA Honey Guidance reads in pertinent part:

> 2. How shall I name my honey?
>
> If a food contains only honey, the food must be named "honey," which is its common or usual name (see section 403(i) of the FD&C Act and 21 CFR 101.3(b)). The common or usual name may also include the source of the honey, such as "Clover Honey," on the label. (See Q&A 3, below). Because honey is a single-ingredient food, you do not need to include an ingredient statement on the label.
>
> (Please note that **this answer pertains solely to how you name your product**; other labeling requirements (e.g., net weight, nutrition facts) apply to the product…
>
> 3. Do I have to declare the floral source of honey?
>
> No. You do not have to declare the floral source of honey on the label. However, you may label the honey with the name of the plant or blossom if you or the honey producer has information to support the conclusion that the plant or blossom designated on the label is the chief floral source of the honey. Names such as "Orange Blossom Honey," "Clover Honey," or "Wild Flower Honey" are acceptable. (See FDA Compliance Policy Guide, section 515.300.) **Any claims about the floral source of the honey must be truthful and not misleading** (see section 403(a)(1) of the FD&C Act).

ER322 (emphasis added)

The highlighted language clarifies that while "Manuka Honey" may be permissible as the common or usual name of the Product for purposes of its <u>name</u>, this does <u>not</u> hold true for purposes of the <u>ingredients statement</u>. This distinction is

consistent with the FDA's general parameters for ascertaining the common or usual names of foods:

> [t]he common or usual name of a food shall include a statement of the presence or absence of any characterizing ingredient(s) or component(s) . . when the presence or absence of such ingredient(s) or component(s) in the food has a material bearing on price or consumer acceptance or when the labeling or the appearance of the food may otherwise create an erroneous impression that such ingredient(s) or component(s) is present when it is not, and consumers may otherwise be misled about the presence or absence of the ingredient(s) or component(s) in the food.

21 C.F.R. § 102.5(c) (emphases added).

"Manuka Honey" cannot be the common or usual name of Defendant's Product for purposes of the ingredient statement given that the purity of the manuka honey at issue "has a material bearing on the price and consumer acceptance of the Products." Listing manuka honey as the sole ingredient would create "an erroneous impression" that more manuka is present in the Product than is actually the case.

Reasonable consumers understand that the name of a honey product, like that of other products, conveys only limited, general information about its contents, and that they should therefore turn to other parts of the label for more a more detailed explanation of a product's make-up. The purpose of the ingredients statement is to provide this, and this is why listing "Manuka Honey" as the Product's sole ingredient is deceptive in a way that invoking "Manuka Honey" as the Product's name on the front label might not be. The FDA's decision to restrict is "chief floral source" proviso to product names, and expressly disclaim its applicability to other regions of

the label, reflects this understanding. "Manuka Honey" as a product name merely communicates to consumers that the product is more appropriately classified as manuka honey than, say, clover honey. But "Manuka Honey" in the ingredients statement communicates to consumers that the product consists entirely of manuka honey. Courts have long recognized that different rules may apply to different regions of the label. *See Hawkins v. Kroger Co.*, 906 F.3d 763, 770 (9th Cir. 2018). ("In *Reid*, we determined that the statement 'No Trans Fat' was not allowed outside of the Nutrition Facts Panel since the product did contain trans fat, notwithstanding that the Nutrition Facts Panel reported that it contained 0g trans fat.").

Forced to acknowledge the unambiguous caveat in the FDA Honey Guidance, Trader Joe's argued:

> Plaintiffs acknowledge that the FDA's Guidance "clarifies" that "'Manuka Honey' may be permissible as the common or usual name of [the] product," but argue that the Guidance does not speak to whether Trader Joe's may list "manuka honey" as the sole ingredient. See Pl.'s Opp. at 15. Plaintiffs point to the FDA Guidance's answer to "How shall I name my honey?" Id. This portion states that the answer "pertains solely to how you name your product; other labeling requirements (e.g., net weight, nutrition facts) apply to the product." See Honey Labeling Guidance at 5. But the Guidance also makes clear that honey products, even honeys named by their chief floral source, require more detailed ingredient statements only when they contain nonhoney ingredients, such as syrups, cane sugar, or flavoring. Id. at 5–6 ("If a food consists of honey and a sweetener, such as sugar or corn syrup . . . the label must, among other information include . . . [t]he common or usual name of each ingredient in the ingredient statement. In this case, the ingredient statement would show 'honey' and the common or usual name of the sweetener (e.g. 'sugar,' 'corn syrup'), in descending order of predominance by weight.").

ER91.

The excerpted language only makes Plaintiffs' point. There is nothing deceptive about an ingredient statement listing "honey" accompanied by, say, sugar or corn syrup, as no claims are being made about the kind(s) of honey in the product, which is particularly material in the case of a rare and valuable honey like manuka—as evidenced by Trader Joe's own 100% claims. Trader Joe's says that the FDA "makes clear that honey products, even honeys named by their chief floral source, require more detailed ingredient statements only when they contain nonhoney ingredients, such as syrups, cane sugar, or flavoring." But the FDA can hardly be construed as stating so much when the only example given is <u>not</u> that of a honey product named by its chief floral source.

