No. 19-16618

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

_____

LYNN MOORE, ET AL.,

*Plaintiffs-Appellants*,

v.

TRADER JOE'S COMPANY,

*Defendant-Appellee.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION
NO. 4:18-CV-04418-KAW

_____

**ANSWERING BRIEF OF DEFENDANT-APPELLEE TRADER JOE'S COMPANY**

_____

DAWN SESTITO
COLLINS KILGORE
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, California 90071
(213) 430-6000

*Counsel for Defendant-Appellee Trader Joe's Company*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendant-Appellee Trader Joe's Company ("Trader Joe's"), by and through its counsel of record, hereby discloses:

1. Trader Joe's is a wholly-owned subsidiary of T.A.C.T. Holding, Inc.

2. No publicly held corporation owns ten percent or more of Trader Joe's stock.

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ....................................................................1

II.   STATEMENT OF THE ISSUES ...........................................3

III.  STATEMENT OF THE CASE ...............................................4

IV.   STANDARD OF REVIEW ...................................................11

V.    SUMMARY OF THE ARGUMENT .....................................11

VI.   ARGUMENT.........................................................................14

    A.    PLAINTIFFS ABANDONED THEIR ADULTERATION
          THEORY...........................................................................14

    B.    TRADER JOE'S MANUKA HONEY LABEL WOULD NOT
          PLAUSIBLY MISLEAD A REASONABLE CONSUMER. ...........15

        1.    Trader Joe's Has Properly Labeled the Product as "100%
             New Zealand Manuka Honey" and It Is Implausible that
             a Reasonable Consumer Would Believe the Product
             Contains Exclusively One Type of Pollen. .............................18

            a.    The Product is 100% New Zealand Manuka
                Honey...........................................................................19

            b.    Plaintiffs Must Demonstrate That a Reasonable
                Consumer Would Have Been Misled by the
                Product's "100% New Zealand Manuka Honey"
                Label Despite its Accuracy............................................20

            c.    No Reasonable Consumer Would Plausibly
                Misunderstand the Product's "100% New Zealand
                Manuka Honey" Label to Mean that the Product
                Contains 100% Manuka Pollen. ....................................23

            d.    The Product's Price Dispels Any Potential
                Ambiguity About the Product's "100% New
                Zealand Manuka Honey" Label....................................26

        2.    Trader Joe's Properly Listed "Manuka Honey" in the
             Ingredient Statement, and a Reasonable Consumer
             Would Not Understand This To Mean the Product
             Contained Only Manuka Pollen...............................................28

# TABLE OF CONTENTS
## (continued)

Page(s)

a.    Plaintiffs Cannot Plausibly Allege That Consumers Understand the Ingredient Statement to Represent Anything Other Than That the Product Contains Only Manuka Honey. ....................................................29

b.    Reasonable Consumers Know an Ingredient Statement Simply Lists Ingredients..............................33

C.    FEDERAL LAW EXPRESSLY PREEMPTS PLAINTIFFS' THEORY THAT HONEY MUST BE LABELED ACCORDING TO ITS POLLEN CONTENT, RATHER THAN ITS HONEY CONTENT. ....................................................35

1.    The NLEA's Express Preemption Provision Applies to Food Labeling Requirements at Issue.....................................35

2.    The Product's Label Complies with Federal Requirements for Listing the "Common or Usual Name."......37

D.    THE SAFE HARBOR DOCTRINE BARS PLAINTIFFS' ASSERTION THAT CALLING THE PRODUCT "MANUKA HONEY" ON THE LABEL OR INGREDIENT STATEMENT IS MISLEADING..............................................................................43

VII.    CONCLUSION..............................................................................45

iii

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allred v. Frito-Lay N. Am.*,
  Case No.: 17-CV-1345 JLS (BGS), 2018 WL 1185227 (S.D. Cal. Mar. 7,
  2018)..........................................................................................................41

*Am. Home Prods. Corp. v. Johnson & Johnson*,
  672 F. Supp. 135 (S.D.N.Y. 1987).......................................................45

*Becerra v. Dr. Pepper/Seven Up, Inc.*,
  No. 18-16721, 2019 WL 7287554 (9th Cir. Dec. 30, 2019).................. 22, 24, 25

*Brady v. Bayer Corp.*,
  26 Cal. App. 5th 1156 (2018) ..............................................................33

*Brown v. Starbucks Corp.*,
  Case No.: 18cv2286 JM (WVG), 2019 WL 996399
  (S.D. Cal. Mar. 1, 2019)........................................................ 29-30, 31, 33

*Caper Corp v. Wells Fargo Bank, N.A.*,
  578 F. App'x 276 (4th Cir. 2014) .........................................................21

*Carrea v. Dreyer's Grand Ice Cream, Inc.*,
  475 F. App'x 113 (9th Cir. 2012) .........................................................37

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
  20 Cal. 4th 163 (Cal. 1999)..................................................................44

*Chae v. SLM Corp.*,
  593 F.3d 936 (9th Cir. 2010)................................................................36

*Degelmann v. Advanced Med. Optics, Inc.*,
  659 F.3d 835 (9th Cir. 2011)................................................................37

*Duke v. Flying J, Inc.*,
  178 F. Supp. 3d 918 (N.D. Cal. 2016) .................................................45

*Durnford  v. MusclePharm Corp.*,
  907 F.3d 595 (9th Cir. 2018)................................................................36

*Ebner v. Fresh, Inc.*,
  838 F.3d 958 (9th Cir. 2016)....................................................... passim

# TABLE OF AUTHORITIES

**Page(s)**

*Freeman v. Time, Inc.*,
  68 F.3d 285 (9th Cir. 1995)............................................................ 22, 27

*Hawkins v. Kroger Co.*,
  906 F.3d 763 (9th Cir. 2018)...............................................................36

*Hill v. Roll Int'l Corp.*,
  195 Cal. App. 4th 1295 (2011) ....................................................... 29, 30

*In re 100% Grated Parmesan Cheese Mktg. & Sales Practices Litig.*,
  275 F. Supp. 3d 910 (N.D. Ill. 2017) ....................................................27

*Jessani v. Monini N. Am.*,
  744 F. App'x 18 (2d Cir. 2018) ............................................... 22, 27, 28

*Manchouck v. Mondelez Int'l Inc.*,
  No. C 13–02148 WHA, 2013 WL 5400285 (N.D. Cal. Sept. 26, 2013),
  *aff'd*, 603 F. App'x 632 (9th Cir. 2015) ...............................................30

*MHC Fin. Ltd. P'ship v. City of San Rafael*,
  714 F.3d 1118 (9th Cir. 2013) .............................................................11

*Red v. Kraft Foods, Inc.*,
  No. CV 10–1028–GW(AGRx), 2012 WL 5504011 (C.D. Cal. Oct. 25,
  2012)...............................................................................................30

*Reddy v. Litton Indus., Inc.*,
  912 F.2d 291 (9th Cir. 1990)...............................................................11

*Reid v. Johnson & Johnson*,
  780 F.3d 952 (9th Cir. 2015).......................................................... 35-36

*Ross v. Sioux Honey Ass'n, Co-op.*,
  No. C-12-1645 EMC, 2013 WL 146367 (N.D. Cal. Jan. 4, 2013).... 25-26, 36, 44

*Shapiro v. Berkshire Life Ins. Co.*,
  212 F.3d 121 (2d Cir. 2000)................................................................21

*Sims v. Campbell Soup Co.*,
  Case No. EDCV 18-668 PSG (SPx), 2018 WL 7568640 (C.D. Cal. Sept.
  24, 2018) ..................................................................................... 40-41

# TABLE OF AUTHORITIES

**Page(s)**

*Solum v. CertainTeed Corp.*,
No. 7:15-cv-114-D, 2015 WL 6505195 (E.D.N.C. Oct. 27, 2015) ....................21

*Tran v. Sioux Honey Ass'n, Coop.*,
2018 U.S. Dist. LEXIS 146380 (C.D. Cal. Aug. 20, 2018) .......................... 42, 43

*Werbel v. Pepsico, Inc.*,
No. C 09–04456 SBA, 2010 WL 2673860 (N.D. Cal. July 2, 2010) ..................22

*Workman v. Plum Inc.*,
141 F. Supp. 3d 1032 (N.D. Cal. 2015) .................................................. 22, 27, 34

## Statutes

21 U.S.C. § 342, *et seq*...........................................................................................37

21 U.S.C. § 343(i)(2) ................................................... 29, 36, 37-38, 44, 45

21 U.S.C. § 343, *et seq*...........................................................................................37

21 U.S.C. § 343-1 ....................................................................................................36

21 U.S.C. § 343-1(a)(2) ..........................................................................................36

## Regulations

21 C.F.R. § 101.100(a)............................................................................................44

21 C.F.R. § 101.3(a)-(b)............................................................................ 38, 40, 44

21 C.F.R. § 101.4(a)......................................................................................... passim

21 C.F.R. § 101.4(a)(1) .................................................................................. passim

21 C.F.R. § 102.5 .....................................................................................................23

21 C.F.R. § 102.5(a)......................................................................... 20, 38, 39, 41, 45

21 C.F.R. § 102.5(d) ........................................................................ 20, 38, 39, 41, 45

## TABLE OF AUTHORITIES

**Page(s)**

**Other Authorities**

*Chief*, Black's Law Dictionary (11th ed. 2019).......................................................19

Food & Drug Admin., Compliance Policy Guide § 515.300,
   Honey – Source Declaration (1980) ........................................................... passim

Food & Drug Admin., Proper Labeling of Honey and Honey Products:
   Guidance for Industry (2018)...................................................................... passim

## I. INTRODUCTION

Plaintiffs' complaint acknowledges a truth about honey that makes it impossible for Plaintiffs to plausibly allege that they were fooled by the labeling of Trader Joe's Manuka Honey: All honey, no matter the type, no matter the price, is made from the nectar of more than one type of plant.

Bees make honey, and beekeepers cannot prevent bees from visiting numerous types of flowers when collecting the nectar that becomes honey in their hives. Recognizing the variability inherent in this natural process, the FDA, which regulates honey labeling in the United States, permits honey producers to label honey with the name of its "chief floral source." Clover honey comes from bees that forage primarily on clover, orange-blossom honey from bees that primarily forage on orange blossoms. Following that longstanding FDA rule, Trader Joe's properly identified the product at issue here (the "Product") as "manuka honey" because—as Plaintiffs themselves allege—it came from bees that foraged chiefly on manuka. This concession is definitive. The Product contains 100% manuka honey, so its labels are accurate and not misleading.

All of Plaintiffs' claims rely on test results showing that of the trace amounts of pollen present in the Product, about 60% is from manuka and the remainder is

1

from a variety of other plants.[1]  These results demonstrate that manuka is the Product's chief floral source but, unsurprisingly, not its *only* floral source.  Based on those results, Plaintiffs have presented vague and evolving theories of liability.  In their First Amended Complaint ("FAC"), Plaintiffs settled on a theory that Trader Joe's Manuka Honey is adulterated, suggesting that the Product is a mixture of honeys of different purity.  They later dropped that claim, and for good reason— the District Court found that Plaintiffs' adulteration theory boiled down to the notion that bees had adulterated their own honey by foraging on more than one type of plant.

Plaintiffs also claimed that the Product's label is misleading because it said "100% New Zealand Manuka Honey" but contained honey with only 60% manuka pollen.  The District Court rejected that claim, too, because Plaintiffs' own test results prove that manuka is the Product's chief floral source, meaning the Product—100% of it—is manuka honey.  A reasonable consumer, the District Court ruled, would not be misled by the accurate statements on the label promising that the Product contained only manuka honey.

On appeal, Plaintiffs have altered their misleading-claims theory, presenting the new notion that they believed the label to mean that the Product contained

---

[1] As bees visit flowers to obtain nectar, they pick up trace amounts of pollen, which is brought back to the hive and is detectible in the bees' honey. This is why pollen counts can indicate nectar source, and thus relate to honey composition.

honey with 100% manuka pollen. This late-coming theory ignores that, as Plaintiffs have conceded, honey with a single floral source—manuka or otherwise—does not exist. Plaintiffs cannot know that fact while also believing the opposite, and they certainly cannot claim a reasonable consumer would do so. No consumer interested in pollen as a measure of honey purity would be misled in the manner Plaintiffs claim to have been. And Plaintiffs cannot plausibly allege that an ordinary consumer of honey would reasonably jump to a conclusion about pollen based on a label that makes no mention of pollen at all.

Even if Plaintiffs had sought to amend to add this understanding to their misleading-claims theory, the District Court's dismissal with prejudice would have been proper. Under this new theory or any other that they have presented, Plaintiffs' claims of deception under state consumer-protection laws are implausible and, because they seek to alter federal labeling regulations, preempted. This Court should affirm the District Court's ruling dismissing this case with prejudice.

## II. STATEMENT OF THE ISSUES

1. Whether a reasonable consumer could plausibly misconstrue the Product's "100% New Zealand Manuka Honey" label as referring to pollen count rather than honey composition;

2. Whether a reasonable consumer would understand "manuka honey," when listed as the sole ingredient on the ingredient statement, to represent that the Product contains exclusively manuka pollen;

3. Whether the FDA's requirement that ingredients be declared by common or usual name, and its policy and guidance that a honey's common or usual name includes the chief floral source of the honey, preempts Plaintiffs' assertion that state law prohibits Trader Joe's from listing "manuka honey" on the ingredient statement.[2]

## III. STATEMENT OF THE CASE

This case is about honey—specifically honey produced by bees that forage mostly on the manuka tree, which is native to Australia and New Zealand. Some consumers believe that manuka honey has various health and wellness benefits. ER 185. Others purchase it for its unique taste and rich texture. Because of high consumer demand and the relative rarity of the manuka flower, manuka honey commands higher prices than most other honey varieties. ER 193.

Manuka honey producers take steps to ensure that their bees forage mostly on manuka. But because it is impossible to control which plants bees forage on, it is impossible to produce honey foraged exclusively from manuka—or on any other

---

[2] An Addendum containing pertinent statutes, regulations, and rules is filed concurrently with this brief.

plant. ER 185. Nor is it possible to process or refine honey to separate it into constituent parts by floral source. Many producers promote the purity of their manuka honeys based on the higher concentration of chemical compounds unique to manuka honey (an approach sanctioned by the New Zealand ministry responsible for regulating the labeling and export of manuka honey). ER 186. Other producers (but not the government of New Zealand) promote the purity of their honeys based on the concentration of manuka pollen, trace amounts of which end up in honey after being carried by bees back to their hives. ER 223.

Here, Plaintiffs filed a class-action complaint against Trader Joe's because they allege, based on pollen tests, that Trader Joe's Manuka Honey (the "Product") contained less manuka pollen than they believe the Product's label promised. ER 218, 310-11. The label, however, says nothing about pollen. ER 206-08.

***The Original Complaint.*** Plaintiffs-Appellants ("Plaintiffs") Lynn Moore, Shanque King, and Jeffrey Akwei filed their Class Action Complaint ("Complaint") against Defendant Trader Joe's Company ("Trader Joe's") in federal district court for the Northern District of California ("District Court") on July 20, 2018. ER 264. The Complaint alleged that Trader Joe's engaged in "false, misleading and deceptive marketing and sale" of Trader Joe's Manuka Honey (the "Product") by including two representations on the Product's label: (1) the statement "100% New Zealand Manuka Honey," which appeared on a version

of the front label of the Product purchased by one of the Plaintiffs; and (2) the

ingredient statement, which listed "manuka honey" as the only ingredient in the

Product when all three Plaintiffs purchased it. ER 267-68. Plaintiffs alleged that

testing of samples purchased by Plaintiffs Moore and Akwei found that

approximately 60% of the pollen in the samples was from the manuka flower while

the remainder came from other floral sources. ER 268, 310-11. Based on those

test results, Plaintiffs allege the Product's statements are false or misleading. ER

267-68.

Alleging nine separate causes of action,[3] Plaintiffs asserted that Trader Joe's

sales and marketing practices violated consumer protection and similar laws of all

fifty states and the District of Columbia. ER 268-71. Plaintiffs alleged that they

paid "a premium price for the Product based on the content claims conveyed by the

front label and/or ingredients statement." ER 272-73. And they claimed

entitlement to injunctive relief, actual damages, restitution and/or disgorgement of

---

[3] The Complaint alleged the following causes of action: (1) violations of New York's Deceptive and Unfair Trade Practices Act, N.Y. Gen. Bus. Law § 349; (2) violations of New York's False Advertising Law, N.Y. Gen. Bus. Law § 350; (3) violations of California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, et seq.; (4) violations of California's Unfair Competition Law ('UCL'), Cal. Bus. & Prof. Code § 17200, et seq.; (5) violations of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500, et seq.; (6) violations of North Carolina's Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1, et seq.; (7) violations of North Carolina's Fraudulent and Deceptive Advertising Law, N.C. Gen. Stat. § 14-117, et seq.; (8) common law fraud; and (9) breach of express warranties. ER 282-97.

profits, statutory damages, attorneys' fees, and costs.  ER 297-98.

**The First Amended Complaint.**  On December 21, 2018, Plaintiffs filed their First Amended Class Action Complaint ("FAC"), adding allegations that Trader Joe's had "adulterated" the Product with "the inclusion of cheaper honey." ER 204-63.  Specifically, Plaintiffs claimed that Trader Joe's had adulterated the Product by "dilut[ing]" "high-manuka honey" with "less valuable low-manuka honey to enable it to market the admixture 'manuka honey.'"  ER 224.  Plaintiffs asserted that Trader Joe's Product was not composed entirely of manuka honey and that if they had known this they would not have purchased the Product.  ER 216-17, 218.  They alleged that the terms "manuka honey" and "100% New Zealand Manuka Honey" misled them into believing that the product contained entirely manuka honey.  ER 216-17.  The FAC asserted the same nine causes of action as the original complaint.  ER 230-44.

**Trader Joe's Motion to Dismiss.**  On January 18, 2019, Trader Joe's moved to dismiss the FAC because it failed to state a claim upon which relief could be granted under Federal Rule of Civil Procedure 12(b)(6).  ER 142-203.  Trader Joe's sought dismissal, arguing that the FAC included no plausible allegations that Trader Joe's had adulterated the Product by adding non-manuka honey, federal law

preempts Plaintiffs' claims,[4] and Plaintiffs failed to meet their pleading burdens in alleging that the Product's statements would mislead a reasonable consumer because the product is—as the label claims—100% manuka honey. ER 156-71. Plaintiffs opposed Trader Joe's motion to dismiss on February 14, 2019. ER 96-141.

**_District Court Hearing and Ruling._** On May 16, 2019, the District Court heard Trader Joe's motion to dismiss. _See_ ER 37-75. At the hearing, the District Court asked Plaintiffs to clarify their factual basis for alleging that the Product's labeling is false or misleading and explain whether Plaintiffs could allege that humans actually adulterated the Product by adding honey that was non-manuka and, if they could not, whether Plaintiffs could allege a basis for contending that the Product was not 100% manuka honey. ER 38-42, 55-57.

Plaintiffs' responses did not satisfy the District Court. On June 24, 2019, it granted Trader Joe's motion to dismiss, dismissing with prejudice Plaintiffs' assertions of adulteration, mislabeling, fraud, and breach of express warranty. ER 27-36. The District Court dismissed Plaintiffs' mislabeling claims on the two independent grounds. ER 31-34. First, it found that Plaintiffs had not plausibly

---

[4] Trader Joe's also asserted that the safe harbor doctrine bars Plaintiffs' state law claims because the Product's labeling complied with federal law, the breach of express warranty claims failed because the Product did not make any express representations that were untrue, and Plaintiffs failed to meet the heightened pleading requirements to allege fraud. ER 164-72.

alleged that the Product's representations would mislead a reasonable consumer because, as Plaintiffs conceded, the Product is indeed 100% manuka honey and was not "adulterated" under the law. ER 31-33. Second, it found that federal law preempted Plaintiffs' challenge because the Product contains 100% manuka honey according to the FDA's definition.[5] ER 34. Because it dismissed the claims with prejudice, the District Court entered judgment in favor of Trader Joe's. ER 26.

In concluding that Plaintiffs could not allege that the Product's label plausibly misleads consumers, the District Court found that both of the challenged labeling statements were accurate in light of Plaintiffs' allegations—including Plaintiffs' clarifications at the hearing on the motion to dismiss. ER 32-34. Plaintiffs' testing of two different jars of the Product allegedly showed that the manuka pollen content was 62.7% and 57.3% respectively—demonstrating to the District Court that the honey came from bees that foraged mostly on manuka. *Id.* And Plaintiffs clarified at the hearing that they were not alleging that Trader Joe's had diluted its manuka honey with non-manuka honey or any other substance. ER 55-56. Rather, Plaintiffs asserted their theory was that pollen count equates to purity, and that because Trader Joe's Product contains only approximately 60% manuka pollen, it is only 60% manuka honey. *Id.*

---

[5] The District Court dismissed Plaintiffs' fraud claim because Plaintiffs failed to allege any intentional or knowing act by Trader Joe's. ER 35. And it dismissed Plaintiffs' breach of warranty claims for the same reasons it dismissed Plaintiffs' mislabeling and fraud claims. ER 35-36.