Trader Joe's argued that the FDA Honey Guidance "does not require honey producers to list 'various types of honeys in the Product in descending order of predominance,'" ER91, and that Plaintiffs' claims "cannot survive unless manuka honey—unlike all other honeys—must be labeled as an amalgam of different honeys, listing each of the different types of flowers honey-producing bees visited as its own 'honey' on the ingredient statement." ER90.

Plaintiffs' argument does not impose this burden, however. As Plaintiffs stressed in their brief, Trader Joe's had several lawful options when creating its ingredient statement. One was to simply have no ingredient statement at all, which

the FDA Honey Guidance authorizes. This would have been under-descriptive but not deceptive. Consumers would know from the Product name that the honey is largely manuka while also knowing that they were taking their chances as to actual purity levels. Another lawful option would have been to list "honey" as the sole ingredient, which also does not mislead as to the kind(s) of honey in the Product. *See* ER324 ("Consumers would know that a food product contains honey as one of the ingredients by reading the ingredient statement. A properly labeled food product would list the ingredient by its common or usual name, 'honey,' in the ingredient statement."). This too would have been under-descriptive but not deceptive. Yet Defendant did not choose from among these lawful ingredient statement options and instead settled upon the one approach that would deceive a reasonable consumer into believing that the Product consisted entirely in manuka honey. Federal regulations do not countenance this choice. Far from inventing a newfangled ingredient statement requirement, Plaintiffs merely insist that Trader's Joe's follow one of the two options prescribed by the FDA, either (1) no ingredient statement at all or (2) an ingredient statement that lists "honey." Trader Joe's argued at the hearing that "honey is a single-ingredient product, so we don't even have to have an ingredient statement." ER51. But the voluntariness of the ingredient statement does not give Trader Joe's license to then say whatever it pleases should it choose to include one.

"[T]he [Nutrition Labeling and Education Act's] preemption provisions do not reflect an intent to preempt every state law requirement with some conceivable relationship to the labeling of food. Instead, express preemption applies only to requirements 'of the type' enumerated." *Sciortino v. PepsiCo, Inc.*, 108 F. Supp. 3d 780, 798 (N.D. Cal. 2015). Read in this narrow light, the FDA Honey Guidance would preempt a state law requirement that required a honey to be 100% manuka honey before it could be named "Manuka Honey." It does not, however, preempt a state law requirement that prohibits a honey from being labeled "100% Manuka Honey" unless it is really 100% manuka. The Guidance would preempt a state law requiring honey to have an ingredients statement. But it does not preempt a state law requiring that any ingredient statement a manufacturer *chooses* to place on its label not mislead consumers regarding how much of a valuable constituent—manuka honey—is actually present in the product.

While Trader Joe's urges an expansive reading of the FDA Honey Guidance's preemptive effect, the law requires that it be construed narrowly. *See id.* ("In mapping the scope of a preemption clause, the Court typically must 'accept the reading that disfavors pre-emption,' if such reading is plausible.") (quoting *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008)); *Cal. Ins. Guarantee Association v. Azar*, Nos. 17-56526, 17-56528, 2019 U.S. App. LEXIS 30339, at *11 (9th Cir. May 16, 2019) ("when the text of a pre-emption clause is susceptible of more than one

33

plausible reading, courts ordinarily accept the reading that disfavors pre-emption.") (internal quotes and citation omitted); *Beaver v. Tarsadia Hotels*, 816 F.3d 1170, 1179 (9th Cir. 2016) ("Our preemption analysis is driven by the presumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.") (internal quotes and citations omitted).

## CONCLUSION

For all the foregoing reasons, the Court should vacate the lower court's ruling that reasonable consumers would not be deceived by the Product's labeling and that Plaintiffs' claims are preempted.

Dated: November 22, 2019

Respectfully Submitted,

*/s/ C.K. Lee*
C.K. Lee, Esq.

**LEE LITIGATION GROUP, PLLC**
148 West 24th Street, Eighth Floor
New York, NY 10011
Tel.: 212-465-1188
Fax: 212-465-1181
Email: cklee@leelitigation.com

*/s/ David A. Makman*
David Alan Makman, Esq.

**LAW OFFICES OF DAVID A. MAKMAN**
483 Seaport Court, Suite 103
Redwood City, CA 94063
Tel: 650-242-1560
Fax: 650-242-1547
Email: david@makmanlaw.com

*Counsel for Plaintiffs-Appellants*

## **STATEMENT OF RELATED CASES**

Appellants are unaware of any cases that would be deemed related under Ninth Circuit Rule 28-2.6.

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

1. This brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) because this brief contains 8,497 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Time New Roman type.

*/s/ C.K. Lee*
C.K. Lee, Esq.

November 22, 2019

37

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on November 22, 2019.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ C.K. Lee*
C.K. Lee, Esq.

November 22, 2019