In light of this clarification, the District Court found that Plaintiffs'
allegations only confirm that the Product is "100% manuka honey." ER 34. The
District Court acknowledged that under the Food and Drug Administration's
("FDA") labeling requirements, honey is a single-ingredient food and honey
producers can label honey with the name of its "chief floral source." ER 33-34.
Applying this definition, the District Court found that both of the labeling
representations at issue—the claim "100% New Zealand Manuka Honey" on the
front-facing label and listing "manuka honey" in the ingredient statement—are
accurate because they comply with federal requirements for labeling products by
their "common or usual name." *Id.* Because the Product contains 100% manuka
honey, the District Court reasoned, "a reasonable consumer could not find [the
claim] misleading, because it is not." ER 34.

The District Court also ruled that Plaintiffs' claims are preempted because
the Product's labeling complies with federal law, and Plaintiffs sought to use state
laws to enforce "food labeling requirements that are not identical to federal law."
*Id.* In dismissing Plaintiffs' claims with prejudice, the District Court determined
that "any amendment [to Plaintiffs' FAC] would be futile." ER-36. Plaintiffs
appealed. ER 1-2.

## IV.   STANDARD OF REVIEW

This Court reviews de novo the District Court's grant of a motion to dismiss

for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  *See*

*Ebner v. Fresh, Inc.*, 838 F.3d 958, 962 (9th Cir. 2016).

This Court reviews the District Court's denial of leave to amend a complaint

for abuse of discretion.  *See MHC Fin. Ltd. P'ship v. City of San Rafael*, 714 F.3d

1118, 1126 (9th Cir. 2013).  "Discretion is abused when the judicial action is

arbitrary, fanciful, or unreasonable or where no reasonable man or woman would

take the view adopted by the trial court."  *Id.*[6]  "It is not an abuse of discretion to

deny leave to amend when any proposed amendment would be futile."  *Reddy v.

Litton Indus., Inc.*, 912 F.2d 291, 296 (9th Cir. 1990).

## V.   SUMMARY OF THE ARGUMENT

Plaintiffs do not challenge the District Court's dismissal for failure to

articulate an actionable adulteration-based claim.  Opening Br. at 1-2.  Instead,

Plaintiffs have adjusted their misleading-claims theory.  No longer do they argue

that the Product is not 100% manuka honey within the meaning of the labeling

regulations.  *Id.* at 28.  Rather, they assert that they have alleged the Product's

labeling statements misled them into believing the honey contained only manuka

pollen and no pollen from other sources.  *Id.* at 20-21.  The theory that the

---

[6] All internal citations and quotation marks are omitted, and all emphasis is added, unless expressly stated otherwise.

Product's labeling statements misled Plaintiffs by allegedly implying that the Product contained exclusively manuka pollen cannot save their complaint. Therefore, the District Court did not err by declining to allow Plaintiffs further opportunity to amend.

The Product's label advertises exactly what it is, and a reasonable consumer would not expect anything else. The Product consists solely of manuka honey, rather than a mixture of honeys or other additives. It is thus accurately labeled "100% New Zealand Manuka Honey" and accurately lists "manuka honey" as the sole ingredient. No reasonable consumer would view these representations about honey and understand them to bear on the Product's pollen count—the Product's label does not mention or discuss pollen. Nor would a reasonable consumer expect the Product to deliver a honey made up entirely of one pollen, which, according to the allegations in Plaintiffs' complaint, is not possible in nature. Even in their Opening Brief, Plaintiffs concede that the Product is accurately labeled because "the FDA Honey Guidance may authorize Trader Joe's to market each and every tablespoon of honey in the Product as 'Manuka Honey'" despite containing pollen from other floral sources. *Id.* at 24. Plaintiffs' concession is definitive and demonstrates that the District Court was correct in concluding that because the Product *is* 100% manuka honey from New Zealand, the challenged labeling

statements are accurate and not misleading to a reasonable consumer. Plaintiffs'

deceptive acts and practices claims fail as a matter of law.

Plaintiffs' claims are furthermore preempted and subject to a safe harbor

defense because the FDA requires products to be identified by their common or

usual name and has expressly endorsed the labeling of single-ingredient honey

products with their chief floral source. [7] State laws cannot directly or indirectly

impose regulations that depart from federal law. As Plaintiffs agree, the Product is

correctly labeled pursuant to federal regulations when it describes the Product as

"manuka honey." Opening Br. at 24. Plaintiffs have identified no basis to

circumvent the federal law that requires producers to list the common or usual

name of a product in the ingredient statement. Nor have they shown that, where

the FDA gives producers the *option* to forego an ingredient statement, listing the

common or usual name can be prohibited by state law. Thus, Plaintiffs cannot

invoke state consumer protection laws to force Trader Joe's to either remove

"manuka honey" from the ingredient statement or to add terms, like "blend," when

---

[7] Plaintiffs allege two versions of the Product label. Only Plaintiff Lynn Moore alleges to have purchased the Product based on a representation that the product contains "100% New Zealand Manuka Honey." ER 216-17. The other Plaintiffs allege only that the Product labels they saw listed "manuka honey" as the lone ingredient on the ingredient statement. *Id*. Accordingly, if this Court rules that a preemption or safe harbor defense warrants dismissal of Plaintiffs' challenge to the ingredient statement, only Plaintiff Moore's California state claims would remain and the New York and North Carolina state law causes of action should be dismissed.

that is not the common or usual name (nor reflective of the composition of the honey).

For these reasons, this Court should affirm the District Court's dismissal of the Plaintiffs' complaint with prejudice.

## VI.    ARGUMENT

## A.    PLAINTIFFS ABANDONED THEIR ADULTERATION THEORY.

The District Court correctly ruled that Plaintiffs' FAC failed to articulate an actionable adulteration-based claim. *See* ER 31-33. Plaintiffs alleged in the FAC that because their tests showed concentrations of manuka pollen between 57% and 63% in the Product, it "is not 100%" manuka honey" and is "adulterated by the inclusion of cheaper honey." ER 209. The District Court rejected Plaintiffs' proffered adulteration theory, finding that (1) manuka honey is not "adulterated" where a producer mixes one batch of manuka honey with another batch of manuka honey having a lower concentration of manuka pollen; and (2) bees do not "adulterate" honey by visiting flowers other than manuka, thereby introducing varying amounts of pollen from flowers other than manuka. ER 31-33.

Because Plaintiffs did not contend that humans had added non-manuka honey to manuka honey, the District Court found that "there is no dispute that all of the honey involved is technically manuka honey." ER 33. There was thus no

adulteration in violation of the federal Food, Drug, and Cosmetic Act ("FDCA")
even though pollen counts may vary among different jars of the Product. *Id.*

Plaintiffs do not challenge this ruling on appeal, abandoning the argument
that Trader Joe's Product is unlawful because it is somehow adulterated.[8]

## B.  TRADER JOE'S MANUKA HONEY LABEL WOULD NOT PLAUSIBLY MISLEAD A REASONABLE CONSUMER.

On appeal, Plaintiffs contend that the District Court erred by failing to
consider that the Product's label was misleading not because the Product did not
contain 100% manuka *honey*, but because it did not contain 100% manuka *pollen*.
The District Court, Plaintiffs argue, failed to analyze whether a reasonable
consumer would understand either the labeling statement or ingredient statement to
mean that the Product contains exclusively *pollen* from the manuka flower.
Opening Br. at 20-22.  In the FAC, Plaintiffs failed to clearly distinguish their

---

[8] Plaintiffs have also abandoned their Breach of Warranty and Common Law Fraud
causes of action.  The District Court ruled that the Product did not make any
express warranty that it contained more manuka pollen than it actually contained.
ER 35-36.  Plaintiffs' brief does not argue that either the "100% New Zealand
Manuka Honey" label or listing "manuka honey" as the sole ingredient constitutes
an express representation about the pollen count.  Rather, they argue only that a
consumer would reasonably interpret these statements as implying the product did
not contain pollen from other flowers.  Opening Br. at 20-21.  That is not an
express warranty.  The District Court also held that the Common Law Fraud claim
failed because Plaintiffs were required to plead that Trader Joe's had knowingly
made a false representation with the intent to deceive Plaintiffs, and Plaintiffs' only
fraud theory was that Trader Joe's adulterated the Product with non-manuka
honey.  ER 35.  Plaintiffs do not argue here that they could have amended to state
an alternative theory of fraud and that therefore the District Court abused its
discretion in denying leave to amend.

15

assertion that the labeling claims are false because they mislead consumers to believe the Product contains exclusively manuka pollen, from their (now abandoned) allegations that Trader Joe's had added non-manuka honey to the Product. *See* ER 222 ("In order to not misrepresent their nature, Defendant's Product would need to have at least 90% pure manuka honey at minimum."); *see also* ER 216-17 (alleging that Plaintiffs personally understood the Product contained not "less than 65% manuka honey," "exclusively manuka," or "pure manuka," without any reference to pollen count); ER 219 ("Reasonable consumers know that the concentration of manuka as opposed to other honey pollens can vary significantly from brand to brand . . . .").

Although Plaintiffs raised at the hearing that consumers "think they're getting . . . something with a super high pollen count . . . ," ER 67, the District Court ruled that Trader Joe's labels were not misleading because a reasonable consumer would understand that the Product accurately claimed to contain 100% manuka honey, ER 34. Therefore, Plaintiffs' argument regarding pollen count—a position Plaintiffs made clear at the hearing on the motion to dismiss—amounts to an attack on the District Court's exercise of its discretion to deny them leave to amend to more clearly plead that theory. This Court, then, should assess Plaintiff's assertion that the District Court erred under an abuse-of-discretion standard. *See*

*Ebner*, 838 F.3d at 963 ("A court's denial of leave to amend is reviewed for an abuse of discretion").

Regardless, whether the Court reviews the District Court's ruling for an abuse of discretion or considers this new theory de novo, Plaintiffs' mislabeling claims fail. The Product label stating "100% New Zealand Manuka Honey" is not misleading. The label is accurate—the Product *is* 100% manuka honey. No reasonable consumer would interpret the label—which never mentions pollen—as representing that the Product contains exclusively pollen of the manuka flower. And to the extent any consumer was confused, the Product's low price relative to manuka honeys that boast high manuka pollen counts strongly suggests that it did not purport to contain virtually nothing but manuka pollen. Likewise, listing only "manuka honey" on the Product's ingredient statement is not misleading because no reasonable consumer would plausibly interpret "manuka honey" on the ingredient list—again, with no mention of pollen—as making any promise about the Product's pollen count. And because the FDA has expressly endorsed calling a honey by its chief floral source, Plaintiffs' attack on using "manuka honey" as the common or usual name is preempted.

1.    **Trader Joe's Has Properly Labeled the Product as "100% New Zealand Manuka Honey," and It Is Implausible that a Reasonable Consumer Would Believe the Product Contains Exclusively One Type of Pollen.**

In claiming that the "100% New Zealand Manuka Honey" Product label is misleading, Plaintiffs conflate manuka honey and manuka pollen. Pointing to a pollen analysis that shows that the Product is not derived exclusively from manuka *pollen*, ER 310-11, Plaintiffs argue it is misleading to label the Product as 100% manuka *honey*, ER 221. But the Product's labeling makes representations only about its manuka honey content and says nothing about pollen. ER 206-08. While Plaintiffs—here and in the District Court—often use the terms "honey" and "pollen" interchangeably, they have never demonstrated that consumers reasonably think of honey this way.

Manuka honey is any finished honey product that has the manuka plant as its chief floral source. *See* Food & Drug Admin., Compliance Policy Guide § 515.300, Honey – Source Declaration (1980) at A-59 ("FDA Source Declaration Policy").[9] Manuka pollen is only a component of that honey, one that will inevitably vary in concentration based on bees' natural foraging behavior. ER 185. Plaintiffs concede that it is impossible to guarantee that honey will consist exclusively of pollen from a single floral source, ER 219; bees cannot be expected

---

[9] All citations for the FDA Source Declaration Policy are to the Addendum filed concurrently with this brief.

to follow instructions to visit only manuka flowers, ER 185. And Plaintiffs have alleged that reasonable consumers of manuka honey know that the concentration of manuka pollen will vary from product to product. ER 219. Knowing those facts, Plaintiffs cannot plausibly allege that they understood "100% New Zealand Manuka Honey" to mean that the Product contained 100% manuka pollen. This Court should affirm the district court's dismissal with prejudice.

### a. The Product is 100% New Zealand Manuka Honey.

The Product is exactly what it claims to be: 100% New Zealand Manuka Honey. The FDA sets standards for labeling honey and, since 1980, has advised honey producers to label honey "with the name of the plant or blossom" that is "the chief floral source of the honey, such as 'Orange Blossom Honey' or 'Clover Honey.'" FDA Source Declaration Policy at A-59. "Chief" should be understood to mean the "principal" or "lead[ing]" floral source, not the only floral source. *See Chief*, Black's Law Dictionary (11th ed. 2019). And the FDA has issued policy guidance clarifying that the common or usual name of single-ingredient honeys includes the chief floral source. *See* Food & Drug Admin., Proper Labeling of Honey and Honey Products: Guidance for Industry (2018) at A-60 ("FDA Honey Labeling Guidance").[10]

---

[10] All citations for the FDA Honey Labeling Guidance are to the Addendum filed concurrently with this brief.

19

Plaintiffs' own testing confirms that, under these FDA standards, the Product is 100% manuka honey. Plaintiffs allege that manuka accounts for the majority—57% to 63%—of the Product's pollen content and that no other floral source contributes even 10%. ER 310-11. These results establish that manuka is the Product's chief floral source. *Id.* The common or usual name of the Product, then, is "manuka honey." *See* FDA Source Declaration Policy at A-59. And because the Product is made up entirely of honey for which manuka is the chief floral source—that is, it contains no other additives or ingredients—it is 100% manuka honey. ER 310–11; *see also* 21 C.F.R. § 102.5. Plaintiffs even concede to this Court that the Product's "100% New Zealand Manuka Honey" label is accurate in the "legalistic sense" because the FDA authorizes Trader Joe's to label "each and every tablespoon of honey in the Product as 'Manuka Honey'. . . ."[11] Opening Br. at 24.

> **b. Plaintiffs Must Demonstrate That a Reasonable Consumer Would Have Been Misled by the Product's "100% New Zealand Manuka Honey" Label Despite its Accuracy.**

Because Plaintiffs acknowledge the accuracy of the "100% New Zealand Manuka Honey" label, their deceptive-practices claims rest on the notion that the label is nonetheless somehow misleading to reasonable consumers. Under California, New York, and North Carolina state law, deceptive acts or practices

---

[11] Plaintiffs do not assert that any portion of the honey in the Product does not come from New Zealand.

claims turn on whether a reasonable consumer is likely to be misled by a representation. *See Ebner*, 838 F.3d at 965-66 (dismissing CLRA, FAL, and UCL claims because the size of a tube of lip balm would not mislead a reasonable consumer into believing it contained more product than it did) ; *Shapiro v. Berkshire Life Ins. Co.*, 212 F.3d 121, 126 (2d Cir. 2000) (defining a "deceptive act or practice" under New York General Business Law § 349 as "a representation or omission likely to mislead a reasonable consumer acting reasonably under the circumstances"); *Solum v. CertainTeed Corp.*, No. 7:15-cv-114-D, 2015 WL 6505195 at *5 (E.D.N.C. Oct. 27, 2015) ("Under North Carolina law, reliance upon a representation is reasonable only when the recipient of the representation uses reasonable care to ascertain the truth of that representation." (citing *Caper Corp v. Wells Fargo Bank, N.A.*, 578 F. App'x 276, 287 (4th Cir. 2014))).

Under this reasonable-consumer standard, a plaintiff must show "more than a mere possibility that [a] label might be conceivably misunderstood by some few consumers viewing it in an unreasonable manner." *See Ebner*, 838 F.3d at 965. Rather, a plaintiff must show "a probability that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled." *Id*. Courts regularly reject deception claims premised on unreasonable assumptions about the meaning of a product label. *See, e.g.*, *id.* at 966 (dismissing deceptive practices claims based on the plaintiffs'

21

unreasonable assumption that the size of a tube of lip balm conveyed that it contained more product than disclosed on the package); *Jessani v. Monini N. Am.*, 744 F. App'x 18, 19-20 (2d Cir. 2018) (affirming dismissal of claim that plaintiffs understood "truffle flavored" olive oil to contain real truffles because it was implausible that a significant portion of the public would reasonably be misled by that phrase); *Workman v. Plum Inc.*, 141 F. Supp. 3d 1032, 1035-37 (N.D. Cal. 2015) (dismissing a deceptive practices claim because "a reasonable consumer would simply not view pictures on the packaging of a . . . box of fruit bars and assume that the size of the items pictured directly correlated with their predominance in the blend); *Werbel v. Pepsico, Inc.*, No. C 09–04456 SBA, 2010 WL 2673860, at *3-5 (N.D. Cal. July 2, 2010) (dismissing a deceptive practices claim because no reasonable consumer would believe that Cap'n Crunch's "Crunch Berries" cereal contained real fruit berries); *see also Freeman v. Time, Inc.*, 68 F.3d 285, 290 (9th Cir. 1995) (affirming dismissal of a deceptive practices claim premised on the plaintiff's unreasonable assumption he had won a sweepstakes where adjacent qualifying language stated that this was only a possibility).

In *Becerra v. Dr. Pepper/Seven Up, Inc.* this Court recently confirmed that deceptive-practices and breach-of-warranty claims premised on the plaintiffs' personal assumptions about a label were implausible where their interpretation was

unreasonable. 945 F.3d 1225, 2019 WL 7287554 (9th Cir. 2019). There, the

plaintiffs claimed that the word "diet" in the name of "Diet Dr. Pepper" misled

consumers by promising that the product would assist in weight loss or weight

maintenance when the drink's sweetener was associated with weight gain. *Id.* at

*1. The plaintiffs' complaint alleged that dictionary definitions, articles about the

meaning of the word "diet," and a consumer survey comported with their

understanding that diet sodas assisted in weight loss or maintenance. *Id.* at *2.

But this Court rejected those allegations as insufficient, finding that they did not

dispel the "prevailing reasonable understanding" that the word "diet" in a soda

name simply means it has fewer calories than its "regular" counterpart. *Id.* at *5.

The Court held that when a complaint's allegations show only that *some*

consumers unreasonably understand a labeling statement, the plaintiff's

understanding is not a plausible basis for a deceptive practices claim. *Id.*

> **c. No Reasonable Consumer Would Plausibly Misunderstand the Product's "100% New Zealand Manuka Honey" Label to Mean that the Product Contains 100% Manuka Pollen.**

Plaintiffs cannot show and have not shown that a reasonable consumer could

plausibly have been misled by the Product's "100% New Zealand Manuka Honey"

label. Their claim rests on their own idiosyncratic and unreasonable assumption

that the label—which does not mention pollen at all—makes a representation about

manuka pollen content.[12]  Opening Br. at 20-21.  Indeed, they present an even

weaker theory than the plaintiffs presented in *Becerra*.  There, the plaintiffs could

at least allege a factual basis supporting their own understanding of the word

"diet."  But Plaintiffs here can allege no factual basis for either their apparent

belief that honey could ever contain pollen from just one floral source or their

conflation of honey and pollen, particularly where they acknowledge that bees

cannot be stopped from visiting multiple plants and allege that reasonable

consumers understand that pollen count varies significantly depending on the steps

producers take to maximize the concentration of manuka pollen in a given batch.

ER 209.

Plaintiffs assert on appeal that they understood "100%" on the label to

promise something impossible: that the Product's pollen content would be 100%

manuka.  Opening Br. at 20-21.  This interpretation ignores that, as Plaintiffs have

acknowledged, honey derived exclusively from manuka—or any single floral

source—does not exist and would be impossible to produce.  ER 219 (noting

honey producers cannot tell bees "to only work the Manuka flowers" and must

increase the concentration of manuka honey through hive placement and collection

---

[12] The same misunderstanding of the label underlies Plaintiffs' Common Law
Fraud and Breach of Express Warranties claims.  ER 218.  Plaintiffs have waived
their right to revive these claims by failing to appeal their dismissal.  *See supra* at
15 n. 8.  But even if they had not, both claims fail because their allegations of
deception are implausible.  *See Becerra*, 945 F.3d 1225, 2019 WL 7287554 at *5.

techniques).  This allegation undermines Plaintiffs' own purported understanding that "100%" referred to pollen count.

Moreover, their interpretation goes against the "prevailing reasonable understanding" that the phrase "100% New Zealand Manuka Honey" means only that the Product contains no honey other than manuka honey from New Zealand. *Cf. Becerra*, 945 F.3d 1225, 2019 WL 7287554 at *3 (the prevailing reasonable view of consumers is that "diet" means a drink has fewer calories than the regular version of the soda).  Because Plaintiffs offer no factual or legal basis for disregarding this prevailing reasonable understanding, that understanding should prevail. *See id.* at *5.

Plaintiffs' brief offers little to overcome that the Product's label says nothing about "pollen."  ER 206-08.  As Plaintiffs alleged in the FAC, some manuka honey producers do use the word "pollen" on product labels and make specific claims about a product's pollen count.  ER 223.  But Trader Joe's Product does neither. A reasonable consumer would interpret the absence of an express representation about "pollen" to mean that the label is not referring to pollen count.

Plaintiffs have failed to allege anything indicating that a reasonable consumer would ordinarily expect honey to contain pollen at all.  Indeed, at least one court has rejected assertions that consumers understand honey to contain pollen at all. *See Ross v. Sioux Honey Ass'n, Co-op.*, No. C-12-1645 EMC, 2013

WL 146367, at *16 (N.D. Cal. Jan. 14, 2013) (holding that while a "particularly sophisticated" consumer may have expectations of value that relate to pollen content in honey, there is no indication that a reasonable consumer would expect honey to contain pollen).

Finally, a reasonable consumer would understand that bees naturally visit more than just a single type of plant and cannot be forced to forage from only one type of flower. Because a reasonable consumer would not understand "manuka honey" as representing anything about pollen count, a reasonable consumer would not mistake the Product's "100% New Zealand Manuka Honey" label to mean anything other than that all of the honey is manuka honey from New Zealand.

Plaintiffs have not alleged facts showing that reasonable consumers would plausibly interpret "100% New Zealand Manuka Honey" to imply that the Product promised an impossible pollen count. And, based on their own pleadings, they cannot do so. The District Court did not err in dismissing Plaintiffs' claims without leave to amend, as granting leave to amend such deficient claims would have been futile.

> ### d. The Product's Price Dispels Any Potential Ambiguity About the Product's "100% New Zealand Manuka Honey" Label.

Even if Plaintiffs could plausibly allege that the "100% New Zealand Manuka Honey" label were ambiguous about whether it referred to manuka *pollen* rather than manuka honey, the Product's price would dispel that ambiguity. *See*

*Jessani*, 744 F. App'x at 19-20 (affirming dismissal of New York and California deceptive statement claims where oil marketed as "Truffle Flavored" contained synthetic truffle flavoring because a reasonable consumer would not expect oil priced at only $11.95 to $20.95 was flavored with real truffles).

Where a product label may have multiple meanings, a reasonable consumer can be expected to look at the other representations about the product to resolve any ambiguity. *See Freeman*, 68 F.3d at 290 (holding that a reasonable consumer would look to surrounding small-type disclosures dispel the ambiguity of an isolated statement suggesting that plaintiff won a sweepstakes); *Workman*, 141 F. Supp. 3d at 1035 (holding that a reasonable consumer would not assume that the size of fruits pictured on the box correlated to their predominance or would at least resolve any ambiguity by reading the ingredient statement); *see also In re 100% Grated Parmesan Cheese Mktg. & Sales Practices Litig.*, 275 F. Supp. 3d 910, 926 (N.D. Ill. 2017) (holding that where "100%" could refer to the total amount of cheese, whether all the cheese was parmesan, or just that all the cheese was grated, a consumer would look to the ingredient statement before concluding that the products did not contain any ingredients other than parmesan). And reasonable consumers of specialty products, such as manuka honey, are particularly familiar with common traits of those products, so they would know which representations are material. *See, e.g.*, *Ebner*, 838 F.3d at 967; *Jessani*, 744 F. App'x at 19-20.

27

If a reasonable consumer were unsure whether the Product's "100% New Zealand Manuka Honey" label referred to the amount of New Zealand manuka honey or to pollen content, the Product's price would settle any doubt. Trader Joe's charged $13.99 for the Product, or $1.59 per ounce. ER 206-08, 216-17. As Plaintiffs acknowledge, manuka honey that advertises a high manuka pollen content is exponentially more expensive: A jar of manuka honey with 92% manuka pollen costs $266, or *$21.55 per ounce*, according to the FAC. ER 222. A reasonable consumer understands that product prices will be much higher where the product contains rare or premium ingredients. *See Jessani*, 744 F. App'x at 19-20. So based on the Product's low price relative to manuka honeys claiming to have more than 90% manuka pollen, a reasonable consumer would conclude that the Product does not contain 100% manuka pollen.

**2.      Trader Joe's Properly Listed "Manuka Honey" in the Ingredient Statement, and a Reasonable Consumer Would Not Understand This to Mean the Product Contained Only Manuka Pollen.**

Two of the Plaintiffs do not allege to have purchased a Product with a label claiming "100% New Zealand Manuka Honey," but claim to have been misled where the Product was labeled "Manuka Honey" on the front-facing label and listed only "manuka honey" on the ingredient statement. Listing "manuka honey" as the sole ingredient would not lead any reasonable consumer to believe that the product contains 100% manuka *pollen*. Plaintiffs argue that including "manuka

28

honey" on the ingredient statement creates an "'erroneous impression' that more manuka [pollen] is present in the Product than is actually the case." Opening Br. at 29. But reasonable consumers understand that the Product's ingredient statement—which is consistent with the front label, complies with federal law, and follows longstanding industry practice—communicates only the undisputed fact that the product is a single-ingredient food, not a representation about pollen counts. *See* 21 U.S.C. § 343(i)(2); 21 C.F.R. § 101.4(a)(1); *Ebner*, 838 F.3d at 965-66. Accordingly, the District Court's dismissal of Plaintiffs' assault on the ingredient statement should be affirmed.

> ### a. Plaintiffs Cannot Plausibly Allege That Consumers Understand the Ingredient Statement to Represent Anything Other Than That the Product Contains Only Manuka Honey.

Plaintiffs cannot plausibly allege that Trader Joe's deceived consumers by listing "manuka honey" as the Product's sole ingredient. Plaintiffs argue that "manuka honey" in the ingredient statement, specifically the modifier "manuka," falsely represents the pollen count. Opening Br. at 29, 31-32. But Plaintiffs own idiosyncratic reading of the ingredient statement—a reading that is not supported by the statement's plain text, context, common sense, or what consumers commonly understand—is insufficient to plead that a reasonable consumer would be misled. *See, e.g., Ebner*, 838 F.3d at 965-66; *Brown v. Starbucks Corp.*, Case No. 18-cv-2286-JM-WVG, 2019 WL 996399 (S.D. Cal. Mar. 1, 2019); *Hill v. Roll*

*Int'l Corp.*, 195 Cal. App. 4th 1295 (2011); *see also Manchouck v. Mondelez Int'l Inc.*, No. C 13–02148-WHA, 2013 WL 5400285, at *1-3 (N.D. Cal. Sept. 26, 2013), *aff'd*, 603 F. App'x 632 (9th Cir. 2015) (holding that the statement "made with real fruit" would not lead a reasonable consumer to believe they contained only "real fruit" when the cookies contained fruit puree); *Red v. Kraft Foods, Inc.*, No. CV 10–1028–GW-AGRx, 2012 WL 5504011, at *3 (C.D. Cal. Oct. 25, 2012) (holding that cracker package stating "made with real vegetables" with depictions of vegetables would not lead a reasonable consumer to believe that the crackers were "healthy" or primarily composed of fresh vegetables).

*Hill v. Roll Int'l Corp.* in instructive. 195 Cal. App. 4th at 1298-99, 1304-05. In that case, the plaintiff alleged that a Fiji-brand water bottle's use of a green-colored water drop misled consumers to believe that the product was "environmentally superior" to other waters and endorsed by an environmental organization. *Id*. at 1298-99. In dismissing plaintiff's claims and denying leave to amend, the court determined that no reasonable consumer would read so much into the "drop itself," which only communicated a "symbol of Fiji water" or at most a reference to the "environment." *Id*. at 1304-05. Similarly here, Plaintiffs assume "manuka" somehow refers to pollen content. Like the rest of the Product's label, the ingredient statement makes no representations about "pollen."

*Brown v. Starbucks Corp.* also rejects unwarranted assumptions by the consumer. 2019 WL 996399 at *1, *3. There, the plaintiff alleged that the statement "Apple, watermelon, tangerine and lemon flavored candies" would lead a reasonable consumer to infer that the product contains "only natural ingredients." *Id.* at *1. Dismissing plaintiff's claims, the court concluded that the statement "might lead a consumer to draw conclusions about the product's *fruit flavor ingredients*, for example, but would not lead a reasonable consumer to infer that the [product] contain[s] *only natural ingredients*." *Id.* at *3. Similarly, although it is reasonable for consumers to form an understanding that Trader Joe's Product contains *manuka honey* after reading the ingredient statement, it is not reasonable for consumers to conclude that it promises not to contain any pollen other than that of the manuka plant.

The ingredient statement also does not pose any "front-back" bait-and-switch problem. Plaintiffs argue that the ingredient statement is particularly misleading because reasonable consumers rely on an ingredient statement for a "more detailed explanation of a product's make-up." Opening Br. at 31. This contradicts Plaintiffs' conclusion that Trader Joe's should rectify the ingredient statement by providing *less* information, such as listing simply "honey" as the

Product's sole ingredient or by including no ingredient statement at all.[13]  Plaintiffs cannot assert that the ingredient statement provides insufficient information while demanding that it disclose less.  They essentially argue that labeling a honey product with its chief floral source is *per se* misleading because it informs consumers that a honey comes primarily from the nectar of a particular flower without disclosing that the flower is not the exclusive source of the honey. Plaintiffs have articulated neither how consumers are misled by having the additional information that a flower is a honey's primary source nor how consumer choice would be bettered where such information cannot be disclosed in the ingredient statement at all.

Regardless, the Product's ingredient statement is consistent with the front label, and thus there is "no deceptive act to be dispelled."  *Ebner*, 838 F.3d at 966 (dismissing false advertising claims in part when the product's packaging accurately stated the net weight in compliance with state and federal law and the weight representation did not "contradict other representations or inferences on [defendant's] packaging" about the amount of accessible product).  The Product is

---

[13] Plaintiffs have also abandoned the argument that in order to comply with state consumer protection laws, Trader Joe's was required to "list[] all the various types of honey in the Product in descending order of predominance—e.g., Manuka honey, kanuka honey, clover honey . . . ." in favor of arguing that "manuka" on the ingredient statement communicates "100% manuka pollen."  *Compare* ER 118 *with* Opening Br. at 31-32.  Plaintiffs now assert that consumers would have been better served had Trader Joe's given consumers less information.

"100% Manuka Honey" because it is comprised of single-ingredient honey for which manuka is the chief floral source. The ingredient statement represents nothing different. *Compare Brown*, 2019 WL 996399 at *3 (finding no "bait-and-switch" problem when the ingredient statement listed an artificial ingredient and the front label did not communicate "only natural ingredients") *with Brady v. Bayer Corp.*, 26 Cal. App. 5th 1156, 1172 (2018) (noting a "front-back problem" when vitamin's "One A Day" representation on the front label in large type conflicted with back label's "nanotype" print that, in fact, two vitamins were required daily).

The Product's ingredient statement makes no pollen claim or other representation that could plausibly render the ingredient statement false or misleading by relating "manuka honey" to pollen count. *See Hill*, 195 Cal. App. 4th at 1304 (holding that the "context" of an allegedly false or misleading statement was "vitally important" to determine whether plaintiff's had stated a plausible claim).

### b. Reasonable Consumers Know an Ingredient Statement Simply Lists Ingredients.

No reasonable consumer would plausibly believe that the Product's ingredient statement communicates that the product contains *100% manuka pollen* because reasonable consumers understand that the ingredient statement simply states the ingredients a product contains. This understanding is consistent with

longstanding federal requirements and industry practice that ingredient statements communicate only the discrete ingredients that comprise a food. FDA regulations require the ingredient statement to list each of the product's ingredients in descending order of predominance. *See* 21 C.F.R. § 101.4(a). Consumers are widely familiar with the purpose and format of the ingredient statement, which appears on countless food products in their homes. *See Workman*, 141 F. Supp. 3d at 1035-36 (holding that a reasonable consumer would understand the ingredient statement to communicate the constituent ingredients and their order of predominance). By creating a set of norms with which the industry complies, federal law therefore shapes consumer understanding of honey products and ingredients statements.

Since at least 1980, federal law has permitted producers to list "manuka honey" as the sole ingredient on the ingredient statement so long as manuka is the chief floral source. *See* FDA Source Declaration Policy at A-59. Thus, listing "manuka honey" on the ingredient statement accurately communicates to consumers that the product contains no other ingredient other than manuka honey. So while Plaintiffs are correct that reasonable consumers rely on the ingredient statement for a "more detailed explanation of a product's make-up," a reasonable consumer would not expect the Product to contain anything more or less than manuka honey when the ingredient statement lists only "manuka honey."

34

C.  **FEDERAL LAW EXPRESSLY PREEMPTS PLAINTIFFS' THEORY THAT HONEY MUST BE LABELED ACCORDING TO ITS POLLEN CONTENT, RATHER THAN ITS HONEY CONTENT.**

Even if a reasonable consumer could plausibly be deceived by the term "manuka honey" on the ingredient statement, Plaintiffs still would not prevail because, as the District Court correctly concluded, federal law preempts their state-law claims. ER 34. Plaintiffs incorrectly argue that the District Court based its preemption finding "solely on the basis of Plaintiffs' failure to plead adulteration." Opening Br. at 25-26. On the contrary, the District Court rightly held that Trader Joe's fully complied with the labeling standards in the FDCA and that the FDCA's express preemption provision, codified as part of the Nutrition Labeling and Education Act ("NLEA"), foreclosed the possibility of liability under any state-law requirement in excess of the federal requirements. ER 34. This Court should affirm the District Court's decision that Plaintiffs' attack on the ingredient statement fails.

### 1.  The NLEA's Express Preemption Provision Applies to Food Labeling Requirements at Issue.

The FDCA, as amended by the NLEA, expressly forecloses the possibility of state-law liability for labeling the Product and its sole ingredient as "manuka honey." Under the Supremacy Clause of the United States Constitution, federal law expressly preempts state law when Congress enacts a statute that explicitly addresses its preemptive effect ("express preemption"). *See Reid v. Johnson &*

35

*Johnson*, 780 F.3d 952, 959 (9th Cir. 2015). The FDCA and NLEA set uniform standards for food labeling and expressly preempt any food labeling requirement that is not identical to federal law. *See* 21 U.S.C. § 343-1; *Durnford v. MusclePharm Corp.*, 907 F.3d 595, 601 (9th Cir. 2018); *Hawkins v. Kroger Co.*, 906 F.3d 763, 769-70 (9th Cir. 2018). The NLEA's express preemption provision, codified at 21 U.S.C. § 343-1(a)(2), explicitly preempts food labeling requirements that are inconsistent with the NLEA's food labeling requirements. 21 U.S.C. § 343-1(a)(2) ("[N]o State . . . may directly or indirectly establish under any authority or continue in effect as to any food in interstate commerce . . . any requirement for the labeling of food of the type required by section . . . 343(i)(2) [NLEA] . . . that is not identical to the requirement of such section . . . ."); *Ross*, 2013 WL 146367 at *10 ("[W]hen confronted with conflicting state labeling requirements, federal law controls how a food must be labeled."). Where, as here, a federal statute contains an express preemption provision, courts must interpret the provision and identify the "domain" expressly preempted. *See Chae v. SLM Corp.*, 593 F.3d 936, 942 (9th Cir. 2010). FDA regulations "have the same preemptive effect as [a] statute." *Durnford*, 907 F.3d at 602; *Hawkins*, 906 F.3d at 770 ("[I]f FDA regulations expressly permit [a] claim . . . on the face of a product's packaging, any state law claim to the contrary would be preempted.").

Plaintiffs do not dispute that the NLEA requirements for food labeling fall within the "domain" of the NLEA's express preemption provision. Opening Br. at 33. As the District Court noted, Plaintiffs admit that the state consumer-protection laws at issue here—including those of California, New York, and North Carolina—"mirror and incorporate federal law" governing "food labeling deception," citing 21 U.S.C. § 343, *et seq*., and food adulteration 21 U.S.C. § 342, *et seq*. ER 34 (citing ER 213, 213 n. 4-5). Because Plaintiffs seek to use state-law claims to challenge statements permitted under federal law, their claims are preempted by the FDCA and FDA regulations. *See Carrea v. Dreyer's Grand Ice Cream, Inc*., 475 F. App'x 113, 115 (9th Cir. 2012) (finding claims that sought to "enjoin and declare unlawful the very statement that federal law permits and defines" would "impose a burden through state law that is not identical to" FDA requirements, and were "therefore expressly preempted." (citing *Degelmann v. Advanced Med. Optics, Inc*., 659 F.3d 835, 840-42 (9th Cir. 2011))).

## 2. The Product's Label Complies with Federal Requirements for Listing the "Common or Usual Name."

Because Trader Joe's followed federal regulations requiring that it declare the ingredient by its "common or usual name," Plaintiffs' attempt to use state law to require Trader Joe's to label its product differently is preempted. Under the NLEA, a product's name ("statement of identity") and declaration of ingredients ("ingredient statement") must use the product's "common or usual name." 21

U.S.C. § 343(i)(2) ("A food shall be deemed to be misbranded . . . [u]nless its label bears (1) the common or usual name of the food, if any there be, and (2) in case it is fabricated from two or more ingredients, the common or usual name of each such ingredient."); 21 C.F.R. § 101.3(a)-(b) (establishing that the "statement of identity shall be in terms . . . [as] required by any applicable Federal law or regulation" or by the "common or usual name of the food"); 21 C.F.R. § 101.4(a)(1) ("Ingredients . . . shall be listed by common or usual name . . . .").

The "common or usual name" of a food must "accurately identify or describe, in as simple and direct terms as possible, the basic nature of the food or its characterizing properties or ingredients" and be "uniform among all identical or similar products." 21 C.F.R. § 102.5(a).

Trader Joe's fully complied with the FDA's industry guidance for honey labeling. *See* FDA Honey Labeling Guidance at A-64. Under that guidance, if a food contains "only honey," it "*must* be named 'honey,' which is its common or usual name." *Id*. And the FDA expressly permits producers to declare the floral source of honey so long as the identified floral source is the "chief floral source." *Id*. This is consistent with the FDA's policy since at least 1980. *See* FDA Source Declaration Policy at A-59 ("A honey may be labeled with the name of the plant or blossom provided that the particular plant or blossom is the chief floral source of the honey, such as 'Orange Blossom Honey' or 'Clover Honey.'").

Because manuka is the Product's chief floral source—as shown by Plaintiffs' own testing—the FDA requires Trader Joe's to label the Product "honey" and expressly permits it to use "manuka honey" for the Product's statement of identity and ingredient statement. ER 218, 310-11 (showing that the Product's manuka pollen count tested at approximately 60%). Plaintiffs grudgingly admit as much. Opening Br. at 24 ("The Product is '100% Manuka Honey' only in the attenuated legalistic sense that the FDA Honey Guidance may authorize Trader Joe's to market each and every tablespoon of honey in the product as 'Manuka Honey' notwithstanding that 40% of the honey is non-manuka.").[14]

While Plaintiffs fail to argue that "manuka honey" is not the common or usual name of the sole ingredient in Trader Joe's Product, they argue only that this

---

[14] Trader Joe's does not argue that the FDA Honey Labeling Guidance and Source Declaration Policy are legally binding such that they have preemptive effect on their own. Rather, Plaintiffs' claims are preempted because Trader Joe's must list ingredients by their "common or usual name," 21 C.F.R. § 101.4(a)(1), and Plaintiffs do not—and cannot—allege that manuka honey is not the Product's chief floral source and therefore that "manuka honey" is not the product's "common or usual name." The FDA requires that the "common or usual name" must be "uniform among all identical or similar products." 21 C.F.R. § 102.5(a). And the FDA Honey Labeling Guidance recognizes that labeling honey with its chief floral source furthers the "[a]ccurate and consistent labeling of honey" as required by section 102.5(a). *See* FDA Honey Labeling Guidance at A-62. Plaintiffs have not alleged or argued that labeling honey by its chief floral source undermines uniformity among honeys or causes confusion between different products. Instead, Plaintiffs proposed requirement that honeys with pollen from more than one floral source (that is, all honey) be called "blended honey" or only "honey" has a likelihood of creating confusing similarities between products that are not blends and have different chief floral sources.

39

term should not be used when it comes to the ingredient statement.  Opening Brief at 29 (arguing that listing manuka honey as the sole ingredient creates an "erroneous impression" about the purity of the honey).  They present no basis to conclude that the FDA considers the common or usual name inappropriate for the ingredient statement if it is permitted on the front-facing label.  When manuka is the chief floral source, "honey" or "manuka honey" is the "common or usual name" for purposes of both the statements of identity and the ingredient statements, and the FDA's practice of allowing producers to forego an ingredient statement for single-ingredient products indicates that the front and back of the label must communicate the same thing.  FDA Honey Labeling Guidance at A-64; *see also* 21 C.F.R. § 101.4(a); 21 C.F.R. § 101.3(a)-(b).  Where Plaintiffs have failed to show that the FDA treats the front-facing label and the ingredient statement differently when it comes to the substance of disclosing an ingredient by its common or usual name—that is, that a common or usual name can be misleading in the ingredient statement if it is disclosed on the front of a product— their assertion that it is misleading to place the common or usual name on the ingredient statement is preempted.  Courts have determined that state law claims forcing changes to the common or usual name of ingredients on the ingredient statement are preempted.  *See Sims v. Campbell Soup Co.*, Case No. EDCV 18-668 PSG (SPx), 2018 WL 7568640 at *7-8 (C.D. Cal. Sept. 24, 2018) (holding that

claim purporting that defendant's ingredient statement must list the "scientific" name "d-l malic acid" instead of the common or usual name "malic acid" to be preempted); *see also Allred v. Frito-Lay N. Am*., Case No.: 17-CV-1345 JLS (BGS), 2018 WL 1185227 at *3 (S.D. Cal. Mar. 7, 2018) (declining to find preemption when there was a dispute as to whether "d-l malic acid" was the "common or usual name" of "malic acid").

Plaintiffs argue their state law claims are not preempted because the product does not "consist[] entirely of manuka honey." Opening Br. at 30. But they have abandoned their adulteration allegations and do not argue here that Trader Joe's has added any honey that is not manuka honey to the Product. *See* Opening Br. at 24 (conceding that the Product is manuka honey in the "legalistic sense" where it contains 40% pollen from other flowers). So their suggestion that the Product is not entirely manuka honey is a reference to pollen count and is preempted by 40 years of FDA policy and its regulations regarding standards of identity.[15] According to the FDA, if a product contains only honey—even honey from several floral sources, as all honeys do—it is a *single-ingredient* food. *See* Honey

---

[15] To the extent Plaintiffs argue that pollen is a "characterizing component" under 21 C.F.R. § 102.5(c) such that "[l]isting manuka honey as the sole ingredient would create 'an erroneous impression' that more manuka [pollen] is present in the Product than is actually the case," they provide no authority to support this claim. Opening Br. at 29. Indeed, another court addressing this issue agreed that no authority supports the position that "pollen" is a "characterizing component" of honey. *Brod v. Sioux Honey Ass'n Co-op*., No. C–12–1322 EMC, 2012 WL 3987516 at *12 (N.D. Cal. Sept. 11, 2012), *aff'd* 609 F. App'x 415 (9th Cir. 2015).

Labeling Guidance at A-64 ("Because honey is a single-ingredient food, you do not need to include an ingredient statement on the label").

Plaintiffs suggest that the law ought to require Trader Joe's to call the Product "manuka-based honey blend," a proposition that would force changes across the honey industry and would rewrite federal law. Opening Br. at 5; ER 213-14. No FDA regulations or guidance state that "Manuka-based honey blend" could be the common or usual name of a honey containing primarily honey from manuka flowers, regardless of what percentage of its pollen comes from other flowers. Forcing producers to abandon the longstanding FDA guidances would harm consumers, not help them. If producers must label honey products as "blends" of honey from several floral sources rather than declaring them by their chief floral source, all honeys would be called "blend," which could mislead consumers into believing they contained something other than single-ingredient honey. Consumers would get far less information if every honey on the market (including actual blends of multiple honeys) were called "honey blend."

Finally, Plaintiffs' citation to *Tran v. Sioux Honey Ass'n, Coop.* does not help their case because *Tran* did not involve a labeling claim that the FDA considered part of the ingredient's common or usual name. Opening Br. at 27 (citing 2018 U.S. Dist. LEXIS 146380 at *7-8 (C.D. Cal. Aug. 20, 2018)). In *Tran*, the plaintiffs argued that representations of "Pure" and "100% Pure" on

honey labels were false or misleading because the products allegedly contained glyphosate, a synthetic chemical and herbicide.  2018 U.S. Dist. LEXIS 146380, at *7-8.  The court held that the claims were not preempted because no FDA regulation expressly required the honey producers to label their products "Pure" or "100% Pure."  *Id.*  Here, FDA regulations expressly require honey to be labeled by its "common or usual name," and the FDA's longstanding policy is that "manuka honey" is the "common or usual name" for single-ingredient honeys sourced chiefly from manuka.

Federal law preempts Plaintiffs' state-law claims, and the District Court rightly rejected them.  This Court should affirm that decision.

**D.    THE SAFE HARBOR DOCTRINE BARS PLAINTIFFS' ASSERTION THAT CALLING THE PRODUCT "MANUKA HONEY" ON THE LABEL OR INGREDIENT STATEMENT IS MISLEADING.**

The safe harbor doctrine provides another independent basis to affirm dismissal of Plaintiff's claims.  Trader Joe's complied with federal law in labeling the product "manuka honey" as both the product name and as the sole ingredient in the ingredient statement.  Under the safe-harbor doctrine, Plaintiffs cannot impose liability on Trader Joe's for following federal law.

The Product's name and ingredient statement complied with federal law. Under federal law, the "statement of identity"[16] and "ingredient statement" must use the product's "common or usual name." 21 U.S.C. § 343(i)(2); 21 C.F.R. § 101.3(a)-(b); 21 C.F.R. § 101.4(a)(1).[17] And, again, "manuka honey" is the "common or usual name" of honey sourced chiefly from manuka.

Because the Product's label complies with the FDCA requirements and FDA guidances, the safe-harbor doctrine bars Plaintiffs' claims as a matter of law. The safe-harbor doctrine creates an absolute barrier to imposing liability on defendants who otherwise comply with federal and state laws. *See Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 973 P.2d 527, 541 (Cal. 1999) (holding that plaintiffs may not bring an action under the UCL if the defendants have complied with and are therefore immune under some other law); *see also Ebner*, 838 F.3d at 963 (holding that product labeling that is affirmatively permitted by the FDCA falls within the safe harbor doctrine, which bars unfair competition claims under the UCL, CLRA,

---

[16] The "statement of identity" may also be established by regulation. 21 C.F.R. § 101.3(a)-(b). No federal regulation establishes the "statement of identity" for honey, so the "common or usual name" is used. *Ross*, 2013 WL 146367 at *10.

[17] FDA guidance establishes that honey is a "single-ingredient food" for which an ingredient statement is not required. FDA Honey Labeling Guidance at A-64; *see also* 21 U.S.C. 343(i)(2) ("A food shall be deemed to be misbranded . . . [u]nless its label bears . . . in case it is fabricated from *two or more* ingredients, the common or usual name of each such ingredient."); 21 C.F.R. § 101.100(a) (noting that the FDCA requires a "declaration on the label of the common or usual name of each ingredient when the food is fabricated from *two or more ingredients*."). However, if a producer chooses to include an ingredient statement, the statement must use the food's "common or usual name." 21 C.F.R. 101.4(a)(1).

44

and FAL); *Duke v. Flying J, Inc.*, 178 F. Supp. 3d 918, 926 (N.D. Cal. 2016) (noting that North Carolina provides a safe harbor to liability under the North Carolina Unfair and Deceptive Trade Practices Act "where the alleged misconduct is required or specifically permitted by federal or state law"); *Am. Home Prods. Corp. v. Johnson & Johnson*, 672 F. Supp. 135, 144 (S.D.N.Y. 1987) (holding that "compliance with FDA . . . requirements is a complete defense" to N.Y. General Business Law §§ 349 and 350 consumer protection law claims under the safe harbor doctrine). Trader Joe's complies with the FDCA and with FDA requirements by labeling the Product with "manuka honey," the common or usual name of the only ingredient. *See* 21 U.S.C. § 343(i)(2); 21 C.F.R. § 102.5(a), (d); *see also* FDA Honey Labeling Guidance at A-64; FDA Source Declaration Policy at A-59.

## VII.   CONCLUSION

Plaintiffs paid a fair price for an accurately labeled product. Their claims to the contrary ignore federal food-labeling laws, overlook the market price for high-manuka-pollen honey, and assume—baselessly—that all consumers share Plaintiffs' idiosyncratic and illogical interpretation of food labels. The District Court properly rejected these deficient claims, and this Court should affirm that decision.

Dated: January 23, 2020                    Respectfully submitted,

                                                    */s/ Dawn Sestito*

                                           Dawn Sestito
                                           Collins Kilgore
                                           O'Melveny & Myers LLP
                                           400 S. Hope Street, 18th Floor
                                           Los Angeles, CA 90071
                                           Telephone: (213) 430-8060
                                           Facsimile: (213) 430-6407
                                           dsestito@omm.com
                                           ckilgore@omm.com
                                           *Attorneys for Appellee Trader Joe's
                                           Company*

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 10,883 words.

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6).  It has been prepared in 14-point Times New Roman type, which is a proportionally spaced typeface.


Dated: January 23, 2020                          */s/ Dawn Sestito*
                                                            _____

                                                            Dawn Sestito
                                                            O'Melveny & Myers LLP
                                                            *Attorneys for Appellee Trader Joe's Company*

47

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, Appellee hereby states that there are no known related cases pending in this Court.


Dated: January 23, 2020

*/s/ Dawn Sestito*

Dawn Sestito
O'Melveny & Myers LLP
*Attorneys for Appellee Trader Joe's Company*

# ADDENDUM

**ADDENDUM TO THE ANSWERING BRIEF OF DEFENDANT-
APPELLEE TRADER JOE'S COMPANY PURSUANT TO NINTH
CIRCUIT RULE 28-2.7**

## TABLE OF CONTENTS

21 U.S.C. § 342 ........................................................................................ A-2

21 U.S.C. § 343 ........................................................................................ A-6

21 U.S.C. § 343-1 .................................................................................. A-40

21 C.F.R. § 101.100(a) .......................................................................... A-42

21 C.F.R. § 101.3 .................................................................................. A-45

21 C.F.R. § 101.4 .................................................................................. A-48

21 C.F.R. § 102.5 .................................................................................. A-56

FDA, Compliance Policy Guide Honey – Source Declaration (1980) .............. A-59

FDA, Proper Labeling of Honey and Honey Products: Guidance for Industry (Feb.
2018) .................................................................................................... A-60

## 21 U.S.C. § 342 — Adulterated Food

**...**

A food shall be deemed to be adulterated--

### (a) Poisonous, insanitary, etc., ingredients

**(1)** If it bears or contains any poisonous or deleterious substance which may render it injurious to health; but in case the substance is not an added substance such food shall not be considered adulterated under this clause if the quantity of such substance in such food does not ordinarily render it injurious to health.[1]

**(2)**

**(A)** if it bears or contains any added poisonous or added deleterious substance (other than a substance that is a pesticide chemical residue in or on a raw agricultural commodity or processed food, a food additive, a color additive, or a new animal drug) that is unsafe within the meaning of section 346 of this title; or

**(B)** if it bears or contains a pesticide chemical residue that is unsafe within the meaning of section 346a(a) of this title; or

**(C)** if it is or if it bears or contains

**(i)** any food additive that is unsafe within the meaning of section 348 of this title; or

**(ii)** a new animal drug (or conversion product thereof) that is unsafe within the meaning of section 360b of this title; or

**(3)** if it consists in whole or in part of any filthy, putrid, or decomposed substance, or if it is otherwise unfit for food; or

**(4)** if it has been prepared, packed, or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health; or

**(5)** if it is, in whole or in part, the product of a diseased animal or of an animal which has died otherwise than by slaughter; or

**(6)** if its container is composed, in whole or in part, of any poisonous or deleterious substance which may render the contents injurious to health; or

**(7)** if it has been intentionally subjected to radiation, unless the use of the radiation was in conformity with a regulation or exemption in effect pursuant to section 348 of this title.

## (b) Absence, substitution, or addition of constituents

**(1)** If any valuable constituent has been in whole or in part omitted or abstracted therefrom; or

**(2)** if any substance has been substituted wholly or in part therefor; or

**(3)** if damage or inferiority has been concealed in any manner; or

**(4)** if any substance has been added thereto or mixed or packed therewith so as to increase its bulk or weight, or reduce its quality or strength, or make it appear better or of greater value than it is.

## (c) Color additives

If it is, or it bears or contains, a color additive which is unsafe within the meaning of section 379e(a) of this title.

## (d) Confectionery containing alcohol or nonnutritive substance

If it is confectionery, and--

**(1)** has partially or completely imbedded therein any nonnutritive object, except that this subparagraph shall not apply in the case of any nonnutritive object if, in the judgment of the Secretary as provided by regulations, such object is of practical functional value to the confectionery product and would not render the product injurious or hazardous to health;

**(2)** bears or contains any alcohol other than alcohol not in excess of one-half of 1 per centum by volume derived solely from the use of flavoring extracts, except that this clause shall not apply to confectionery which is introduced or delivered for introduction into, or received or held for sale in, interstate commerce if the sale of such confectionery is permitted under the laws of the State in which such confectionery is intended to be offered for sale; or

**(3)** bears or contains any nonnutritive substance, except that this subparagraph shall not apply to a safe nonnutritive substance which is in or on confectionery by reason of its use for some practical

functional purpose in the manufacture, packaging, or storage of such confectionery if the use of the substance does not promote deception of the consumer or otherwise result in adulteration or misbranding in violation of any provision of this chapter, except that the Secretary may, for the purpose of avoiding or resolving uncertainty as to the application of this subparagraph, issue regulations allowing or prohibiting the use of particular nonnutritive substances.

**(e) Oleomargarine containing filthy, putrid, etc., matter**

If it is oleomargarine or margarine or butter and any of the raw material used therein consisted in whole or in part of any filthy, putrid, or decomposed substance, or such oleomargarine or margarine or butter is otherwise unfit for food.

**(f) Dietary supplement or ingredient: safety**

**(1)** If it is a dietary supplement or contains a dietary ingredient that--

**(A)** presents a significant or unreasonable risk of illness or injury under--

**(i)** conditions of use recommended or suggested in labeling, or

**(ii)** if no conditions of use are suggested or recommended in the labeling, under ordinary conditions of use;

**(B)** is a new dietary ingredient for which there is inadequate information to provide reasonable assurance that such ingredient does not present a significant or unreasonable risk of illness or injury;

**(C)** the Secretary declares to pose an imminent hazard to public health or safety, except that the authority to make such declaration shall not be delegated and the Secretary shall promptly after such a declaration initiate a proceeding in accordance with sections 554and 556 of Title 5 to affirm or withdraw the declaration; or

**(D)** is or contains a dietary ingredient that renders it adulterated under paragraph (a)(1) under the conditions of use recommended or suggested in the labeling of such dietary supplement.

In any proceeding under this subparagraph, the United States shall bear the burden of proof on each element to show that a

dietary supplement is adulterated. The court shall decide any issue under this paragraph on a de novo basis.

**(2)** Before the Secretary may report to a United States attorney a violation of paragraph[2] (1)(A) for a civil proceeding, the person against whom such proceeding would be initiated shall be given appropriate notice and the opportunity to present views, orally and in writing, at least 10 days before such notice, with regard to such proceeding.

## (g) Dietary supplement: manufacturing practices

**(1)** If it is a dietary supplement and it has been prepared, packed, or held under conditions that do not meet current good manufacturing practice regulations, including regulations requiring, when necessary, expiration date labeling, issued by the Secretary under subparagraph (2).

**(2)** The Secretary may by regulation prescribe good manufacturing practices for dietary supplements. Such regulations shall be modeled after current good manufacturing practice regulations for food and may not impose standards for which there is no current and generally available analytical methodology. No standard of current good manufacturing practice may be imposed unless such standard is included in a regulation promulgated after notice and opportunity for comment in accordance with chapter 5 of Title 5.

## (h) Reoffer of food previously denied admission

If it is an article of food imported or offered for import into the United States and the article of food has previously been refused admission under section 381(a) of this title, unless the person reoffering the article affirmatively establishes, at the expense of the owner or consignee of the article, that the article complies with the applicable requirements of this chapter, as determined by the Secretary.

## (i) Noncompliance with sanitary transportation practices

If it is transported or offered for transport by a shipper, carrier by motor vehicle or rail vehicle, receiver, or any other person engaged in the transportation of food under conditions that are not in compliance with regulations promulgated under section 350e of this title.

## 21 U.S.C. § 343 — Misbranded Food

**…**

A food shall be deemed to be misbranded--

### (a) False or misleading label

If…

(**1**) its labeling is false or misleading in any particular, or

(**2**) in the case of a food to which section 350 of this title applies, its advertising is false or misleading in a material respect or its labeling is in violation of section 350(b)(2) of this title.

### (b) Offer for sale under another name

If it is offered for sale under the name of another food.

### (c) Imitation of another food

If it is an imitation of another food, unless its label bears, in type of uniform size and prominence, the word "imitation" and, immediately thereafter, the name of the food imitated.

### (d) Misleading container

If its container is so made, formed, or filled as to be misleading.

### (e) Package form

If in package form unless it bears a label containing…

(**1**) the name and place of business of the manufacturer, packer, or distributor; and

(**2**) an accurate statement of the quantity of the contents in terms of weight, measure, or numerical count, except that under clause (2) of this paragraph reasonable variations shall be permitted, and exemptions as to small packages shall be established, by regulations prescribed by the Secretary.

### (f) Prominence of information on label

If any word, statement, or other information required by or under authority of this chapter to appear on the label or labeling is not prominently placed thereon with such conspicuousness (as compared with other words, statements, designs, or devices, in the labeling) and in such terms as to

render it likely to be read and understood by the ordinary individual under customary conditions of purchase and use.

**(g) Representation as to definition and standard of identity**

If it purports to be or is represented as a food for which a definition and standard of identity has been prescribed by regulations as provided by section 341 of this title, unless…

> **(1)** it conforms to such definition and standard, and

> **(2)** its label bears the name of the food specified in the definition and standard, and, insofar as may be required by such regulations, the common names of optional ingredients (other than spices, flavoring, and coloring) present in such food.

**(h) Representation as to standards of quality and fill of container**

If it purports to be or is represented as--

> **(1)** a food for which a standard of quality has been prescribed by regulations as provided by section 341 of this title, and its quality falls below such standard, unless its label bears, in such manner and form as such regulations specify, a statement that it falls below such standard;

> **(2)** a food for which a standard or standards of fill of container have been prescribed by regulations as provided by section 341 of this title, and it falls below the standard of fill of container applicable thereto, unless its label bears, in such manner and form as such regulations specify, a statement that it falls below such standard; or

> **(3)** a food that is pasteurized unless--

>> **(A)** such food has been subjected to a safe process or treatment that is prescribed as pasteurization for such food in a regulation promulgated under this chapter; or

>> **(B)**

>>> **(i)** such food has been subjected to a safe process or treatment that--

>>>> **(I)** is reasonably certain to achieve destruction or elimination in the food of the most resistant microorganisms of public health significance that are likely to occur in the food;

**(II)** is at least as protective of the public health as a process or treatment described in subparagraph (A);

**(III)** is effective for a period that is at least as long as the shelf life of the food when stored under normal and moderate abuse conditions; and

**(IV)** is the subject of a notification to the Secretary, including effectiveness data regarding the process or treatment; and

**(ii)** at least 120 days have passed after the date of receipt of such notification by the Secretary without the Secretary making a determination that the process or treatment involved has not been shown to meet the requirements of subclauses (I) through (III) of clause (i).

For purposes of paragraph (3), a determination by the Secretary that a process or treatment has not been shown to meet the requirements of subclauses (I) through (III) of subparagraph (B)(i) shall constitute final agency action under such subclauses.

**(i) Label where no representation as to definition and standard of identity**

Unless its label bears

**(1)** the common or usual name of the food, if any there be, and **(2)** in case it is fabricated from two or more ingredients, the common or usual name of each such ingredient and if the food purports to be a beverage containing vegetable or fruit juice, a statement with appropriate prominence on the information panel of the total percentage of such fruit or vegetable juice contained in the food; except that spices, flavorings, and colors not required to be certified under section 379e(c) of this title[1] unless sold as spices, flavorings, or such colors, may be designated as spices, flavorings, and colorings without naming each. To the extent that compliance with the requirements of clause (2) of this paragraph is impracticable, or results in deception or unfair competition, exemptions shall be established by regulations promulgated by the Secretary.

**(j) Representation for special dietary use**

If it purports to be or is represented for special dietary uses, unless its label bears such information concerning its vitamin, mineral, and other dietary properties as the Secretary determines to be, and by regulations prescribes as, necessary in order fully to inform purchasers as to its value for such uses.

### (k) Artificial flavoring, artificial coloring, or chemical preservatives

If it bears or contains any artificial flavoring, artificial coloring, or chemical preservative, unless it bears labeling stating that fact, except that to the extent that compliance with the requirements of this paragraph is impracticable, exemptions shall be established by regulations promulgated by the Secretary. The provisions of this paragraph and paragraphs (g) and (i) with respect to artificial coloring shall not apply in the case of butter, cheese, or ice cream. The provisions of this paragraph with respect to chemical preservatives shall not apply to a pesticide chemical when used in or on a raw agricultural commodity which is the produce of the soil.

### (l) Pesticide chemicals on raw agricultural commodities

If it is a raw agricultural commodity which is the produce of the soil, bearing or containing a pesticide chemical applied after harvest, unless the shipping container of such commodity bears labeling which declares the presence of such chemical in or on such commodity and the common or usual name and the function of such chemical, except that no such declaration shall be required while such commodity, having been removed from the shipping container, is being held or displayed for sale at retail out of such container in accordance with the custom of the trade.

### (m) Color additives

If it is a color additive, unless its packaging and labeling are in conformity with such packaging and labeling requirements, applicable to such color additive, as may be contained in regulations issued under section 379e of this title.

### (n) Packaging or labeling of drugs in violation of regulations

If its packaging or labeling is in violation of an applicable regulation issued pursuant to section 1472 or 1473 of Title 15.

### (o) Repealed. Pub.L. 106-554, § 1(a)(1) [Title V, § 517], Dec. 21, 2000, 114 Stat. 2763, 2763A-73

### (p) Repealed. Pub.L. 104-124, § 1, Apr. 1, 1996, 110 Stat. 882

### (q) Nutrition information

**(1)** Except as provided in subparagraphs (3), (4), and (5), if it is a food intended for human consumption and is offered for sale, unless its label or labeling bears nutrition information that provides--

**(A)**

**(i)** the serving size which is an amount customarily consumed and which is expressed in a common household measure that is appropriate to the food, or

**(ii)** if the use of the food is not typically expressed in a serving size, the common household unit of measure that expresses the serving size of the food,

**(B)** the number of servings or other units of measure per container,

**(C)** the total number of calories--

**(i)** derived from any source, and

**(ii)** derived from the total fat, in each serving size or other unit of measure of the food,

**(D)** the amount of the following nutrients: Total fat, saturated fat, cholesterol, sodium, total carbohydrates, complex carbohydrates, sugars, dietary fiber, and total protein contained in each serving size or other unit of measure,

**(E)** any vitamin, mineral, or other nutrient required to be placed on the label and labeling of food under this chapter before October 1, 1990, if the Secretary determines that such information will assist consumers in maintaining healthy dietary practices.

The Secretary may by regulation require any information required to be placed on the label or labeling by this subparagraph or subparagraph (2)(A) to be highlighted on the label or labeling by larger type, bold type, or contrasting color if the Secretary determines that such highlighting will assist consumers in maintaining healthy dietary practices.

**(2)**

**(A)** If the Secretary determines that a nutrient other than a nutrient required by subparagraph (1)(C), (1)(D), or (1)(E) should be included in the label or labeling of food subject to

subparagraph (1) for purposes of providing information regarding the nutritional value of such food that will assist consumers in maintaining healthy dietary practices, the Secretary may by regulation require that information relating to such additional nutrient be included in the label or labeling of such food.

**(B)** If the Secretary determines that the information relating to a nutrient required by subparagraph (1)(C), (1)(D), or (1)(E) or clause (A) of this subparagraph to be included in the label or labeling of food is not necessary to assist consumers in maintaining healthy dietary practices, the Secretary may by regulation remove information relating to such nutrient from such requirement.

**(3)** For food that is received in bulk containers at a retail establishment, the Secretary may, by regulation, provide that the nutrition information required by subparagraphs (1) and (2) be displayed at the location in the retail establishment at which the food is offered for sale.

**(4)**

**(A)** The Secretary shall provide for furnishing the nutrition information required by subparagraphs (1) and (2) with respect to raw agricultural commodities and raw fish by issuing voluntary nutrition guidelines, as provided by clause (B) or by issuing regulations that are mandatory as provided by clause (D).

**(B)**

**(i)** Upon the expiration of 12 months after November 8, 1990, the Secretary, after providing an opportunity for comment, shall issue guidelines for food retailers offering raw agricultural commodities or raw fish to provide nutrition information specified in subparagraphs (1) and (2). Such guidelines shall take into account the actions taken by food retailers during such 12-month period to provide to consumers nutrition information on raw agricultural commodities and raw fish. Such guidelines shall only apply--

**(I)** in the case of raw agricultural commodities, to the 20 varieties of vegetables most frequently consumed during a year and the 20 varieties of fruit most frequently consumed during a year, and

**(II)** to the 20 varieties of raw fish most frequently consumed during a year.

The vegetables, fruits, and raw fish to which such guidelines apply shall be determined by the Secretary by regulation and the Secretary may apply such guidelines regionally.

**(ii)** Upon the expiration of 12 months after November 8, 1990, the Secretary shall issue a final regulation defining the circumstances that constitute substantial compliance by food retailers with the guidelines issued under subclause (i). The regulation shall provide that there is not substantial compliance if a significant number of retailers have failed to comply with the guidelines. The size of the retailers and the portion of the market served by retailers in compliance with the guidelines shall be considered in determining whether the substantial-compliance standard has been met.

**(C)**

**(i)** Upon the expiration of 30 months after November 8, 1990, the Secretary shall issue a report on actions taken by food retailers to provide consumers with nutrition information for raw agricultural commodities and raw fish under the guidelines issued under clause (A). Such report shall include a determination of whether there is substantial compliance with the guidelines.

**(ii)** If the Secretary finds that there is substantial compliance with the guidelines, the Secretary shall issue a report and make a determination of the type required in subclause (i) every two years.

**(D)**

**(i)** If the Secretary determines that there is not substantial compliance with the guidelines issued under clause (A), the Secretary shall at the time such determination is made

issue proposed regulations requiring that any person who offers raw agricultural commodities or raw fish to consumers provide, in a manner prescribed by regulations, the nutrition information required by subparagraphs (1) and (2). The Secretary shall issue final regulations imposing such requirements 6 months after issuing the proposed regulations. The final regulations shall become effective 6 months after the date of their promulgation.

**(ii)** Regulations issued under subclause (i) may require that the nutrition information required by subparagraphs (1) and (2) be provided for more than 20 varieties of vegetables, 20 varieties of fruit, and 20 varieties of fish most frequently consumed during a year if the Secretary finds that a larger number of such products are frequently consumed. Such regulations shall permit such information to be provided in a single location in each area in which raw agricultural commodities and raw fish are offered for sale. Such regulations may provide that information shall be expressed as an average or range per serving of the same type of raw agricultural commodity or raw fish. The Secretary shall develop and make available to the persons who offer such food to consumers the information required by subparagraphs (1) and (2).

**(iii)** Regulations issued under subclause (i) shall permit the required information to be provided in each area of an establishment in which raw agricultural commodities and raw fish are offered for sale. The regulations shall permit food retailers to display the required information by supplying copies of the information provided by the Secretary, by making the information available in brochure, notebook or leaflet form, or by posting a sign disclosing the information. Such regulations shall also permit presentation of the required information to be supplemented by a video, live demonstration, or other media which the Secretary approves.

**(E)** For purposes of this subparagraph, the term "fish" includes freshwater or marine fin fish, crustaceans, and mollusks,

including shellfish, amphibians, and other forms of aquatic animal life.

**(F)** No person who offers raw agricultural commodities or raw fish to consumers may be prosecuted for minor violations of this subparagraph if there has been substantial compliance with the requirements of this paragraph.

**(5)**

**(A)** Subparagraphs (1), (2), (3), and (4) shall not apply to food--

**(i)** except as provided in clause (H)(ii)(III), which is served in restaurants or other establishments in which food is served for immediate human consumption or which is sold for sale or use in such establishments,

**(ii)** except as provided in clause (H)(ii)(III), which is processed and prepared primarily in a retail establishment, which is ready for human consumption, which is of the type described in subclause (i), and which is offered for sale to consumers but not for immediate human consumption in such establishment and which is not offered for sale outside such establishment,

**(iii)** which is an infant formula subject to section 350a of this title,

**(iv)** which is a medical food as defined in section 360ee(b) of this title, or

**(v)** which is described in section 345(2) of this title.

**(B)** Subparagraphs (1) and (2) shall not apply to the label of a food if the Secretary determines by regulations that compliance with such subparagraphs is impracticable because the package of such food is too small to comply with the requirements of such subparagraphs and if the label of such food does not contain any nutrition information.

**(C)** If a food contains insignificant amounts, as determined by the Secretary, of all the nutrients required by subparagraphs (1) and (2) to be listed in the label or labeling of food, the requirements of such subparagraphs shall not apply to such food if the label, labeling, or advertising of such food does not make any claim with respect to the nutritional value of such

food. If a food contains insignificant amounts, as determined by the Secretary, of more than one-half the nutrients required by subparagraphs (1) and (2) to be in the label or labeling of the food, the Secretary shall require the amounts of such nutrients to be stated in a simplified form prescribed by the Secretary.

**(D)** If a person offers food for sale and has annual gross sales made or business done in sales to consumers which is not more than $500,000 or has annual gross sales made or business done in sales of food to consumers which is not more than $50,000, the requirements of subparagraphs (1), (2), (3), and (4) shall not apply with respect to food sold by such person to consumers unless the label or labeling of food offered by such person provides nutrition information or makes a nutrition claim.

**(E)**

> **(i)** During the 12-month period for which an exemption from subparagraphs (1) and (2) is claimed pursuant to this subclause, the requirements of such subparagraphs shall not apply to any food product if--
>
> > **(I)** the labeling for such product does not provide nutrition information or make a claim subject to paragraph (r),
> >
> > **(II)** the person who claims for such product an exemption from such subparagraphs employed fewer than an average of 100 full-time equivalent employees,
> >
> > **(III)** such person provided the notice described in subclause (iii), and
> >
> > **(IV)** in the case of a food product which was sold in the 12-month period preceding the period for which an exemption was claimed, fewer than 100,000 units of such product were sold in the United States during such preceding period, or in the case of a food product which was not sold in the 12-month period preceding the period for which such exemption is claimed, fewer than 100,000 units of such product are reasonably

anticipated to be sold in the United States during the period for which such exemption is claimed.

**(ii)** During the 12-month period after the applicable date referred to in this sentence, the requirements of subparagraphs (1) and (2) shall not apply to any food product which was first introduced into interstate commerce before May 8, 1994, if the labeling for such product does not provide nutrition information or make a claim subject to paragraph (r), if such person provided the notice described in subclause (iii), and if--

> **(I)** during the 12-month period preceding May 8, 1994, the person who claims for such product an exemption from such subparagraphs employed fewer than an average of 300 full-time equivalent employees and fewer than 600,000 units of such product were sold in the United States,

> **(II)** during the 12-month period preceding May 8, 1995, the person who claims for such product an exemption from such subparagraphs employed fewer than an average of 300 full-time equivalent employees and fewer than 400,000 units of such product were sold in the United States, or

> **(III)** during the 12-month period preceding May 8, 1996, the person who claims for such product an exemption from such subparagraphs employed fewer than an average of 200 full-time equivalent employees and fewer than 200,000 units of such product were sold in the United States.

**(iii)** The notice referred to in subclauses (i) and (ii) shall be given to the Secretary prior to the beginning of the period during which the exemption under subclause (i) or (ii) is to be in effect, shall state that the person claiming such exemption for a food product has complied with the applicable requirements of subclause (i) or (ii), and shall--

> **(I)** state the average number of full-time equivalent employees such person employed during the 12

months preceding the date such person claims such exemption,

**(II)** state the approximate number of units the person claiming the exemption sold in the United States,

**(III)** if the exemption is claimed for a food product which was sold in the 12-month period preceding the period for which the exemption was claimed, state the approximate number of units of such product which were sold in the United States during such preceding period, and, if the exemption is claimed for a food product which was not sold in such preceding period, state the number of units of such product which such person reasonably anticipates will be sold in the United States during the period for which the exemption was claimed, and

**(IV)** contain such information as the Secretary may require to verify the information required by the preceding provisions of this subclause if the Secretary has questioned the validity of such information.

If a person is not an importer, has fewer than 10 full-time equivalent employees, and sells fewer than 10,000 units of any food product in any year, such person is not required to file a notice for such product under this subclause for such year.

**(iv)** In the case of a person who claimed an exemption under subclause (i) or (ii), if, during the period of such exemption, the number of full-time equivalent employees of such person exceeds the number in such subclause or if the number of food products sold in the United States exceeds the number in such subclause, such exemption shall extend to the expiration of 18 months after the date the number of full-time equivalent employees or food products sold exceeded the applicable number.

**(v)** For any food product first introduced into interstate commerce after May 8, 2002, the Secretary may by

regulation lower the employee or units of food products requirement of subclause (i) if the Secretary determines that the cost of compliance with such lower requirement will not place an undue burden on persons subject to such lower requirement.

(**vi**) For purposes of subclauses (i), (ii), (iii), (iv), and (v)--

    (**I**) the term "unit" means the packaging or, if there is no packaging, the form in which a food product is offered for sale to consumers,

    (**II**) the term "food product" means food in any sized package which is manufactured by a single manufacturer or which bears the same brand name, which bears the same statement of identity, and which has similar preparation methods, and

    (**III**) the term "person" in the case of a corporation includes all domestic and foreign affiliates of the corporation.

(**F**) A dietary supplement product (including a food to which section 350 of this title applies) shall comply with the requirements of subparagraphs (1) and (2) in a manner which is appropriate for the product and which is specified in regulations of the Secretary which shall provide that--

    (**i**) nutrition information shall first list those dietary ingredients that are present in the product in a significant amount and for which a recommendation for daily consumption has been established by the Secretary, except that a dietary ingredient shall not be required to be listed if it is not present in a significant amount, and shall list any other dietary ingredient present and identified as having no such recommendation;

    (**ii**) the listing of dietary ingredients shall include the quantity of each such ingredient (or of a proprietary blend of such ingredients) per serving;

    (**iii**) the listing of dietary ingredients may include the source of a dietary ingredient; and

(**iv**) the nutrition information shall immediately precede the ingredient information required under subclause (i), except that no ingredient identified pursuant to subclause (i) shall be required to be identified a second time.

(**G**) Subparagraphs (1), (2), (3), and (4) shall not apply to food which is sold by a food distributor if the food distributor principally sells food to restaurants or other establishments in which food is served for immediate human consumption and does not manufacture, process, or repackage the food it sells.

(**H**) **Restaurants, retail food establishments, and vending machines**

(**i**) **General requirements for restaurants and similar retail food establishments**

Except for food described in subclause (vii), in the case of food that is a standard menu item that is offered for sale in a restaurant or similar retail food establishment that is part of a chain with 20 or more locations doing business under the same name (regardless of the type of ownership of the locations) and offering for sale substantially the same menu items, the restaurant or similar retail food establishment shall disclose the information described in subclauses (ii) and (iii).

(**ii**) **Information required to be disclosed by restaurants and retail food establishments**

Except as provided in subclause (vii), the restaurant or similar retail food establishment shall disclose in a clear and conspicuous manner--

(**I**)(**aa**) in a nutrient content disclosure statement adjacent to the name of the standard menu item, so as to be clearly associated with the standard menu item, on the menu listing the item for sale, the number of calories contained in the standard menu item, as usually prepared and offered for sale; and

(**bb**) a succinct statement concerning suggested daily caloric intake, as specified by the Secretary by regulation and posted prominently on the menu and designed to enable the public to understand, in

the context of a total daily diet, the significance of the caloric information that is provided on the menu;

**(II)(aa)** in a nutrient content disclosure statement adjacent to the name of the standard menu item, so as to be clearly associated with the standard menu item, on the menu board, including a drive-through menu board, the number of calories contained in the standard menu item, as usually prepared and offered for sale; and

**(bb)** a succinct statement concerning suggested daily caloric intake, as specified by the Secretary by regulation and posted prominently on the menu board, designed to enable the public to understand, in the context of a total daily diet, the significance of the nutrition information that is provided on the menu board;

**(III)** in a written form, available on the premises of the restaurant or similar retail establishment and to the consumer upon request, the nutrition information required under clauses (C) and (D) of subparagraph (1); and

**(IV)** on the menu or menu board, a prominent, clear, and conspicuous statement regarding the availability of the information described in item (III).

### (iii) Self-service food and food on display

Except as provided in subclause (vii), in the case of food sold at a salad bar, buffet line, cafeteria line, or similar self-service facility, and for self-service beverages or food that is on display and that is visible to customers, a restaurant or similar retail food establishment shall place adjacent to each food offered a sign that lists calories per displayed food item or per serving.

### (iv) Reasonable basis

For the purposes of this clause, a restaurant or similar retail food establishment shall have a reasonable basis for

its nutrient content disclosures, including nutrient databases, cookbooks, laboratory analyses, and other reasonable means, as described in section 101.10 of title 21, Code of Federal Regulations (or any successor regulation) or in a related guidance of the Food and Drug Administration.

### (v) Menu variability and combination meals

The Secretary shall establish by regulation standards for determining and disclosing the nutrient content for standard menu items that come in different flavors, varieties, or combinations, but which are listed as a single menu item, such as soft drinks, ice cream, pizza, doughnuts, or children's combination meals, through means determined by the Secretary, including ranges, averages, or other methods.

### (vi) Additional information

If the Secretary determines that a nutrient, other than a nutrient required under subclause (ii)(III), should be disclosed for the purpose of providing information to assist consumers in maintaining healthy dietary practices, the Secretary may require, by regulation, disclosure of such nutrient in the written form required under subclause (ii)(III).

### (vii) Nonapplicability to certain food

#### (I) In general

Subclauses (i) through (vi) do not apply to--

(aa) items that are not listed on a menu or menu board (such as condiments and other items placed on the table or counter for general use);

(bb) daily specials, temporary menu items appearing on the menu for less than 60 days per calendar year, or custom orders; or

(cc) such other food that is part of a customary market test appearing on the

menu for less than 90 days, under terms and conditions established by the Secretary.

**(II) Written forms**

Subparagraph (5)(C) shall apply to any regulations promulgated under subclauses (ii)(III) and (vi).

### (viii) Vending machines

**(I) In general**

In the case of an article of food sold from a vending machine that--

**(aa)** does not permit a prospective purchaser to examine the Nutrition Facts Panel before purchasing the article or does not otherwise provide visible nutrition information at the point of purchase; and

**(bb)** is operated by a person who is engaged in the business of owning or operating 20 or more vending machines,

the vending machine operator shall provide a sign in close proximity to each article of food or the selection button that includes a clear and conspicuous statement disclosing the number of calories contained in the article.

### (ix) Voluntary provision of nutrition information

**(I) In general**

An authorized official of any restaurant or similar retail food establishment or vending machine operator not subject to the requirements of this clause may elect to be subject to the requirements of such clause, by registering biannually the name and address of such restaurant or similar retail food establishment or vending machine operator with the Secretary, as specified by the Secretary by regulation.

**(II) Registration**

Within 120 days of March 23, 2010, the Secretary shall publish a notice in the Federal Register specifying the terms and conditions for implementation of item (I), pending promulgation of regulations.

**(III) Rule of construction**

Nothing in this subclause shall be construed to authorize the Secretary to require an application, review, or licensing process for any entity to register with the Secretary, as described in such item.

## (x) Regulations

**(I) Proposed regulation**

Not later than 1 year after March 23, 2010, the Secretary shall promulgate proposed regulations to carry out this clause.

**(II) Contents**

In promulgating regulations, the Secretary shall--

> **(aa)** consider standardization of recipes and methods of preparation, reasonable variation in serving size and formulation of menu items, space on menus and menu boards, inadvertent human error, training of food service workers, variations in ingredients, and other factors, as the Secretary determines; and

> **(bb)** specify the format and manner of the nutrient content disclosure requirements under this subclause.

**(III) Reporting**

The Secretary shall submit to the Committee on Health, Education, Labor, and Pensions of the Senate and the Committee on Energy and Commerce of the House of Representatives a quarterly report that describes the Secretary's

progress toward promulgating final regulations under this subparagraph.

### (xi) Definition

In this clause, the term "menu" or "menu board" means the primary writing of the restaurant or other similar retail food establishment from which a consumer makes an order selection.

## (r) Nutrition levels and health-related claims

**(1)** Except as provided in clauses (A) through (C) of subparagraph (5), if it is a food intended for human consumption which is offered for sale and for which a claim is made in the label or labeling of the food which expressly or by implication--

**(A)** characterizes the level of any nutrient which is of the type required by paragraph (q)(1) or (q)(2) to be in the label or labeling of the food unless the claim is made in accordance with subparagraph (2), or

**(B)** characterizes the relationship of any nutrient which is of the type required by paragraph (q)(1) or (q)(2) to be in the label or labeling of the food to a disease or a health-related condition unless the claim is made in accordance with subparagraph (3) or (5)(D).

A statement of the type required by paragraph (q) that appears as part of the nutrition information required or permitted by such paragraph is not a claim which is subject to this paragraph and a claim subject to clause (A) is not subject to clause (B).

**(2)**

**(A)** Except as provided in subparagraphs (4)(A)(ii) and (4)(A)(iii) and clauses (A) through (C) of subparagraph (5), a claim described in subparagraph (1)(A)--

**(i)** may be made only if the characterization of the level made in the claim uses terms which are defined in regulations of the Secretary,

**(ii)** may not state the absence of a nutrient unless--

**(I)** the nutrient is usually present in the food or in a food which substitutes for the food as defined by the Secretary by regulation, or

**(II)** the Secretary by regulation permits such a statement on the basis of a finding that such a statement would assist consumers in maintaining healthy dietary practices and the statement discloses that the nutrient is not usually present in the food,

**(iii)** may not be made with respect to the level of cholesterol in the food if the food contains, as determined by the Secretary by regulation, fat or saturated fat in an amount which increases to persons in the general population the risk of disease or a health related condition which is diet related unless--

**(I)** the Secretary finds by regulation that the level of cholesterol is substantially less than the level usually present in the food or in a food which substitutes for the food and which has a significant market share, or the Secretary by regulation permits a statement regarding the absence of cholesterol on the basis of a finding that cholesterol is not usually present in the food and that such a statement would assist consumers in maintaining healthy dietary practices and the regulation requires that the statement disclose that cholesterol is not usually present in the food, and

**(II)** the label or labeling of the food discloses the level of such fat or saturated fat in immediate proximity to such claim and with appropriate prominence which shall be no less than one-half the size of the claim with respect to the level of cholesterol,

**(iv)** may not be made with respect to the level of saturated fat in the food if the food contains cholesterol unless the label or labeling of the food discloses the level of cholesterol in the food in immediate proximity to such claim and with appropriate prominence which shall be no

less than one-half the size of the claim with respect to the level of saturated fat,

(**v**) may not state that a food is high in dietary fiber unless the food is low in total fat as defined by the Secretary or the label or labeling discloses the level of total fat in the food in immediate proximity to such statement and with appropriate prominence which shall be no less than one-half the size of the claim with respect to the level of dietary fiber, and

(**vi**) may not be made if the Secretary by regulation prohibits the claim because the claim is misleading in light of the level of another nutrient in the food.

(**B**) If a claim described in subparagraph (1)(A) is made with respect to a nutrient in a food and the Secretary makes a determination that the food contains a nutrient at a level that increases to persons in the general population the risk of a disease or health-related condition that is diet related, the label or labeling of such food shall contain, prominently and in immediate proximity to such claim, the following statement: "See nutrition information for _____ content." The blank shall identify the nutrient associated with the increased disease or health-related condition risk. In making the determination described in this clause, the Secretary shall take into account the significance of the food in the total daily diet.

(**C**) Subparagraph (2)(A) does not apply to a claim described in subparagraph (1)(A) and contained in the label or labeling of a food if such claim is contained in the brand name of such food and such brand name was in use on such food before October 25, 1989, unless the brand name contains a term defined by the Secretary under subparagraph (2)(A)(i). Such a claim is subject to paragraph (a).

(**D**) Subparagraph (2) does not apply to a claim described in subparagraph (1)(A) which uses the term "diet" and is contained in the label or labeling of a soft drink if (i) such claim is contained in the brand name of such soft drink, (ii) such brand name was in use on such soft drink before October 25, 1989, and (iii) the use of the term "diet" was in conformity

with section 105.66 of title 21 of the Code of Federal Regulations. Such a claim is subject to paragraph (a).

**(E)** Subclauses (i) through (v) of subparagraph (2)(A) do not apply to a statement in the label or labeling of food which describes the percentage of vitamins and minerals in the food in relation to the amount of such vitamins and minerals recommended for daily consumption by the Secretary.

**(F)** Subclause (i) clause (A) does not apply to a statement in the labeling of a dietary supplement that characterizes the percentage level of a dietary ingredient for which the Secretary has not established a reference daily intake, daily recommended value, or other recommendation for daily consumption.

**(G)** A claim of the type described in subparagraph (1)(A) for a nutrient, for which the Secretary has not promulgated a regulation under clause (A)(i), shall be authorized and may be made with respect to a food if--

> **(i)** a scientific body of the United States Government with official responsibility for public health protection or research directly relating to human nutrition (such as the National Institutes of Health or the Centers for Disease Control and Prevention) or the National Academy of Sciences or any of its subdivisions has published an authoritative statement, which is currently in effect, which identifies the nutrient level to which the claim refers;

> **(ii)** a person has submitted to the Secretary, at least 120 days (during which the Secretary may notify any person who is making a claim as authorized by clause (C) that such person has not submitted all the information required by such clause) before the first introduction into interstate commerce of the food with a label containing the claim, (I) a notice of the claim, which shall include the exact words used in the claim and shall include a concise description of the basis upon which such person relied for determining that the requirements of subclause (i) have been satisfied, (II) a copy of the statement referred to in subclause (i) upon which such person relied in making the claim, and (III) a balanced representation

of the scientific literature relating to the nutrient level to which the claim refers;

**(iii)** the claim and the food for which the claim is made are in compliance with clauses (A) and (B), and are otherwise in compliance with paragraph (a) and section 321(n) of this title; and

**(iv)** the claim is stated in a manner so that the claim is an accurate representation of the authoritative statement referred to in subclause (i) and so that the claim enables the public to comprehend the information provided in the claim and to understand the relative significance of such information in the context of a total daily diet.

For purposes of this clause, a statement shall be regarded as an authoritative statement of a scientific body described in subclause (i) only if the statement is published by the scientific body and shall not include a statement of an employee of the scientific body made in the individual capacity of the employee.

**(H)** A claim submitted under the requirements of clause (G) may be made until--

**(i)** such time as the Secretary issues a regulation--

**(I)** prohibiting or modifying the claim and the regulation has become effective, or

**(II)** finding that the requirements of clause (G) have not been met, including finding that the petitioner had not submitted all the information required by such clause; or

**(ii)** a district court of the United States in an enforcement proceeding under subchapter III has determined that the requirements of clause (G) have not been met.

**(3)**

**(A)** Except as provided in subparagraph (5), a claim described in subparagraph (1)(B) may only be made--

**(i)** if the claim meets the requirements of the regulations of the Secretary promulgated under clause (B), and

**(ii)** if the food for which the claim is made does not contain, as determined by the Secretary by regulation, any nutrient in an amount which increases to persons in the general population the risk of a disease or health-related condition which is diet related, taking into account the significance of the food in the total daily diet, except that the Secretary may by regulation permit such a claim based on a finding that such a claim would assist consumers in maintaining healthy dietary practices and based on a requirement that the label contain a disclosure of the type required by subparagraph (2)(B).

**(B)**

**(i)** The Secretary shall promulgate regulations authorizing claims of the type described in subparagraph (1)(B) only if the Secretary determines, based on the totality of publicly available scientific evidence (including evidence from well-designed studies conducted in a manner which is consistent with generally recognized scientific procedures and principles), that there is significant scientific agreement, among experts qualified by scientific training and experience to evaluate such claims, that the claim is supported by such evidence.

**(ii)** A regulation described in subclause (i) shall describe--

**(I)** the relationship between a nutrient of the type required in the label or labeling of food by paragraph (q)(1) or (q)(2) and a disease or health-related condition, and

**(II)** the significance of each such nutrient in affecting such disease or health-related condition.

**(iii)** A regulation described in subclause (i) shall require such claim to be stated in a manner so that the claim is an accurate representation of the matters set out in subclause (ii) and so that the claim enables the public to comprehend the information provided in the claim and to understand the relative significance of such information in the context of a total daily diet.

**(C)** Notwithstanding the provisions of clauses (A)(i) and (B), a claim of the type described in subparagraph (1)(B) which is not authorized by the Secretary in a regulation promulgated in accordance with clause (B) shall be authorized and may be made with respect to a food if--

**(i)** a scientific body of the United States Government with official responsibility for public health protection or research directly relating to human nutrition (such as the National Institutes of Health or the Centers for Disease Control and Prevention) or the National Academy of Sciences or any of its subdivisions has published an authoritative statement, which is currently in effect, about the relationship between a nutrient and a disease or health-related condition to which the claim refers;

**(ii)** a person has submitted to the Secretary, at least 120 days (during which the Secretary may notify any person who is making a claim as authorized by clause (C) that such person has not submitted all the information required by such clause) before the first introduction into interstate commerce of the food with a label containing the claim, (I) a notice of the claim, which shall include the exact words used in the claim and shall include a concise description of the basis upon which such person relied for determining that the requirements of subclause (i) have been satisfied, (II) a copy of the statement referred to in subclause (i) upon which such person relied in making the claim, and (III) a balanced representation of the scientific literature relating to the relationship between a nutrient and a disease or health-related condition to which the claim refers;

**(iii)** the claim and the food for which the claim is made are in compliance with clause (A)(ii) and are otherwise in compliance with paragraph (a) and section 321(n) of this title; and

**(iv)** the claim is stated in a manner so that the claim is an accurate representation of the authoritative statement referred to in subclause (i) and so that the claim enables the public to comprehend the information provided in the

claim and to understand the relative significance of such information in the context of a total daily diet.

For purposes of this clause, a statement shall be regarded as an authoritative statement of a scientific body described in subclause (i) only if the statement is published by the scientific body and shall not include a statement of an employee of the scientific body made in the individual capacity of the employee.

**(D)** A claim submitted under the requirements of clause (C) may be made until--

**(i)** such time as the Secretary issues a regulation under the standard in clause (B)(i)--

**(I)** prohibiting or modifying the claim and the regulation has become effective, or

**(II)** finding that the requirements of clause (C) have not been met, including finding that the petitioner has not submitted all the information required by such clause; or

**(ii)** a district court of the United States in an enforcement proceeding under subchapter III has determined that the requirements of clause (C) have not been met.

**(4)**

**(A)**

**(i)** Any person may petition the Secretary to issue a regulation under subparagraph (2)(A)(i) or (3)(B) relating to a claim described in subparagraph (1)(A) or (1)(B). Not later than 100 days after the petition is received by the Secretary, the Secretary shall issue a final decision denying the petition or file the petition for further action by the Secretary. If the Secretary does not act within such 100 days, the petition shall be deemed to be denied unless an extension is mutually agreed upon by the Secretary and the petitioner. If the Secretary denies the petition or the petition is deemed to be denied, the petition shall not be made available to the public. If the Secretary files the petition, the Secretary shall deny the

petition or issue a proposed regulation to take the action requested in the petition not later than 90 days after the date of such decision. If the Secretary does not act within such 90 days, the petition shall be deemed to be denied unless an extension is mutually agreed upon by the Secretary and the petitioner. If the Secretary issues a proposed regulation, the rulemaking shall be completed within 540 days of the date the petition is received by the Secretary. If the Secretary does not issue a regulation within such 540 days, the Secretary shall provide the Committee on Commerce of the House of Representatives and the Committee on Labor and Human Resources of the Senate the reasons action on the regulation did not occur within such 540 days.

**(ii)** Any person may petition the Secretary for permission to use in a claim described in subparagraph (1)(A) terms that are consistent with the terms defined by the Secretary under subparagraph (2)(A)(i). Within 90 days of the submission of such a petition, the Secretary shall issue a final decision denying the petition or granting such permission.

**(iii)** Any person may petition the Secretary for permission to use an implied claim described in subparagraph (1)(A) in a brand name. After publishing notice of an opportunity to comment on the petition in the Federal Register and making the petition available to the public, the Secretary shall grant the petition if the Secretary finds that such claim is not misleading and is consistent with terms defined by the Secretary under subparagraph (2)(A)(i). The Secretary shall grant or deny the petition within 100 days of the date it is submitted to the Secretary and the petition shall be considered granted if the Secretary does not act on it within such 100 days.

**(B)** A petition under clause (A)(i) respecting a claim described in subparagraph (1)(A) or (1)(B) shall include an explanation of the reasons why the claim meets the requirements of this paragraph and a summary of the scientific data which supports such reasons.

**(C)** If a petition for a regulation under subparagraph (3)(B) relies on a report from an authoritative scientific body of the United States, the Secretary shall consider such report and shall justify any decision rejecting the conclusions of such report.

**(5)**

**(A)** This paragraph does not apply to infant formulas subject to section 350a(h) of this title and medical foods as defined in section 360ee(b) of this title.

**(B)** Subclauses (iii) through (v) of subparagraph (2)(A) and subparagraph (2)(B) do not apply to food which is served in restaurants or other establishments in which food is served for immediate human consumption or which is sold for sale or use in such establishments.

**(C)** A subparagraph (1)(A) claim made with respect to a food which claim is required by a standard of identity issued under section 341 of this title shall not be subject to subparagraph (2)(A)(i) or (2)(B).

**(D)** A subparagraph (1)(B) claim made with respect to a dietary supplement of vitamins, minerals, herbs, or other similar nutritional substances shall not be subject to subparagraph (3) but shall be subject to a procedure and standard, respecting the validity of such claim, established by regulation of the Secretary.

**(6)** For purposes of paragraph (r)(1)(B), a statement for a dietary supplement may be made if--

**(A)** the statement claims a benefit related to a classical nutrient deficiency disease and discloses the prevalence of such disease in the United States, describes the role of a nutrient or dietary ingredient intended to affect the structure or function in humans, characterizes the documented mechanism by which a nutrient or dietary ingredient acts to maintain such structure or function, or describes general well-being from consumption of a nutrient or dietary ingredient,

**(B)** the manufacturer of the dietary supplement has substantiation that such statement is truthful and not misleading, and

**(C)** the statement contains, prominently displayed and in boldface type, the following: "This statement has not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat, cure, or prevent any disease.".

A statement under this subparagraph may not claim to diagnose, mitigate, treat, cure, or prevent a specific disease or class of diseases. If the manufacturer of a dietary supplement proposes to make a statement described in the first sentence of this subparagraph in the labeling of the dietary supplement, the manufacturer shall notify the Secretary no later than 30 days after the first marketing of the dietary supplement with such statement that such a statement is being made.

**(7)** The Secretary may make proposed regulations issued under this paragraph effective upon publication pending consideration of public comment and publication of a final regulation if the Secretary determines that such action is necessary--

**(A)** to enable the Secretary to review and act promptly on petitions the Secretary determines provide for information necessary to--

**(i)** enable consumers to develop and maintain healthy dietary practices;

**(ii)** enable consumers to be informed promptly and effectively of important new knowledge regarding nutritional and health benefits of food; or

**(iii)** ensure that scientifically sound nutritional and health information is provided to consumers as soon as possible; or

**(B)** to enable the Secretary to act promptly to ban or modify a claim under this paragraph.

Such proposed regulations shall be deemed final agency action for purposes of judicial review.

**(s) Dietary supplements**

If--

**(1)** it is a dietary supplement; and

**(2)**

**(A)** the label or labeling of the supplement fails to list--

> **(i)** the name of each ingredient of the supplement that is described in section 321(ff) of this title; and

> **(ii)**

>> **(I)** the quantity of each such ingredient; or

>> **(II)** with respect to a proprietary blend of such ingredients, the total quantity of all ingredients in the blend;

**(B)** the label or labeling of the dietary supplement fails to identify the product by using the term "dietary supplement", which term may be modified with the name of such an ingredient;

**(C)** the supplement contains an ingredient described in section 321(ff)(1)(C) of this title, and the label or labeling of the supplement fails to identify any part of the plant from which the ingredient is derived;

**(D)** the supplement--

> **(i)** is covered by the specifications of an official compendium;

> **(ii)** is represented as conforming to the specifications of an official compendium; and

> **(iii)** fails to so conform; or

**(E)** the supplement--

> **(i)** is not covered by the specifications of an official compendium; and

> **(ii)**

>> **(I)** fails to have the identity and strength that the supplement is represented to have; or

>> **(II)** fails to meet the quality (including tablet or capsule disintegration), purity, or compositional specifications, based on validated assay or other appropriate methods, that the supplement is represented to meet.

A dietary supplement shall not be deemed misbranded solely because its label or labeling contains directions or conditions of use or warnings.

**(t) Catfish**

If it purports to be or is represented as catfish, unless it is fish classified within the family Ictaluridae.

**(u) Ginseng**

If it purports to be or is represented as ginseng, unless it is an herb or herbal ingredient derived from a plant classified within the genus Panax.

**(v) Failure to label; health threat**

If--

> **(1)** it fails to bear a label required by the Secretary under section 381(n)(1) of this title (relating to food refused admission into the United States);

> **(2)** the Secretary finds that the food presents a threat of serious adverse health consequences or death to humans or animals; and

> **(3)** upon or after notifying the owner or consignee involved that the label is required under section 381 of this title, the Secretary informs the owner or consignee that the food presents such a threat.

**(w) Major food allergen labeling requirements**

> **(1)** If it is not a raw agricultural commodity and it is, or it contains an ingredient that bears or contains, a major food allergen, unless either--

>> **(A)** the word "Contains", followed by the name of the food source from which the major food allergen is derived, is printed immediately after or is adjacent to the list of ingredients (in a type size no smaller than the type size used in the list of ingredients) required under subsections (g) and (i); or

>> **(B)** the common or usual name of the major food allergen in the list of ingredients required under subsections (g) and (i) is followed in parentheses by the name of the food source from which the major food allergen is derived, except that the name of the food source is not required when--

**(i)** the common or usual name of the ingredient uses the name of the food source from which the major food allergen is derived; or

**(ii)** the name of the food source from which the major food allergen is derived appears elsewhere in the ingredient list, unless the name of the food source that appears elsewhere in the ingredient list appears as part of the name of a food ingredient that is not a major food allergen under section 321(qq)(2)(A) or (B) of this title.

**(2)** As used in this subsection, the term "name of the food source from which the major food allergen is derived" means the name described in section 321(qq)(1) of this title; provided that in the case of a tree nut, fish, or Crustacean shellfish, the term "name of the food source from which the major food allergen is derived" means the name of the specific type of nut or species of fish or Crustacean shellfish.

**(3)** The information required under this subsection may appear in labeling in lieu of appearing on the label only if the Secretary finds that such other labeling is sufficient to protect the public health. A finding by the Secretary under this paragraph (including any change in an earlier finding under this paragraph) is effective upon publication in the Federal Register as a notice.

**(4)** Notwithstanding subsection (g), (i), or (k), or any other law, a flavoring, coloring, or incidental additive that is, or that bears or contains, a major food allergen shall be subject to the labeling requirements of this subsection.

**(5)** The Secretary may by regulation modify the requirements of subparagraph (A) or (B) of paragraph (1), or eliminate either the requirement of subparagraph (A) or the requirements of subparagraph (B) of paragraph (1), if the Secretary determines that the modification or elimination of the requirement of subparagraph (A) or the requirements of subparagraph (B) is necessary to protect the public health.

**(6)**

**(A)** Any person may petition the Secretary to exempt a food ingredient described in section 321(qq)(2) of this title from the allergen labeling requirements of this subsection.

(B) The Secretary shall approve or deny such petition within 180 days of receipt of the petition or the petition shall be deemed denied, unless an extension of time is mutually agreed upon by the Secretary and the petitioner.

(C) The burden shall be on the petitioner to provide scientific evidence (including the analytical method used to produce the evidence) that demonstrates that such food ingredient, as derived by the method specified in the petition, does not cause an allergic response that poses a risk to human health.

(D) A determination regarding a petition under this paragraph shall constitute final agency action.

(E) The Secretary shall promptly post to a public site all petitions received under this paragraph within 14 days of receipt and the Secretary shall promptly post the Secretary's response to each.

(7)

(A) A person need not file a petition under paragraph (6) to exempt a food ingredient described in section 321(qq)(2) of this title from the allergen labeling requirements of this subsection, if the person files with the Secretary a notification containing

(i) scientific evidence (including the analytical method used) that demonstrates that the food ingredient (as derived by the method specified in the notification, where applicable) does not contain allergenic protein; or

(ii) a determination by the Secretary that the ingredient does not cause an allergic response that poses a risk to human health under a premarket approval or notification program under section 348 of this title.

(B) The food ingredient may be introduced or delivered for introduction into interstate commerce as a food ingredient that is not a major food allergen 90 days after the date of receipt of the notification by the Secretary, unless the Secretary determines within the 90-day period that the notification does not meet the requirements of this paragraph, or there is insufficient scientific evidence to determine that the food ingredient does not contain allergenic protein or does not cause an allergenic response that poses a risk to human health.

**(C)** The Secretary shall promptly post to a public site all notifications received under this subparagraph within 14 days of receipt and promptly post any objections thereto by the Secretary.

**(x) Nonmajor food allergen labeling requirements**

Notwithstanding subsection (g), (i), or (k), or any other law, a spice, flavoring, coloring, or incidental additive that is, or that bears or contains, a food allergen (other than a major food allergen), as determined by the Secretary by regulation, shall be disclosed in a manner specified by the Secretary by regulation.

**(y) Dietary supplements**

If it is a dietary supplement that is marketed in the United States, unless the label of such dietary supplement includes a domestic address or domestic phone number through which the responsible person (as described in section 379aa-1 of this title) may receive a report of a serious adverse event with such dietary supplement.

**21 U.S.C. § 343-1 — National Uniform Nutrition Labeling**

**...**

(a) Except as provided in subsection (b), no State or political subdivision of a State may directly or indirectly establish under any authority or continue in effect as to any food in interstate commerce--

(1) any requirement for a food which is the subject of a standard of identity established under section 341 of this title that is not identical to such standard of identity or that is not identical to the requirement of section 343(g) of this title, except that this paragraph does not apply to a standard of identity of a State or political subdivision of a State for maple syrup that is of the type required by sections 341 and 343(g)of this title,

(2) any requirement for the labeling of food of the type required by section 343(c), 343(e), 343(i)(2), 343(w), or 343(x) of this title that is not identical to the requirement of such section, except that this paragraph does not apply to a requirement of a State or political subdivision of a State that is of the type required by section 343(c) of this title and that is applicable to maple syrup,

(3) any requirement for the labeling of food of the type required by section 343(b), 343(d), 343(f), 343(h), 343(i)(1), or 343(k) of this title that is not identical to the requirement of such section, except that this paragraph does not apply to a requirement of a State or political subdivision of a State that is of the type required by section 343(h)(1) of this title and that is applicable to maple syrup,

(4) any requirement for nutrition labeling of food that is not identical to the requirement of section 343(q) of this title, except that this paragraph does not apply to food that is offered for sale in a restaurant or similar retail food establishment that is not part of a chain with 20 or more locations doing business under the same name (regardless of the type of ownership of the locations) and offering for sale substantially the same menu items unless such restaurant or similar retail food establishment complies with the voluntary provision of nutrition information requirements under section 343(q)(5)(H)(ix) of this title, or

(5) any requirement respecting any claim of the type described in section 343(r)(1) of this title made in the label or labeling of food

that is not identical to the requirement of section 343(r) of this title, except a requirement respecting a claim made in the label or labeling of food which is exempt under section 343(r)(5)(B) of this title.

Paragraph (3) shall take effect in accordance with section 6(b) of the Nutrition Labeling and Education Act of 1990.

**(b)** Upon petition of a State or a political subdivision of a State, the Secretary may exempt from subsection (a), under such conditions as may be prescribed by regulation, any State or local requirement that--

**(1)** would not cause any food to be in violation of any applicable requirement under Federal law,

**(2)** would not unduly burden interstate commerce, and

**(3)** is designed to address a particular need for information which need is not met by the requirements of the sections referred to in subsection (a).

## 21 C.F.R. § 101.100(a) — Food; Exemptions from Labeling

**...**

**(a)** The following foods are exempt from compliance with the requirements of section 403(i)(2) of the act (requiring a declaration on the label of the common or usual name of each ingredient when the food is fabricated from two or more ingredients).

> **(1)** An assortment of different items of food, when variations in the items that make up different packages packed from such assortment normally occur in good packing practice and when such variations result in variations in the ingredients in different packages, with respect to any ingredient that is not common to all packages. Such exemption, however, shall be on the condition that the label shall bear, in conjunction with the names of such ingredients as are common to all packages, a statement (in terms that are as informative as practicable and that are not misleading) indicating by name other ingredients which may be present.

> **(2)** A food having been received in bulk containers at a retail establishment, if displayed to the purchaser with either:

>> **(i)** The labeling of the bulk container plainly in view, provided ingredient information appears prominently and conspicuously in lettering of not less than one-fourth of an inch in height; or

>> **(ii)** A counter card, sign, or other appropriate device bearing prominently and conspicuously, but in no case with lettering of less than one-fourth of an inch in height, the information required to be stated on the label pursuant to section 403(i)(2) of the Federal Food, Drug, and Cosmetic Act (the act).

> **(3)** Incidental additives that are present in a food at insignificant levels and do not have any technical or functional effect in that food. For the purposes of this paragraph (a)(3), incidental additives are:

>> **(i)** Substances that have no technical or functional effect but are present in a food by reason of having been incorporated into the food as an ingredient of another food, in which the substance did have a functional or technical effect.

>> **(ii)** Processing aids, which are as follows:

(a) Substances that are added to a food during the processing of such food but are removed in some manner from the food before it is packaged in its finished form.

(b) Substances that are added to a food during processing, are converted into constituents normally present in the food, and do not significantly increase the amount of the constituents naturally found in the food.

(c) Substances that are added to a food for their technical or functional effect in the processing but are present in the finished food at insignificant levels and do not have any technical or functional effect in that food.

(iii) Substances migrating to food from equipment or packaging or otherwise affecting food that are not food additives as defined in section 201(s) of the act; or if they are food additives as so defined, they are used in conformity with regulations established pursuant to section 409 of the act.

(4) For the purposes of paragraph (a)(3) of this section, any sulfiting agent (sulfur dioxide, sodium sulfite, sodium bisulfite, potassium bisulfite, sodium metabisulfite, and potassium metabisulfite) that has been added to any food or to any ingredient in any food and that has no technical effect in that food will be considered to be present in an insignificant amount only if no detectable amount of the agent is present in the finished food. A detectable amount of sulfiting agent is 10 parts per million or more of the sulfite in the finished food. Compliance with this paragraph will be determined using sections 20.123–20.125, "Total Sulfurous Acid," in "Official Methods of Analysis of the Association of Official Analytical Chemists," 14th Ed. (1984), which is incorporated by reference and the refinements of the "Total Sulfurous Acid" procedure in the "Monier–Williams Procedure (with Modifications) for Sulfites in Foods," which is appendix A to part 101. A copy of sections 20.123–20–125 of the Official Methods of Analysis of the Association of Official Analytical Chemists" is available from the AOAC INTERNATIONAL, 481 North Frederick Ave., suite 500, Gaithersburg, MD 20877, or available for inspection at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call 202–741–6030, or go to:

http://www.archives.gov/federal_register/code_of_federal_regulations
/ibr_locations.html.

...

## 21 C.F.R. § 101.3 — Identity labeling of food in packaged form

...

**(a)** The principal display panel of a food in package form shall bear as one of its principal features a statement of the identity of the commodity.

**(b)** Such statement of identity shall be in terms of:

>**(1)** The name now or hereafter specified in or required by any applicable Federal law or regulation; or, in the absence thereof,

>**(2)** The common or usual name of the food; or, in the absence thereof,

>**(3)** An appropriately descriptive term, or when the nature of the food is obvious, a fanciful name commonly used by the public for such food.

**(c)** Where a food is marketed in various optional forms (whole, slices, diced, etc.), the particular form shall be considered to be a necessary part of the statement of identity and shall be declared in letters of a type size bearing a reasonable relation to the size of the letters forming the other components of the statement of identity; except that if the optional form is visible through the container or is depicted by an appropriate vignette, the particular form need not be included in the statement. This specification does not affect the required declarations of identity under definitions and standards for foods promulgated pursuant to section 401 of the act.

**(d)** This statement of identity shall be presented in bold type on the principal display panel, shall be in a size reasonably related to the most prominent printed matter on such panel, and shall be in lines generally parallel to the base on which the package rests as it is designed to be displayed.

**(e)** Under the provisions of section 403(c) of the Federal Food, Drug, and Cosmetic Act, a food shall be deemed to be misbranded if it is an imitation of another food unless its label bears, in type of uniform size and prominence, the word "imitation" and, immediately thereafter, the name of the food imitated.

>**(1)** A food shall be deemed to be an imitation and thus subject to the requirements of section 403(c) of the act if it is a substitute for and resembles another food but is nutritionally inferior to that food.

(**2**) A food that is a substitute for and resembles another food shall not be deemed to be an imitation provided it meets each of the following requirements:

(**i**) It is not nutritionally inferior to the food for which it substitutes and which it resembles.

(**ii**) Its label bears a common or usual name that complies with the provisions of § 102.5 of this chapter and that is not false or misleading, or in the absence of an existing common or usual name, an appropriately descriptive term that is not false or misleading. The label may, in addition, bear a fanciful name which is not false or misleading.

(**3**) A food for which a common or usual name is established by regulation (e.g., in a standard of identity pursuant to section 401 of the act, in a common or usual name regulation pursuant to part 102 of this chapter, or in a regulation establishing a nutritional quality guideline pursuant to part 104 of this chapter), and which complies with all of the applicable requirements of such regulation(s), shall not be deemed to be an imitation.

(**4**) Nutritional inferiority includes:

(**i**) Any reduction in the content of an essential nutrient that is present in a measurable amount, but does not include a reduction in the caloric or fat content provided the food is labeled pursuant to the provisions of § 101.9, and provided the labeling with respect to any reduction in caloric content complies with the provisions applicable to caloric content in part 105 of this chapter.

(**ii**) For the purpose of this section, a measurable amount of an essential nutrient in a food shall be considered to be 2 percent or more of the Daily Reference Value (DRV) of protein listed under § 101.9(c)(7)(iii) and of potassium listed under § 101.9(c)(9) per reference amount customarily consumed and 2 percent or more of the Reference Daily Intake (RDI) of any vitamin or mineral listed under § 101.9(c)(8)(iv) per reference amount customarily consumed, except that selenium, molybdenum, chromium, and chloride need not be considered.

(**iii**) If the Commissioner concludes that a food is a substitute for and resembles another food but is inferior to the food

imitated for reasons other than those set forth in this paragraph, he may propose appropriate revisions to this regulation or he may propose a separate regulation governing the particular food.

**(f)** A label may be required to bear the percentage(s) of a characterizing ingredient(s) or information concerning the presence or absence of an ingredient(s) or the need to add an ingredient(s) as part of the common or usual name of the food pursuant to subpart B of part 102 of this chapter.

**(g)** Dietary supplements shall be identified by the term "dietary supplement" as a part of the statement of identity, except that the word "dietary" may be deleted and replaced by the name of the dietary ingredients in the product (e.g., calcium supplement) or an appropriately descriptive term indicating the type of dietary ingredients that are in the product (e.g., herbal supplement with vitamins).

## 21 C.F.R. § 101.4 — Food; Designation of Ingredients

**...**

    **(a)**

        **(1)** Ingredients required to be declared on the label or labeling of a food, including foods that comply with standards of identity, except those ingredients exempted by § 101.100, shall be listed by common or usual name in descending order of predominance by weight on either the principal display panel or the information panel in accordance with the provisions of § 101.2, except that ingredients in dietary supplements that are listed in the nutrition label in accordance with § 101.36 need not be repeated in the ingredient list. Paragraph (g) of this section describes the ingredient list on dietary supplement products.

        **(2)** The descending order of predominance requirements of paragraph (a)(1) of this section do not apply to ingredients present in amounts of 2 percent or less by weight when a listing of these ingredients is placed at the end of the ingredient statement following an appropriate quantifying statement, e.g., "Contains ___ percent or less of ____" or "Less than ___ percent of ____." The blank percentage within the quantifying statement shall be filled in with a threshold level of 2 percent, or, if desired, 1.5 percent, 1.0 percent, or 0.5 percent, as appropriate. No ingredient to which the quantifying phrase applies may be present in an amount greater than the stated threshold.

**(b)** The name of an ingredient shall be a specific name and not a collective (generic) name, except that:

    **(1)** Spices, flavorings, colorings and chemical preservatives shall be declared according to the provisions of § 101.22.

    **(2)** An ingredient which itself contains two or more ingredients and which has an established common or usual name, conforms to a standard established pursuant to the Meat Inspection or Poultry Products Inspection Acts by the U.S. Department of Agriculture, or conforms to a definition and standard of identity established pursuant to section 401 of the Federal Food, Drug, and Cosmetic Act, shall be designated in the statement of ingredients on the label of such food by either of the following alternatives:

**(i)** By declaring the established common or usual name of the ingredient followed by a parenthetical listing of all ingredients contained therein in descending order of predominance except that, if the ingredient is a food subject to a definition and standard of identity established in subchapter B of this chapter that has specific labeling provisions for optional ingredients, optional ingredients may be declared within the parenthetical listing in accordance with those provisions.

**(ii)** By incorporating into the statement of ingredients in descending order of predominance in the finished food, the common or usual name of every component of the ingredient without listing the ingredient itself.

**(3)** Skim milk, concentrated skim milk, reconstituted skim milk, and nonfat dry milk may be declared as "skim milk" or "nonfat milk".

**(4)** Milk, concentrated milk, reconstituted milk, and dry whole milk may be declared as "milk".

**(5)** Bacterial cultures may be declared by the word "cultured" followed by the name of the substrate, e.g., "made from cultured skim milk or cultured buttermilk".

**(6)** Sweetcream buttermilk, concentrated sweetcream buttermilk, reconstituted sweetcream buttermilk, and dried sweetcream buttermilk may be declared as "buttermilk".

**(7)** Whey, concentrated whey, reconstituted whey, and dried whey may be declared as "whey".

**(8)** Cream, reconstituted cream, dried cream, and plastic cream (sometimes known as concentrated milk fat) may be declared as "cream".

**(9)** Butteroil and anhydrous butterfat may be declared as "butterfat".

**(10)** Dried whole eggs, frozen whole eggs, and liquid whole eggs may be declared as "eggs".

**(11)** Dried egg whites, frozen egg whites, and liquid egg whites may be declared as "egg whites".

**(12)** Dried egg yolks, frozen egg yolks, and liquid egg yolks may be declared as "egg yolks".

**(13)** [Reserved]

**(14)** Each individual fat and/or oil ingredient of a food intended for human consumption shall be declared by its specific common or usual name (e.g., "beef fat", "cottonseed oil") in its order of predominance in the food except that blends of fats and/or oils may be designated in their order of predominance in the foods as "_____ shortening" or "blend of _____ oils", the blank to be filled in with the word "vegetable", "animal", "marine", with or without the terms "fat" or "oils", or combination of these, whichever is applicable if, immediately following the term, the common or usual name of each individual vegetable, animal, or marine fat or oil is given in parentheses, e.g., "vegetable oil shortening (soybean and cottonseed oil)". For products that are blends of fats and/or oils and for foods in which fats and/or oils constitute the predominant ingredient, i.e., in which the combined weight of all fat and/or oil ingredients equals or exceeds the weight of the most predominant ingredient that is not a fat or oil, the listing of the common or usual names of such fats and/or oils in parentheses shall be in descending order of predominance. In all other foods in which a blend of fats and/or oils is used as an ingredient, the listing of the common or usual names in parentheses need not be in descending order of predominance if the manufacturer, because of the use of varying mixtures, is unable to adhere to a constant pattern of fats and/or oils in the product. If the fat or oil is completely hydrogenated, the name shall include the term hydrogenated, or if partially hydrogenated, the name shall include the term partially hydrogenated. If each fat and/or oil in a blend or the blend is completely hydrogenated, the term "hydrogenated" may precede the term(s) describing the blend, e.g., "hydrogenated vegetable oil (soybean, cottonseed, and palm oils)", rather than preceding the name of each individual fat and/or oil; if the blend of fats and/or oils is partially hydrogenated, the term "partially hydrogenated" may be used in the same manner. Fat and/or oil ingredients not present in the product may be listed if they may sometimes be used in the product. Such ingredients shall be identified by words indicating that they may not be present, such as "or", "and/or", "contains one or more of the following:", e.g., "vegetable oil shortening (contains one or more of the following: cottonseed oil, palm oil, soybean oil)". No fat or oil ingredient shall be listed unless actually present if the fats and/or oils constitute the predominant ingredient of the product, as defined in this paragraph (b)(14).

**(15)** When all the ingredients of a wheat flour are declared in an ingredient statement, the principal ingredient of the flour shall be declared by the name(s) specified in §§ 137.105, 137.200, 137.220 and 137.225 of this chapter, i.e., the first ingredient designated in the ingredient list of flour, or bromated flour, or enriched flour, or self-rising flour is "flour", "white flour", "wheat flour", or "plain flour"; the first ingredient designated in the ingredient list of durum flour is "durum flour"; the first ingredient designated in the ingredient list of whole wheat flour, or bromated whole wheat flour is "whole wheat flour", "graham flour", or "entire wheat flour"; and the first ingredient designated in the ingredient list of whole durum wheat flour is "whole durum wheat flour".

**(16)** Ingredients that act as leavening agents in food may be declared in the ingredient statement by stating the specific common or usual name of each individual leavening agent in parentheses following the collective name "leavening", e.g., "leavening (baking soda, monocalcium phosphate, and calcium carbonate)". The listing of the common or usual name of each individual leavening agent in parentheses shall be in descending order of predominance: Except, That if the manufacturer is unable to adhere to a constant pattern of leavening agents in the product, the listing of individual leavening agents need not be in descending order of predominance. Leavening agents not present in the product may be listed if they are sometimes used in the product. Such ingredients shall be identified by words indicating that they may not be present, such as "or", "and/or", "contains one or more of the following:".

**(17)** Ingredients that act as yeast nutrients in foods may be declared in the ingredient statement by stating the specific common or usual name of each individual yeast nutrient in parentheses following the collective name "yeast nutrients", e.g., "yeast nutrients (calcium sulfate and ammonium phosphate)". The listing of the common or usual name of each individual yeast nutrient in parentheses shall be in descending order of predominance: Except, That if the manufacturer is unable to adhere to a constant pattern of yeast nutrients in the product, the listing of the common or usual names of individual yeast nutrients need not be in descending order of predominance. Yeast nutrients not present in the product may be listed if they are sometimes used in the product. Such ingredients shall be

identified by words indicating that they may not be present, such as "or", "and/or", or "contains one or more of the following:".

**(18)** Ingredients that act as dough conditioners may be declared in the ingredient statement by stating the specific common or usual name of each individual dough conditioner in parentheses following the collective name "dough conditioner", e.g., "dough conditioners (L-cysteine, ammonium sulfate)". The listing of the common or usual name of each dough conditioner in parentheses shall be in descending order of predominance: Except, That if the manufacturer is unable to adhere to a constant pattern of dough conditioners in the product, the listing of the common or usual names of individual dough conditioners need not be in descending order of predominance. Dough conditioners not present in the product may be listed if they are sometimes used in the product. Such ingredients shall be identified by words indicating that they may not be present, such as "or", "and/or", or "contains one or more of the following:".

**(19)** Ingredients that act as firming agents in food (e.g., salts of calcium and other safe and suitable salts in canned vegetables) may be declared in the ingredient statement, in order of predominance appropriate for the total of all firming agents in the food, by stating the specific common or usual name of each individual firming agent in descending order of predominance in parentheses following the collective name "firming agents". If the manufacturer is unable to adhere to a constant pattern of firming agents in the food, the listing of the individual firming agents need not be in descending order of predominance. Firming agents not present in the product may be listed if they are sometimes used in the product. Such ingredients shall be identified by words indicating that they may not be present, such as "or", "and/or", "contains one or more of the following:".

**(20)** For purposes of ingredient labeling, the term sugar shall refer to sucrose, which is obtained from sugar cane or sugar beets in accordance with the provisions of § 184.1854 of this chapter.

**(21)** [Reserved]

**(22)** Wax and resin ingredients on fresh produce when such produce is held for retail sale, or when held for other than retail sale by packers or repackers shall be declared collectively by the phrase "coated with food-grade animal-based wax, to maintain freshness" or the phrase "coated with food-grade vegetable-, petroleum-, beeswax-, and/or

shellac-based wax or resin, to maintain freshness" as appropriate. The terms "food-grade" and "to maintain freshness" are optional. The term lac-resin may be substituted for the term shellac.

**(23)** When processed seafood products contain fish protein ingredients consisting primarily of the myofibrillar protein fraction from one or more fish species and the manufacturer is unable to adhere to a constant pattern of fish species in the fish protein ingredient, because of seasonal or other limitations of species availability, the common or usual name of each individual fish species need not be listed in descending order of predominance. Fish species not present in the fish protein ingredient may be listed if they are sometimes used in the product. Such ingredients must be identified by words indicating that they may not be present, such as "or", "and/or", or "contains one or more of the following:" Fish protein ingredients may be declared in the ingredient statement by stating the specific common or usual name of each fish species that may be present in parentheses following the collective name "fish protein", e.g., "fish protein (contains one or more of the following: Pollock, cod, and/or pacific whiting)".

**(c)** When water is added to reconstitute, completely or partially, an ingredient permitted by paragraph (b) of this section to be declared by a class name, the position of the ingredient class name in the ingredient statement shall be determined by the weight of the unreconstituted ingredient plus the weight of the quantity of water added to reconstitute that ingredient, up to the amount of water needed to reconstitute the ingredient to single strength. Any water added in excess of the amount of water needed to reconstitute the ingredient to single strength shall be declared as "water" in the ingredient statement.

**(d)** When foods characterized on the label as "nondairy" contain a caseinate ingredient, the caseinate ingredient shall be followed by a parenthetical statement identifying its source. For example, if the manufacturer uses the term "nondairy" on a creamer that contains sodium caseinate, it shall include a parenthetical term such as "a milk derivative" after the listing of sodium caseinate in the ingredient list.

**(e)** If the percentage of an ingredient is included in the statement of ingredients, it shall be shown in parentheses following the name of the ingredient and expressed in terms of percent by weight. Percentage declarations shall be expressed to the nearest 1 percent, except that where ingredients are present at levels of 2 percent or less, they may be grouped

together and expressed in accordance with the quantifying guidance set forth in paragraph (a)(2) of this section.

**(f)** Except as provided in § 101.100, ingredients that must be declared on labeling because there is no label for the food, including foods that comply with standards of identity, shall be listed prominently and conspicuously by common or usual name in the manner prescribed by paragraph (b) of this section.

**(g)** When present, the ingredient list on dietary supplement products shall be located immediately below the nutrition label, or, if there is insufficient space below the nutrition label, immediately contiguous and to the right of the nutrition label and shall be preceded by the word "Ingredients," unless some ingredients (i.e., sources) are identified within the nutrition label in accordance with § 101.36(d), in which case the ingredients listed outside the nutrition label shall be in a list preceded by the words "Other ingredients." Ingredients in dietary supplements that are not dietary ingredients or that do not contain dietary ingredients, such as excipients, fillers, artificial colors, artificial sweeteners, flavors, or binders, shall be included in the ingredient list.

**(h)** The common or usual name of ingredients of dietary supplements that are botanicals (including fungi and algae) shall be consistent with the names standardized in Herbs of Commerce, 1992 edition, which is incorporated by reference in accordance with 5 U.S.C. 552(a) and 1 CFR part 51. Copies may be obtained from the American Herbal Products Association, 8484 Georgia Ave., suite 370, Silver Spring, MD 20910, 301–588–1171, FAX 301–588–1174, e-mail: ahpa@ahpa.org, or may be examined at the Food and Drug Administration's Main Library, 10903 New Hampshire Ave., Bldg. 2, Third Floor, Silver Spring, MD 20993, 301–796–2039, or at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call 202–741–6030, or go to: http://www.archives.gov/federal_register/code_of_federal_regulations/ibr_locations.html. The listing of these names on the label shall be followed by statements of:

> **(1)** The part of the plant (e.g., root, leaves) from which the dietary ingredient is derived (e.g., "Garlic bulb" or "Garlic (bulb)"), except that this designation is not required for algae. The name of the part of the plant shall be expressed in English (e.g., "flower" rather than "flos");

**(2)** The Latin binomial name of the plant, in parentheses, except that this name is not required when it is available in the reference entitled: Herbs of Commerce for the common or usual name listed on the label, and, when required, the Latin binomial name may be listed before the part of the plant. Any name in Latin form shall be in accordance with internationally accepted rules on nomenclature, such as those found in the International Code of Botanical Nomenclature and shall include the designation of the author or authors who published the Latin name, when a positive identification cannot be made in its absence. The International Code of Botanical Nomenclature (Tokyo Code), 1994 edition, a publication of the International Association for Plant Taxonomy, is incorporated by reference in accordance with 5 U.S.C. 552(a) and 1 CFR part 51. Copies of the International Code of Botanical Nomenclature may be obtained from Koeltz Scientific Books, D–61453 Konigstein, Germany, and University Bookstore, Southern Illinois University, Carbondale, IL 62901–4422, 618–536–3321, FAX 618–453–5207, or may be examined at the Food and Drug Administration's Main Library, 10903 New Hampshire Ave., Bldg. 2, Third Floor, Silver Spring, MD 20993, 301–796–2039, or at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call 202–741–6030, or go to: http://www.archives.gov/federal_register/code_of_federal_regulations/ibr_locations.html.

**(3)** On labels of single-ingredient dietary supplements that do not include an ingredient list, the identification of the Latin binomial name, when needed, and the part of the plant may be prominently placed on the principal display panel or information panel, or included in the nutrition label.

## 21 C.F.R. § 102.5 — General Principles

**...**

(a) The common or usual name of a food, which may be a coined term, shall accurately identify or describe, in as simple and direct terms as possible, the basic nature of the food or its characterizing properties or ingredients. The name shall be uniform among all identical or similar products and may not be confusingly similar to the name of any other food that is not reasonably encompassed within the same name. Each class or subclass of food shall be given its own common or usual name that states, in clear terms, what it is in a way that distinguishes it from different foods.

(b) The common or usual name of a food shall include the percentage(s) of any characterizing ingredient(s) or component(s) when the proportion of such ingredient(s) or component(s) in the food has a material bearing on price or consumer acceptance or when the labeling or the appearance of the food may otherwise create an erroneous impression that such ingredient(s) or component(s) is present in an amount greater than is actually the case. The following requirements shall apply unless modified by a specific regulation in subpart B of this part.

(1) The percentage of a characterizing ingredient or component shall be declared on the basis of its quantity in the finished product (i.e., weight/weight in the case of solids, or volume/volume in the case of liquids).

(2) The percentage of a characterizing ingredient or component shall be declared by the words "containing (or contains) ___ percent (or %) _____" or "___ percent (or %) _____" with the first blank filled in with the percentage expressed as a whole number not greater than the actual percentage of the ingredient or component named and the second blank filled in with the common or usual name of the ingredient or component. The word "containing" (or "contains"), when used, shall appear on a line immediately below the part of the common or usual name of the food required by paragraph (a) of this section. For each characterizing ingredient or component, the words "___ percent or %) _____" shall appear following or directly below the word "containing" (or contains), or directly below the part of the common or usual name of the food required by paragraph (a) of this section when the word "containing" (or contains) is not used, in easily legible boldface print or type in distinct contrast to other printed or

graphic matter, and in a height not less than the larger of the following alternatives:

> **(i)** Not less than one-sixteenth inch in height on packages having a principal display panel with an area of 5 square inches or less and not less than one-eighth inch in height if the area of the principal display panel is greater than 5 square inches; or

> **(ii)** Not less than one-half the height of the largest type appearing in the part of the common or usual name of the food required by paragraph (a) of this section.

**(c)** The common or usual name of a food shall include a statement of the presence or absence of any characterizing ingredient(s) or component(s) and/or the need for the user to add any characterizing ingredient(s) or component(s) when the presence or absence of such ingredient(s) or component(s) in the food has a material bearing on price or consumer acceptance or when the labeling or the appearance of the food may otherwise create an erroneous impression that such ingredient(s) or component(s) is present when it is not, and consumers may otherwise be misled about the presence or absence of the ingredient(s) or component(s) in the food. The following requirements shall apply unless modified by a specific regulation in subpart B of this part.

> **(1)** The presence or absence of a characterizing ingredient or component shall be declared by the words "containing (or contains) _____" or "containing (or contains) no _____" or "no _____" or "does not contain _____", with the blank being filled in with the common or usual name of the ingredient or component.

> **(2)** The need for the user of a food to add any characterizing ingredient(s) or component(s) shall be declared by an appropriate informative statement.

> **(3)** The statement(s) required under paragraph (c)(1) and/or (2) of this section shall appear following or directly below the part of the common or usual name of the food required by paragraphs (a) and (b) of this section, in easily legible boldface print or type in distinct contrast to other printed or graphic matter, and in a height not less than the larger of the alternatives established under paragraphs (b)(2)(i) and (ii) of this section.

**(d)** A common or usual name of a food may be established by common usage or by establishment of a regulation in subpart B of this part, in part

104 of this chapter, in a standard of identity, or in other regulations in this chapter.

**COMPLIANCE POLICY GUIDE (CPG)**

# CPG Sec. 515.300 Honey - Source Declaration

## OCTOBER 1980

Final

POLICY:

A honey may be labeled with the name of the plant or blossom provided that the particular plant or blossom is the chief floral source of the honey, such as "Orange Blossom Honey" or "Clover Honey," and provided that the honey producer is in a position to demonstrate that the plant or blossom designated on the label constitutes the chief floral source of the honey.

Issued: 10/1/80

---

# Submit Comments

Submit comments on this guidance document electronically via docket ID: FDA-2013-S-0610 (https://www.regulations.gov/docket?D=FDA-2013-S-0610) - Specific Electronic Submissions Intended For FDA's Dockets Management Staff (i.e., Citizen Petitions, Draft Proposed Guidance Documents, Variances, and other administrative record submissions)

If unable to submit comments online, please mail written comments to:

Dockets Management

Food and Drug Administration

5630 Fishers Lane, Rm 1061

Rockville, MD 20852

All comments should be identified with the title of the guidance.

⊖ Search for FDA
Guidance Documents (/regulatory-information/search-fda-guidance-documents)

# Proper Labeling of Honey and Honey Products: Guidance for Industry

*Additional copies are available from:*
*Office of Nutrition and Food Labeling*
*Food Labeling and Standards Staff HFS-820*
*Center for Food Safety and Applied Nutrition*
*Food and Drug Administration*
*5001 Campus Drive*
*College Park, MD 20740*
*(Tel) 240-402-2371*
http://www.fda.gov/FoodGuidances

You may submit electronic or written comments regarding this guidance at any time. Submit electronic comments to https://www.regulations.gov/. Submit written comments on the guidance to the Dockets Management Staff (HFA-305), Food and Drug Administration, 5630 Fishers Lane, rm. 1061, Rockville, MD 20852. All comments should be identified with the docket number FDA-2006-P-0207 listed in the notice of availability that publishes in the *Federal Register*.

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Food Safety and Applied Nutrition**

**February 2018**

# Table of Contents

**I.      Introduction**

**II.     Background**

**III.    Questions and Answers (Q & A)**

# Proper Labeling of Honey and Honey Products: Guidance for Industry[1]

This guidance represents the current thinking of the Food and Drug Administration (FDA or we) on this topic. It does not establish any rights for any person and is not binding on FDA or the public. You can use an alternative approach if it satisfies the requirements of the applicable statutes and regulations. To discuss an alternative approach, contact the FDA staff responsible for this guidance as listed on the title page.

## I.    Introduction

This guidance is intended to advise the regulated industry on the proper labeling of honey and honey products in accordance with sections 402 and 403 of the Federal Food, Drug, and Cosmetic Act (the FD&C Act) (21 U.S.C. 342 and 343) and its implementing regulations. Accurate and consistent labeling of honey and honey products helps to ensure that honey and honey products are not adulterated or misbranded and enhances consumers' ability to make informed choices among products.

FDA's guidance documents, including this guidance, do not establish legally enforceable responsibilities. Instead, guidances describe our current thinking on a topic and should be viewed only as recommendations, unless specific regulatory or statutory requirements are cited. The use of the word *should* in FDA guidances means that something is suggested or recommended, but not required. Throughout this guidance, "you" refers to firms that manufacture, process, pack, label, or distribute honey and honey products and to persons who are authorized to act on behalf of such firms.

## II.    Background

We are issuing this guidance document, which includes a summary of the current legal authorities that are most relevant to the labeling of honey, to address key questions and answers on the labeling of honey.

---

[1] This guidance has been prepared by the Office of Nutrition and Food Labeling, Food Labeling and Standards Staff, in the Center for Food Safety and Applied Nutrition at the U.S. Food and Drug Administration.

Misbranding

Under section 403(i) of the FD&C Act, a food is misbranded unless its label bears: (1) the common or usual name of the food, if there be any; and (2) the common or usual name of each ingredient, if the food is fabricated from two or more ingredients. The common or usual name for a food may be established by common usage or by regulation (21 CFR 102.5(d)). The common or usual name must accurately identify or describe, in as simple and direct terms as possible, the basic nature of the food or its characterizing properties or ingredients, and may not be "confusingly similar to the name of any other food that is not reasonably encompassed within the same name" (21 CFR 102.5(a)). Moreover, under 21 CFR 101.4(a)(1), ingredients required to be declared on the label or labeling of a food must be listed on its label by common or usual name in descending order of predominance by weight. Furthermore, under section 403(a)(1) of the FD&C Act, a food is misbranded if its labeling is false or misleading in any particular.

Adulteration

Under section 402(b) of the FD&C Act, a food is adulterated if: (1) a valuable constituent has been omitted in whole or in part from a food; (2) if any substance has been substituted wholly or in part; (3) if damage or inferiority has been concealed in any manner; or (4) if a substance has been added to a food so as to increase its bulk or weight, reduce its quality or strength, or make it appear to be better or of greater value than it is.

# III. Questions and Answers (Q & A)

To further provide guidance to industry on the proper labeling of honey and honey products in accordance with our laws and regulations, we have developed the following questions and answers.

1. **What is honey?**

   Reference materials in the public domain define honey as "a thick, sweet, syrupy substance that bees make as food from the nectar of plants or secretions of living parts of plants and store in honeycombs."[2] FDA has concluded that this definition accurately reflects the common usage of the term "honey."

---

[2] Webster's New World College Dictionary (Wiley Publishing, Inc., Cleveland, Ohio 2010). See also: "Honey is a thick, sweet liquid made by bees from flower nectar," Sharon Tyler Herbst and Ron Herbst, The Deluxe Food Lover's Companion (Hauppauge: New York, 2009); "Honey [is a] sweet, viscous liquid food, dark golden in color, produced in the honey sacs of various bees from the nectar of flowers," Encyclopedia Britannica Online, 2017, available at http://www.britannica.com/EBchecked/topic/270849/honey; and "Honey is the natural sweet substance produced by honey bees from the nectar of plants or from secretions of living parts of plants . . . ," CODEX Standard for Honey CODEX STAN 12-1981, available at: www.fao.org/input/download/standards/310/cxs_012e.pdf.

2. **How shall I name my honey?**

If a food contains only honey, the food must be named "honey," which is its common or usual name (see section 403(i) of the FD&C Act and 21 CFR 101.3(b)). The common or usual name may also include the source of the honey, such as "Clover Honey," on the label. (See Q&A 3, below). Because honey is a single-ingredient food, you do not need to include an ingredient statement on the label.

(Please note that this answer pertains solely to how you name your product; other labeling requirements (e.g., net weight, nutrition facts) apply to the product. For more information, see FDA's Food Labeling Guide at https://www.fda.gov/Food/GuidanceRegulation/GuidanceDocumentsRegulatoryInformation/LabelingNutrition/ucm2006828.htm.)

3. **Do I have to declare the floral source of honey?**

No. You do not have to declare the floral source of honey on the label. However, you may label the honey with the name of the plant or blossom if you or the honey producer has information to support the conclusion that the plant or blossom designated on the label is the chief floral source of the honey. Names such as "Orange Blossom Honey," "Clover Honey," or "Wild Flower Honey" are acceptable. (See FDA Compliance Policy Guide, section 515.300.) Any claims about the floral source of the honey must be truthful and not misleading (see section 403(a)(1) of the FD&C Act).

4. **If a food consists of honey and a sweetener, such as sugar or corn syrup, can I label the food as only "honey"?**

No. A product consisting of honey and a sweetener cannot be labeled with the common or usual name "honey" because "[t]he common or usual name of a food . . . shall accurately identify or describe . . . the basic nature of the food or its characterizing properties or ingredients" (21 CFR 102.5(a)). Identifying a blend or a mixture of honey and another sweetener only as "honey" does not properly identify the basic nature of the food. You must sufficiently describe the name of the food on the label to distinguish it from simply "honey" (21 CFR 102.5(a)).

5. **If a food consists of honey and a sweetener, such as sugar or corn syrup, how shall I label the food**?

For a food consisting of honey and a sweetener, the label must, among other information, include both of the following:

    a. A statement of identity, which must accurately identify or describe the basic nature of the food or its characterizing properties or ingredients (see section 403(i) of the FD&C Act, 21 CFR 101.3(b), and 21 CFR 102.5(a)): for example, "Blend of honey and corn syrup," if the food has more honey than corn syrup (conversely, "Blend of corn syrup and honey," if the food has more corn syrup than honey).

b. The common or usual name of each ingredient in the ingredient statement.  In this case, the ingredient statement would show "honey" and the common or usual name of the sweetener (e.g., "sugar," "corn syrup"), in descending order of predominance by weight (see section 403(i) of the FD&C Act and 21 CFR 101.4(a)(1)).

You should also refer to section 403 of the FD&C Act and 21 CFR part 101, as other labeling requirements (e.g., net weight, nutrition facts) apply to your product.  For more information, see FDA's Food Labeling Guide at https://www.fda.gov/Food/GuidanceRegulation/GuidanceDocumentsRegulatoryInformation/LabelingNutrition/ucm2006828.htm.

6. **If a food consists of honey and a flavor ingredient, such as natural raspberry flavor, what are the labeling requirements?**

a. If your labeling makes any direct or indirect representations with respect to the primary recognizable flavor (e.g., by word or vignette), other than through the statement of ingredients, the product is considered to have a characterizing flavor and must be labeled in accordance with 21 CFR 101.22(i).  In such a case, you should choose a name that accurately describes the food with its characterizing flavor, such as "raspberry-flavored honey" (see section 403(i) of the FD&C Act, 21 CFR 101.3(b), and 21 CFR 102.5(a)).

b. In the statement of ingredients, the label must follow the requirements set forth in 21 CFR 101.4.  The labeling must include the common or usual name of each ingredient in the ingredient statement.  For a food consisting of honey and natural raspberry flavor, the ingredient statement would show "honey" and "natural flavor," in descending order of predominance by weight (see section 403(i) of the FD&C Act, 21 CFR 101.4(a)(1), and 21 CFR 101.22(h)(1)).

You should refer to section 403 of the FD&C Act and 21 CFR part 101, as other labeling requirements (e.g., net weight, nutrition facts) apply to your product.  For more information, see FDA's Food Labeling Guide at https://www.fda.gov/Food/GuidanceRegulation/GuidanceDocumentsRegulatoryInformation/LabelingNutrition/ucm2006828.htm.

7. **How would consumers know whether the food is honey, a blend of honey and another sweetener (e.g., sugar or corn syrup), or a honey product that contains other ingredients?**

Consumers would know what the food is and what the food contains by reading the label.  A properly labeled package of only honey would show the name of the food as "honey," and it would not need an ingredient statement because it would only contain one ingredient.  By comparison, a properly labeled package of a blend of honey and a sweetener or other ingredients would have a statement of identity that accurately describes the food, such as "blend of honey and sugar," "blend of honey and corn syrup," or another appropriately descriptive term, and an ingredient statement that lists each ingredient, such as "honey" and "sugar," or "honey" and "corn syrup."

8. **How would consumers know if a food product that contains two or more ingredients contains honey?**

Consumers would know that a food product contains honey as one of the ingredients by reading the ingredient statement. A properly labeled food product would list the ingredient by its common or usual name, "honey," in the ingredient statement.

9. **What enforcement authorities does FDA have for food products that are represented solely as "honey," but contain other ingredients?**

FDA's enforcement authorities for food products that are represented as "honey," but contain other ingredients, are described below.

**Case A**: A product is labeled as "honey," but it contains natural raspberry flavoring. The ingredient statement lists only "honey."

According to section 403(i) of the FD&C Act, a food is misbranded unless the label bears: (1) the common or usual name of the food, if there be any; and (2) the common or usual name of each ingredient, if the food is made from two or more ingredients. In this case, the name of the food, "honey," does not accurately describe that the food is a raspberry-flavored honey, so "honey" is not an appropriate common or usual name under 21 CFR 102.5(a). Moreover, the ingredient statement lists only one ingredient, "honey," while the food contains "honey" and "natural flavoring." Therefore, the product fails to satisfy the requirements under 21 CFR 101.4(a)(1) and section 403(i)(2) of the FD&C Act, and FDA would consider such product to be misbranded.

**Case B**: A product is labeled as "honey," but it contains honey and another sweetener, such as sugar or corn syrup. The ingredient statement lists only "honey."

Under section 402(b) of the FD&C Act, a food is adulterated if any valuable constituent has been omitted in whole or in part, if any substance has been substituted wholly or in part, or if any substance has been added so as to reduce the quality of the food or make it appear to be better or of greater value than it is. In this case, the food is represented as honey when another sweetener (e.g., sugar or corn syrup) has been substituted in part for honey. Products that contain only honey and no other ingredients are considered more valuable than a food that contains both honey and sugar or both honey and corn syrup.[3] Therefore, we would consider such product adulterated under section 402(b)(1) of the FD&C Act because a valuable constituent (honey) has been omitted in part; under section 402(b)(2) of the FD&C Act, because a substance (sugar or corn syrup) has been substituted in part; and/or under section 402(b)(4) of the FD&C Act, because a substance (sugar or corn syrup) has been added to the honey so as to increase its bulk or weight or make it appear better or of greater value than it is.

---

[3] Honey is more valuable than other sweeteners. See "Sugar and Sweeteners Yearbook Tables," United States Department of Agriculture Economic Research Service. 2017. Available at: https://www.ers.usda.gov/data-products/sugar-and-sweeteners-yearbook-tables.aspx.

Further, we would consider such food misbranded under section 403 of the FD&C Act due to improper labeling of the food: *i.e.*, the name of the food and the ingredient statement (see Case A and Q&A 5).

10. **How does FDA monitor imported products labeled as honey to ensure that they contain only honey as the sole ingredient?**

We have a long-standing import alert for surveillance of honey for adulteration with cane or corn sugars (see Import Alert 36-01 at https://www.accessdata.fda.gov/cms_ia/importalert_108.html).  Such a product would be detained until we determined that the product was not adulterated or misbranded.